# 14-1445-cv

(14-1515; 14-1784; 14-1788)

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE SECOND CIRCUIT

Lidia Levy, on behalf of herself and all others similarly situated, William Cole, Derivatively on Behalf of Facebook, Inc.,

*Plaintiffs – Appellants – Cross-Appellees,*

*(For Continuation of Caption See Inside Cover)*

———————————————

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

**BRIEF AND SPECIAL APPENDIX FOR PLAINTIFF–APPELLANT–
CROSS-APPELLEE WILLIAM COLE**

FELIPE J. ARROYO
SHANE P. SANDERS
ROBBINS ARROYO LLP
600 B Street, Suite 1900
San Diego, CA 92101
(619) 525-3990

THOMAS G. AMON
LAW OFFICES OF THOMAS G.
AMON
250 West 57th Street, Suite 1316
New York, NY 10107
(212) 810-2430

*Attorneys for Plaintiff–Appellant–Cross-Appellee William Cole*

Thomas E. Nelson, individually and behalf of all others similarly situated, Rock Southward, Derivatively on Behalf of Himself &All Others Similarly Situated, Avatar Securities, LLC, Meredith Bailey, on behalf of themselves and all others similarly situated, Dmitri Bougakov, on behalf of themselves and all others similarly situated, Ryan Cefalu, on behalf of themselves and all others similarly situated, Lorrain Chin, First New York Securities L.L.C., Atish Gandhi, on behalf of themselves and all others similarly situated, Phillip Goldberg, on behalf of themselves and all others similarly situated, Eric Hamrick, on behalf of themselves and all others similarly situated, Steve Jarvis, Joe Johnson, on behalf of themselves and all others similarly situated, Nuhket Kayahan, on behalf of themselves and all others similarly situated, David Kenton, on behalf of themselves and all others similarly situated, Dennis Kuhn, on behalf of themselves and all others similarly situated, Benjamin Levine, on behalf of themselves and all others similarly situated, Katerhine Loiacono, on behalf of themselves and all others similarly situated, Crystal McMahon, on behalf of themselves and all others similarly situated, George Michalitsianos, on behalf of themselves and all others similarly situated, Randy Teresa Mielke, on behalf of themselves and all others similarly situated, Jacinto Rivera, on behalf of themselves and all others similarly situated, Faisal Sami, on behalf of themselves and all others similarly situated, Sanjeev Sharma, on behalf of themselves and all others similarly situated, Colin Suzman, on behalf of themselves and all others similarly situated, T3 Trading Group, LLC, Vijay Akkaraju, Alexis Alexander, as custodian for Chloe Sophie Alexander, Brian Roffe Profit Sharing Plan, Individually and on behalf of all others similarly situated, Jose Galvan, Mary Galvan, Robert Herpst, Individually, on behalf of all others similarly situated, Sanjay Israni, on behalf of themselves and all others similarly situated, KBC Asset Management NV, and the Employees' Retirement System of the Government of the Virgin Islands (Collectively, the Institutional Investors), Douglas M. Lightman, Individually and on behalf of all others similarly situated, Dennis Palkon, Individually and on behalf of all others similarly situated, Rick Pond, Jacob Salzmann, Individually and on behalf of all others similarly situated, Michael Spatz, Maren Twining, Individually and on behalf of all others similarly situated, Goldrich Cousins P.C. 401(k) Profit Sharing Plan &Trust, Irving S. Braun, Individually, Edward Childs, Derivately on Behalf of Himself and All Others Similarly Situated, Kathy Reichenbaum, Individually and on behalf of all others similarly situated, Jun Yan, on behalf of herself and all others similarly situated, Elbita Alfonso, Vicky Jones, Phyllis Peterson, Jerry Rayborn, on behalf of themselves and all others similarly situated, Edward Vernoff, Justin F. Lazard, on behalf of himself and all others similarly situated, Sylvia Gregorcyzk, on behalf of herself and all others similarly situated, Peter Brinckerhoff, Garrett Garrison, David Goldber, individually and on behalf of all others similarly situated, Kevin Hyms, individually and on behalf of all others similarly situated, Richard P. Eannarino, Individually and on behalf of all others similarly situated, Peter Mamula, Individually and on behalf of all others similarly situated, Khodayar Amin, on behalf of himself and all others similarly situated, Elliot Leitner, individually and on behalf of all others similarly situated, Barbara Steinman, on behalf of herself and all others similarly situated, Howard Savitt, on behalf of himself and all others similarly situated, Chad Roderick, Eugene Stricker, individually and on behalf of all others similarly situated, Steve Sexton, Individually and on behalf of all others similarly situated, Keith Wise, Individually and on behalf of all others similarly situated, Jonathan R. Simon, James Chang, individually and on behalf of all others similarly situated, Sameer Ansari, individually and on behalf of all others similarly situated, Darryl Lazar, individually and on behalf of all others similarly situated, Michael Lieber, individually and on behalf of other members of the general public similarly

situated, Thoma J. Ahrendtsen, Aaron M. Levine, Individually, and on behalf of all others similarly situated, Karen Cuker, individually and on behalf of all others similarly situated, Brian Gralnick, individually and on behalf of all others similarly situated, Jennifer Stokes, Individually and On Behalf of All Others Similarly Situated, Vernon R. DeMois, Jr., Individually and On Behalf of All Others Similarly Situated, Hal Hubuschman, Derivately on Behalf of Facebook, Inc., Edward Shierry, Individually and On Behalf of All Others Similary Situated, Janis Fleming, Robert Lowinger, Steve Griffis, Gaye Jones, Derivatively on Behalf of Facebook Inc., Holly McConnaughey, Derivatively on Behalf of Facebook Inc.,

*Plaintiffs,*

v.

Marc L. Andreessen, Erskine B. Bowles, James W. Breyer, David A. Ebersman, Goldman, Sachs & Co., Donald E. Graham, Reed Hastings, J.P. Morgan Securities LLC., Peter A. Thiel, Mark E. Zuckerberg, Morgan Stanley & Co. LLC, Sheryl K. Sandberg, Cipora Herman, David Spillane,

*Defendants – Appellees,*

Facebook, Inc., a Delaware corporation

*Defendant – Appellee – Cross-Appellant,*

Barclays Capital Inc., Merrill Lynch, Pierce, Fenner & Smith Incorporated, Morgan Stanley & Co, Inc., David Spillane, Allen & Company LLC, BMO Capital Markets Corp., Blaylock Robert Van LLC, C.L. King &Associates, Inc., Cabrera Capital Markets, LLC, Castleoak Securities, L.P., CitiGroup Global Market, Inc., Cowen and Company, LLC, Credit Suisse Securites (USA) LLC, Deutsche Bank Securites, Inc., E Trade Securities LLC, ITAU BBA USA Securities, Inc., Lazard Capital Markets LLC, Lebenthal & Co., LLC, Loop Capital Markets LLC, M.R. Beal & Company, Macquarie Capital (USA) Inc., Muriel Siebert & Co., Inc., Oppenheimer & CO. Inc., Pacific Crest Securities LLC, Piper Jaffray & Co., RBC Capital Markets LLC, Raymond James & Associates, Inc., Samuel A. Ramirez & Company, Inc., Stifel, Nicolaus & Company, Inc., The Williams Capital Group, L.P., Wells Fargo Securities, LLC, William Blair &Company L.L.C., Goldman Sachs & Co., Nasdaqomx Group, Inc., Lawrence Corneck, Individually and on behalf of all others similarly situated, Jill D. Simon, Citigroup Global Markets Inc., Merrill Lynch, Pierce Fenner & Smith Incorporated, Allen & Facebook (sic) LLC, William Blair & Facebook (sic) LLC, M.R. Beal & Facebook (sic), Cowen and Facebook (sic) LLC, Stifel Nicholas & Facebook (sic) Incorporated, Samuel A. Ramirez & Facebook (sic) Inc, Kevin Hicks, individually and on behalf of all others similarly situated, Linh Luu, individually and on behalf of all others similarly situated, Harvey Lapin, Individually and On Behalf of All Others Similarly Situated, King & Associates, Inc., David E. (sic) Ebersman, Nick E. Tran, The Nasdaq Stock Market L.L.C., a Foreign Limited Liability Company, Nasdaq Stock Market, Inc., NASDAQ OMX Group, Inc., Uma M. Swaminathan, Robert Greifeld, Anna M. Ewing, J.P. Morgan Securities LLC, Morgan Stanley & Co. LLC,

*Defendants.*

# CORPORATE DISCLOSURE STATEMENT

Pursuant to Rule 26.1 of the Federal Rules of Appellate Procedure, Plaintiff-appellant William Cole makes the following Corporate Disclosure Statement: Plaintiff-appellant William Cole has no parent corporation and no publicly held company owns 10% or more of its stock.

# TABLE OF CONTENTS

**Page**

CORPORATE DISCLOSURE STATEMENT ......................................................i

I.    JURISDICTIONAL STATEMENT ...................................................1

II.   STATEMENT OF THE ISSUES PRESENTED FOR REVIEW ..................1

III.  STATEMENT OF THE CASE ......................................................2

      A.   Relevant Procedural History ..................................................2

      B.   Statement of Facts ...........................................................4

      C.   Disposition Below .............................................................8

IV.  SUMMARY OF THE ARGUMENT ....................................................9

V.   STANDARD OF REVIEW .........................................................10

VI.  ARGUMENT...........................................................................13

      A.   The District Court Erred in Dismissing This Action, Which Pleads Only State Law Claims, Without First Determining Subject Matter Jurisdiction...............................................13

      B.   There Is No Subject Matter Jurisdiction Because the Complaint Relies Solely on State Law and Does Not Raise Any Federal Issues ...........................................................................23

          1.   No Federal Question Is Presented on the Face of Plaintiff's Complaint ................................................23

          2.   This Action Does Not Meet the Narrow Exception of Substantial Federal Question Jurisdiction................................25

      C.   The District Court Erred in Dismissing Plaintiff's Complaint Under Rule 23.1 .............................................................32

          1.   The District Court Applied an Incorrect Standard to Plaintiff's *Brophy* Claims .........................................34

2. The District Court Departed from the Applicable Standard of Review, Which Led It to Erroneously Determine that Plaintiff Lacked Standing ................................38

3. The District Court Misapplied Delaware Law Regarding Director Independence .............................................................46

D. The District Court Erred in Dismissing Plaintiff's Action on Ripeness Grounds.................................................................54

VII. CONCLUSION.............................................................................59

CERTIFICATE OF COMPLIANCE......................................................61

CERTIFICATE OF SERVICE ................................................................1

# TABLE OF AUTHORITIES

**CASES**                                                                    **Page(s)**

*7547 Partners v. Beck*,
    682 A.2d 160 (Del. 1996)....................................................................42, 44

*AmBase Corp. v. United States*,
    731 F.3d 109 (2d Cir. 2013) ........................................................................10

*Aronson v. Lewis*,
    473 A.2d 805 (Del. 1984), *overruled on other grounds sub*
    *nom. by Brehm*, 746 A.2d ..................................................................*passim*

*Ashcroft v. Iqbal*,
    556 U.S. 662 (2009)...............................................................................33, 38

*Banco De Santander Cent. Hispano, S.A. v. Consalvi Int'l Inc.*,
    425 F. Supp. 2d 421 (S.D.N.Y. 2006) .........................................................14

*Beam ex rel. Martha Stewart Living Omnimedia, Inc. v. Stewart*,
    845 A.2d 1040 (Del. 2004)...........................................................46, 47, 51, 54

*Bennett v. Sw. Airlines Co.*,
    484 F.3d 907 (7th Cir. 2007) .......................................................................31

*Betts v. Eli Lilly & Co.*,
    435 F. Supp. 2d 1180 (S.D. Ala. 2006) .......................................................17

*Bi v. Union Carbide Chems. & Plastics Co.*,
    984 F.2d 582 (2d Cir. 1993) ........................................................................20

*Bldg. & Const. Trades Council of Buffalo, N.Y.*
    *& Vicinity v. Downtown Dev., Inc.*,
    448 F.3d 138 (2d Cir. 2006) ........................................................................11

*Blockbuster, Inc. v. Galeno*,
    472 F.3d 53 (2d Cir. 2006) ..........................................................................11

*Brehm v. Eisner*,
    746 A.2d (Del. 2000) ...................................................................................32

*Broder v. Cablevision Sys. Corp.*,
    418 F.3d 187 (2d Cir. 2005) ........................................................................26

*Brophy v. Cities Serv. Co.*,
    70 A.2d 5 (Del. Ch. 1949) ....................................................................*passim*

*Cal. Pub. Emps.' Ret. Sys. v. Coulter*,
    No. Civ. A. 19191, 2002 WL 31888343
    (Del. Ch. Dec. 18, 2002)..........................................................................54

*Calabro v. Aniqa Halal Live Poultry Corp.*,
    650 F.3d 163 (2d Cir. 2011) ......................................................................24

*Can v. United States*,
    14 F.3d 160 (2d Cir. 1994) ..................................................................19, 21

*Caterpillar Inc. v. Williams*,
    482 U.S. 386 (1987)..................................................................................23

*Central States Se. & Sw. Areas Health & Welfare Fund
    v. Merck-Medco Managed Care, L.L.C.*,
    433 F.3d 181 (2d Cir. 2005) ......................................................................14

*Christianson v. Colt Indus. Operating Corp.*,
    486 U.S. 800 (1988)..................................................................................26

*Cinerama, Inc. v. Technicolor, Inc.*,
    663 A.2d 1156 (Del. 1995)........................................................................47

*Connecticut v. Duncan*,
    612 F.3d 107 (2d Cir. 2010) ......................................................................13

*Deep v. XAC, LLC*,
    No. 07-8-C, 2007 WL 1308356 (W.D. Ky. May 2, 2007) ....................21, 22

*Dennis v. Hart*,
    724 F.3d 1249 (9th Cir. 2013) ..................................................................18

*DiFolco v. MSNBC Cable L.L.C.*,
    622 F.3d 104 (2d Cir. 2010) ..........................................................32, 38, 40

*Ekas v. Burris*,
No. 07-61156-CIV, 2007 WL 4055630 (S.D. Fla. Nov. 14,
2007) ...............................................................................................30

*Empire Healthchoice Assurance, Inc. v. McVeigh*,
547 U.S. 677 (2006)........................................................................25

*Fagin v. Gilmartin*,
432 F.3d 276 (3d Cir. 2005) ...........................................................38

*Finance & Trading, Ltd. v. Rhodia S.A.*,
No. 04 Civ. 6083 (MBM), 2004 WL 2754862
(S.D.N.Y. Nov. 30, 2004)..........................................................28, 30

*Fixture Specialists, Inc. v. Global Const. Co., L.L.C.*,
No. 3:07-CV-570, 2007 WL 3468997 (E.D. Va. Nov. 14, 2007)..........21, 22

*Flynn ex rel. Moody's Corp. v. McDaniel*,
689 F. Supp. 2d 686 (S.D.N.Y. 2010) ............................................24

*Fracasse v. People's United Bank*,
747 F. 3d 141 (2d Cir. 2014) ..........................................................31

*Freedman v. Adams*,
58 A.3d 414, 416 ............................................................................44

*Freund v. Republic of France*,
592 F. Supp. 2d 540 (S.D.N.Y. 2008) ............................................19

*Gamoran v. Neuberger Berman LLC*,
No. 13-1589, 2013 WL 5779643 (2d Cir. Oct. 28, 2013)................11

*Glazer Capital Mgmt., LP v. Elec. Clearing House, Inc.*,
672 F. Supp. 2d 371 (S.D.N.Y. 2009) ............................................23

*Grable & Sons Metal Prods. Inc. v. Darue Eng'g & Mfg.*,
545 U.S. 308 (2005).............................................................25, 26, 31

*Griggs v. Jornayvaz*,
No. 09-cv-00629-PAB-KMT, 2010 WL 4932674
(D. Colo. Nov. 29, 2010) ................................................................45

*Grimes v. Donald*,
    673 A.2d 1207 (Del. 1996), *overruled on other grounds sub*
    *nom. by Brehm*, 746 A.2d ...............................................................33

*Grobow v. Perot*,
    539 A.2d 180 (Del. 1988), *overruled on the other grounds sub*
    *nom. by Brehm*, 746 A.2d ...............................................................34

*Gunn v. Minton*,
    133 Sup. Ct. 1059 (2013).............................................................25, 26

*Guth v. Loft*,
    Inc., 5 A.2d 503 (Del.1939)..............................................................27

*Guttman v. Huang*,
    823 A.2d 492 (Del. Ch. 2003) .....................................................35, 37

*Haith ex rel. Accretive Health, Inc. v. Bronfman*,
    928 F. Supp. 2d 964 (N.D. Ill. 2013)........................................18, 19, 29

*Halebian v. Berv*,
    590 F.3d 195 (2d Cir. 2009) ..................................................12, 32, 33, 38

*Halebian v. Berv*.,
    644 F.3d 122 (2d Cir. 2011) *aff'd*, 548 Fed. Appx. 641
    (2d Cir. 2013).............................................................................38, 45

*Harris v. Carter*,
    582 A.2d 222 (Del. Ch. 1990) .....................................................34, 35

*Henik ex rel. LaBranche & Co. v. LaBranche*,
    433 F. Supp. 2d 372 (S.D.N.Y. 2006) .................................................19

*In re Am. Int'l Grp., Inc.*,
    965 A.2d 763 (Del. Ch. 2009), *aff'd sub nom.*
    *Teachers' Ret. Sys. of La. v. PricewaterhouseCoopers LLP*,
    11 A.3d 228 (Del. 2011) ..............................................................36, 37

*In re Cendant Corp. Derivative Action Litig.*,
    189 F.R.D. 117 (D.N.J. 1999) ......................................................34, 58

*In re eBay, Inc. S'holders Litig.*,
    No. C.A. 19988-NC, 2004 WL 253521 (Del. Ch. Feb. 11, 2004) ..........48, 50

*In re Fossil, Inc. Derivative Litig.*,
713 F. Supp. 2d 644 (N.D. Tex. 2010) ..........................................37

*In re Goldman Sachs Grp., Inc. S'holder Litig.*,
No. 5215-VCG, 2011 WL 4826104 (Del Ch. Oct. 12, 2011) ...............51, 52

*In re HealthSouth Corp. S'holders Litig.*,
845 A.2d 1096 (Del. Ch. 2003) ....................................................27

*In re Hydrogen, L.L.C.*,
431 B.R. 337 (Bankr. S.D.N.Y. 2010) ..........................................24

*In re Limited, Inc. S'holders Litig.*,
No. Civ. A. 17148-NC, 2002 WL 537692 (Del. Ch. Mar. 27,
2002) ..................................................................................52

*In re Methyl Tertiary Butyl Ether Prods. Liab. Litig.*,
488 F.3d 112 (2d Cir. 2007) ........................................................11

*In re Methyl Tertiary Butyl Ether Prods. Liab. Litig.*,
725 F.3d 65 (2d Cir. 2013) ........................................54, 55, 56

*In re Oracle Corp. Derivative Litig.*,
867 A.2d 904 (Del. Ch. 2004), *aff'd*, 872 A.2d 960 (Del. 2005) ...........35, 37

*In re Prestige Brands Holding, Inc.*,
No. 05 CV. 06924, 2006 WL 2147719 (S.D.N.Y. July 10,
2006) ..............................................................................34, 35

*In re Primedia, Inc. S'holders Litig.*,
67 A.3d 455, 472 (Del. Ch. 2013) ..............................................37

*In re RasterOps Corp. Sec. Litig.*,
No. C-92-20115-RMW-EAI, 1993 WL 476651 (N.D. Cal. Sept.
10, 1993) ............................................................................59

*Jacobs v. Yang*,
No. 206-N, 2004 WL 1728521 (Del. Ch. Aug. 2, 2004) *aff'd*,
867 A.2d 902 (Del. 2005)
.........................................................................52, 53, 54

*Jones v. Deutsch*,
715 F. Supp. 1237 (S.D.N.Y. 1989) ..........................................19

*Joseph v. Leavitt,*
    465 F.3d 87 (2d Civ. 2006)........................................................................11

*Kahn v. Kohlberg Kravis Roberts & Co., L.P.,*
    23 A.3d 831 (Del. 2011).................................................................*passim*

*Kamen v. Kemper Fin. Servs., Inc.,*
    500 U.S. 90 (1991)...............................................................12, 19, 32

*Leung v. Schuler,*
    No. 17089, 2000 WL 264328 (Del. Ch. Feb. 29, 2000)..............................44

*Lujan v. Defenders of Wildlife,*
    504 U.S. 555 (1992)........................................................................57

*Maclary v. Pleasant Hills, Inc.,*
    109 A.2d 830 (Del. Ch. 1954) ........................................................44

*Marcus v. AT&T Corp.,*
    138 F.3d 46 (2d Cir. 1998) ........................................................23, 24

*Mehlenbacher v. Akzo Nobel Salt, Inc.,*
    216 F.3d 291 (2d Cir. 2000) ........................................................13

*Merrell Dow Pharm. Inc. v. Thompson,*
    478 U.S. 804 (1986)........................................................................26

*Mirto v. Am. Int'l Grp., Inc.*
    No. C-04-4998-VRWQ, 2005 WL 827093
    (N.D. Cal. Apr. 8, 2005) ........................................................20

*Motor Vehicle Mfrs. Assoc. v. N.Y. State Dept. of Envtl. Conservation,*
    79 F. 3d 1298 (2d Cir. 1996) ........................................................56

*N.Y. Civil Liberties Union v. Grandeau,*
    528 F.3d 122 (2d Cir. 2008) ........................................................56

*Nemazee v. Premier, Inc.,*
    232 F. Supp. 2d 172 (S.D.N.Y. 2002) ........................................................16

*Nutritional Health Alliance v. Shalala,*
    144 F. 3d 220 (2d Cir. 1998) ........................................................56

*Orman v. Cullman*,
   794 A.2d 5 (Del. Ch. 2002) ..............................................................47, 50, 51

*Pettus v. Morgenthau*,
   554 F.3d 293 (2d Cir. 2009) ......................................................................20

*Pfeiffer v. Toll*, 989 A. 2d 683 (Del. Ch. 2010)
   *abrogated by Kahn*, 23 A.3d at 831 ....................................................36, 37

*Potter v. Hughes*,
   546 F.3d 1051 (9th Cir. 2008) ....................................................................18

*Rales v. Blasband*,
   634 A.2d 927 (Del. 1993)............................................................33, 42, 46, 47

*Randolph v. Forsee*,
   No. 10-2445-JAR-JPO, 2010 WL 5148293
   (D. Kan. Dec. 13, 2010)..............................................................................29

*Rollenhagen v. Int'l Speedway Corp.*,
   No. 1:07-cv-818, 2007 WL 4324018
   (W.D. Mich. Dec. 7, 2007) ....................................................................21, 22

*Romano v. Kazacos*,
   609 F.3d 512 (2d Cir. 2010) ......................................................................24

*Ruhrgas AG v. Marathon Oil Co.*,
   526 U.S. 574 (1999)....................................................................14, 15, 16

*Salve Regina Coll. v. Russell*,
   499 U.S. 225 (1991)....................................................................................12

*Scalisi v. Fund Asset Mgmt., L.P.*,
   380 F.3d 133 (2d Cir. 2004) ......................................................................12

*Seminaris v. Landa*,
   662 A.2d 1350 (Del. Ch. 1995) ..................................................................33

*Silverberg ex rel. Dendreon Corp. v. Gold*,
   No. 7646-VCP, 2013 WL 6859282 (Del. Ch. Dec. 31, 2013) ....................35

*Simmonds v. I.N.S.*,
   326 F.3d 351 (2d Cir. 2003) ............................................................54, 55, 57

*Sinochem Int'l Co. v. Malaysia Int'l Shipping Corp.*,
  549 U.S. 422 (2007)...........................................................14, 15, 18

*Sonkin v. Barker*,
  670 F. Supp. 249 (S.D. Ind. 1987).................................................58

*Stan Winston Creatures, Inc. v. Toys "R" Us, Inc.*,
  314 F. Supp. 2d 177 (S.D.N.Y. 2003) ...........................................16

*Steel Co. v. Citizens for a Better Env't*,
  523 U.S. 83 (1998)........................................................................13

*Steele v. Anderson*,
  No. 03-CV-1251, 2004 WL 45527 (N.D.N.Y. Jan. 8, 2004) .......................17

*Stern v. Baldwin*,
  No. 09-4167 (WJM), 2010 WL 1142034 (D.N.J. Mar. 24, 2010) ...............30

*Studebaker-Worthington Leasing Corp. v.
  Michael Rachlin & Co., LLC*,
  357 F. Supp. 2d 529 (E.D.N.Y. 2004)...........................................13

*Sung ex rel. Lazard Ltd. v. Wasserstein*,
  415 F. Supp. 2d 393 (S.D.N.Y. 2006) .............................24, 28, 30

*Tenet v. Doe*,
  544 U.S. 1 (2005)...........................................................................21

*United States v. Fell*,
  360 F. 3d 135 (2d Cir. 2004) .........................................................56

*Wash. Consulting Grp., Inc. v. Raytheon Tech. Servs. Co., LLC*,
  760 F. Supp. 2d 94 (D.D.C. 2011)..................................................31

*Zenith Radio Corp. v. Hazeltine Research, Inc.*,
  395 U.S. 100 (1969).......................................................................57

*Zimmerman ex rel. Priceline.com Inc. v. Braddock*,
  No. Civ. A. 18473-NC, 2002 WL 31926608 (Del. Ch. Dec. 20,
  2002)
  ...........................................................................47, 51, 52

## STATUTES, RULES & OTHER AUTHORITIES

28 U.S.C.

    §1291 ................................................................................1

    §1331 ...........................................................................2, 23

    §1447(c) ..........................................................................13

Fed. R. App. P.

    Rule 32(a)(5) ...................................................................61

    Rule 32(a)(6) ...................................................................61

    Rule 32(a)(7)(B)(iii) ........................................................61

Fed. R. Civ. P.

    Rule 12(b)(1) ...................................................................11

    Rule 12(b)(6) ...................................................................10

    Rule 23.1 .................................................................*passim*

    Rule 23.1(3) .....................................................................32

    Rule 23.1(b)(1) ........................................................*passim*

    Rule 23.1(b)(3) ........................................................*passim*

    Rule 56 ......................................................................39, 45

## I.  JURISDICTIONAL STATEMENT

Plaintiff-Appellant William Cole ("Plaintiff") appeals from a judgment of dismissal entered on April 22, 2014, pursuant to the February 13, 2013 decision by the Honorable Ronald W. Sweet in the U.S. District Court for the Southern District of New York (the "District Court") granting in part Nominal Defendant Facebook's motion to dismiss Plaintiff's shareholder derivative Action[1] on the grounds of standing and ripeness without first addressing whether or not the District Court had federal question jurisdiction, and denying as moot Plaintiff's motion to remand the Action to California State Court.  SA-70.

Judgment was entered on April 22, 2014.  SA-71.  The entry of judgment gave this Court appellate jurisdiction under 28 U.S.C. §1291.  Plaintiff timely filed his Notice of Appeal on May 9, 2014.  Vol. VI, JA-1379-88.

## II.  STATEMENT OF THE ISSUES PRESENTED FOR REVIEW

1.     Whether the District Court erred in granting Nominal Defendant Facebook's motion to dismiss Plaintiff's shareholder derivative complaint without first establishing that it had subject matter jurisdiction and denying as moot Plaintiff's motion to remand.

---

[1] "Action" refers to *Cole v. Zuckerberg*, originally filed in the Superior Court of the State of California, County of San Mateo ("California State Court") on May 31, 2012.  Vol. I, JA-121-154; Vol. I, JA-1-2.

- 1 -

2.    Whether the District Court had federal question jurisdiction over Plaintiff's exclusively state law shareholder derivative claims, which do not allege violations of federal securities laws and do not necessarily raise or dispute any substantial federal issues.

3.    Whether the District Court erred in dismissing the Action on the grounds that Plaintiff failed to adequately plead contemporaneous stock ownership and demand futility and that Plaintiff's claims were not ripe.

## III.   STATEMENT OF THE CASE

### A.   Relevant Procedural History

Plaintiff commenced this shareholder derivative action in the California State Court on May 31, 2012. Vol. I, JA-121-54; Vol. I, JA-1-2. On June 28, 2012, Defendants[2] removed the Action to the U.S. District Court for the Northern District of California ("California Federal Court")[3], asserting that the California Federal Court had original jurisdiction pursuant to 28 U.S.C. §1331. Vol. I, JA-201-12.

---

[2] "Defendants" are collectively Nominal Defendant Facebook, Inc. ("Facebook" or the "Company") and individual defendants Mark Zuckerberg ("Zuckerberg"), Sheryl K. Sandberg, David A. Ebersman, David M. Spillane, Marc L. Andreessen, Erskine B. Bowles, James W. Breyer ("Breyer"), Donald E. Graham, Reed Hastings, and Peter A. Thiel ("Thiel") ("Individual Defendants").

[3] *Cole v. Zuckerberg*, No. 3:12-cv-03367 (N.D. Cal.). Vol. I, JA-3-10.

On June 29, 2012, one day after the Action was removed, Defendants filed an amended motion to transfer the Action to the District Court, which added Plaintiff's Action to a list of cases Defendants sought to transfer. Vol. I, JA-14 (Dkt. No. 18).[4] Plaintiff filed an opposition to the Transfer Motions on July 16, 2012. Vol. I, JA-18 (Dkt. No. 67). Defendants also filed on June 29, 2012, a motion to stay the Action pending a ruling by the Judicial Panel on Multidistrict Litigation ("JPML") on the Transfer Motions ("Stay Motion"). Vol. I, JA-4-5 (Dkt. No. 7).

Plaintiff timely filed a motion to remand the Action to California State Court on August 1, 2012 ("First Remand Motion"). Vol. I, JA-4-5 (Dkt. No. 7). Notwithstanding the pending Transfer Motions, Stay Motion, and First Remand Motion, Nominal Defendant Facebook filed a motion to dismiss the Action in the California Federal Court on August 3, 2012. Vol. I, JA-7 (Dkt. No. 29). On August 10, 2012, Plaintiff filed an Administrative Motion to extend the briefing schedule and hearing on the motion to dismiss until after the Stay Motion and First

---

[4] Morgan Stanley & Co. LLC ("Morgan Stanley"), J.P. Morgan Securities LLC, and Goldman, Sachs & Co., lead underwriters ("Underwriters") in the Facebook initial public offering ("IPO") and defendants in the action *In re Facebook, Inc., IPO Securities & Derivative Litigation*, No. 12-2389 filed in the District Court on October 5, 2012, joined in the motion to transfer filed on June 14, 2012. Vol. I, JA-11 (Dkt. No. 1). "Transfer Motions" refers collectively to the June 14, 2012 motion to transfer and the amended motion to transfer. Vol. I, JA-11 (Dkt. No. 1), 14 (Dkt. No. 18).

Remand Motion were decided. Vol. I, JA-8 (Dkt. No. 35). On August 15, 2012, the California Federal Court issued an order granting the Administrative Motion and vacating the hearing on the motion to dismiss. Vol. I, JA-9 (Dkt. No. 40). The parties briefed the Stay Motion and the First Remand Motion simultaneously. Vol. I, JA-9-10 (Dkt. Nos. 41, 44, 45, 48). On September 11, 2012, the California Federal Court issued an Order granting the Stay Motion and declined to hear the First Remand Motion pending the JPML's decision on the Transfer Motions. Vol. II, JA-431-33. On October 4, 2012, the JPML granted the Transfer Motions and the Action was transferred to the Southern District of New York. Vol. I, JA-10 (Dkt. No. 50); Vol. II, JA-436, 438.

On November 14, 2012, Plaintiff filed in the District Court a motion to remand the Action to California State Court ("Second Remand Motion") (Vol. I, JA-41, Dkt. No. 21), and Nominal Defendant Facebook filed a motion to dismiss ("Motion to Dismiss") on venue, standing, demand futility, and ripeness grounds. (Vol. I, JA-23-24, Dkt. No. 29). All motions were marked fully submitted on December 12, 2012.

### B. Statement of Facts

Facebook's revenues are primarily derived from advertising on the Company's ubiquitous social networking website. Vol. I, JA-125 (¶13), 135-37 (¶46). Historically, as the popularity of Facebook's website has increased, so have

its advertising revenues.  *Id.*  The Company has generally increased its internal revenue projections concomitantly with the increase in "active users" of its website.  Vol. I, JA-122 (¶2), 133-35 (¶¶43-45).

On February 1, 2012, Facebook filed a Registration Statement with the U. S. Securities and Exchange Commission ("SEC") relating to the Company's planned IPO.[5]  Over the next few months, Facebook filed amended versions of the Registration Statement, and the Company, Facebook employees, and the Underwriters participated in road shows that included a series of meetings with potential investors.  Vol. I, JA-133-37 (¶¶39-46, 47).

Facebook's IPO was highly anticipated.  Vol. I, JA-122-23 (¶4).  At the IPO price of $38 per share, the Company's market value was set higher than McDonalds, Boeing, Caterpillar, or Amazon.com.  *Id.*  Defendants were able to attain such a high valuation for the Company by touting Facebook's extraordinary growth in the Registration Statement.  Vol. I, JA-122-23 (¶4), 133-37 (¶¶39-47). In the months leading up to the IPO, Facebook continued to experience substantial increases in the number of "active users" of its website, including mobile users. Vol. I, JA-122-23 (¶4), 133-34 (¶¶43-44).  The Registration Statement touted this

---

[5] "Registration Statement" refers to the Form S-1 filed by Facebook on February 1, 2012, and all amendments thereto, including the final version filed on May 16, 2012.

increased mobile usage as a "key contributor" to Facebook's revenue growth.  Vol. I, JA-134 (¶44).

The Individual Defendants knew, however, that Facebook was experiencing a serious reduction in revenues due to an increase in users who accessed its website through mobile devices rather than personal computers ("PCs").  Vol. I, JA-122-23 (¶4), 134-38 (¶¶44-48).  This pattern in Facebook's user base negatively affected the Company's business prospects because advertising was not as effective on mobile devices as it was on PCs, which jeopardized the Company's primary source of revenues.  *Id.*  During a roadshow preceding the IPO, Facebook executives selectively disclosed to the Underwriters that these negative trends were causing Facebook's revenues to fall short of the Company's earlier estimates for the second quarter of 2012.  Vol. I, JA-123 (¶5), 137-38 (¶¶48-49).  The Underwriters, in turn, reduced their own earnings forecasts for the Company, but conveyed this highly material information to only a select few of their large investor clients just before the IPO took place.  Vol. I, JA-123 (¶5), 137-41 (¶¶48-49, 51, 53).

On May 16, 2012, Facebook filed the final version of the Registration Statement.  Vol. I, JA-122 (¶3), 133 (¶¶40, 42).  The Individual Defendants were well aware that material information relating to Facebook's internal revenue projections had not been disclosed in the Registration Statement, and that allowing the IPO to occur pursuant to the Registration Statement could cause substantial

harm to Facebook and unjustly enrich defendants Zuckerberg, Breyer, and Thiel, who planned to sell significant amounts of stock in connection with the IPO. Vol. I, JA-123 (¶6-7), 133 (¶¶40, 42), 141-43 (¶¶55-61).

On May 18, 2012, the Prospectus, which forms part of the Registration Statement, became effective, and 421 million shares of Facebook common stock were sold to the public at $38 per share. Vol. I, JA-122 (¶3), 133 (¶40).[6] The IPO price valued the Company at more than $104 billion. *Id.*

The Individual Defendants knew of the material, non-public facts concerning Facebook's declining advertising revenues, and the Underwriters' reduced earnings forecasts had not been disclosed in the Registration Statement, which they all signed. Vol. I, JA-123 (¶7), 133 (¶40), 141-43 (¶¶55-62). Facebook's IPO stock price was artificially inflated because the Registration Statement did not disclose this material, nonpublic information. Vol. I, JA-123 (¶7), 133-37 (¶¶42-46), 141-43 (¶¶55-62). Defendants Zuckerberg, Breyer, and Thiel capitalized on the artificially inflated IPO stock price, selling over $3.9 billion worth of their Facebook stock in connection with the IPO. *Id.*

In the days following the IPO, media reports of the Underwriters' reduced earnings forecasts began to emerge. Vol. I, JA-138-39 (¶51), 139-41 (¶53). As

---

[6] The Registration Statement and Prospectus are collectively referred to as the "Offering Documents."

news concerning the Individual Defendants' selective disclosure of material information regarding negative trends in the Company's advertising business was revealed to the market, the Company lost billions of dollars in market capitalization. Vol. I, JA-139-41 (¶¶52-54). This news prompted government investigations into Facebook and the circumstances surrounding the IPO, as well as the filing of numerous lawsuits against the Company, including state and federal securities fraud class actions. Vol. I, JA-143 (¶¶63-64).

### C.    Disposition Below

On February 13, 2013, the District Court issued an order granting the Motion to Dismiss and denying as moot Plaintiff's Second Remand Motion.[7] SA-70.

The District Court declined to determine whether it had subject matter jurisdiction over the Action before resolving the Motion to Dismiss. SA-1-70. The District Court elected instead to first consider the Motion to Dismiss, citing its purported "discretion to address non-merits threshold grounds for dismissal before jurisdiction" and "considerations of judicial economy and consistency." SA-21.

_____

[7] The District Court's ruling also applied to *Hubuschman v. Zuckerberg*, No. 12-cv-7553 (removed 6/28/12); and *Levy v. Zuckerberg, et al.*, no. 12-cv-7815 (removed 7/12/12), which were both removed from the Northern District of California; and *Childs v. Zuckerberg, et al.*, No. 12-cv4156 (filed 5/24/12), which was filed originally in the District Court. SA-3 n.1.

The District Court granted the Motion to Dismiss based on the following findings: (i) Plaintiff failed to adequately plead demand upon Facebook's Board of Directors (the "Board") was excused as futile (SA-49-65); (ii) Plaintiff lacked standing because he did not satisfy the "contemporaneous ownership" requirement (SA-39-48); and (iii) Plaintiff's claims were not ripe (SA-65-70).[8]

## IV.    SUMMARY OF THE ARGUMENT

The District Court erred by considering and ruling on the Motion to Dismiss on standing and ripeness grounds before addressing whether it had subject matter jurisdiction.  The District Court improperly side-stepped the requirement that it determine subject matter jurisdiction before deciding Nominal Defendant's dispositive motion and failed to conduct the straightforward analysis of whether a federal question is presented on the face of Plaintiff's Complaint.  Such analysis reveals that the District Court did not have subject matter jurisdiction because Plaintiff's Complaint pleads solely state-law claims for breach of fiduciary duty, corporate waste, and unjust enrichment. It is not among the rare cases that involve a federal issue which is necessarily raised, actually disputed, substantial, and capable of resolution in federal court without disrupting the federal-state balance.

---

[8] The District Court denied the Motion to Dismiss based upon purportedly improper venue grounds on May 21, 2014.  SA-29-39.  Defendants have filed a cross-appeal on that issue.  Vol. I, JA-60 (Dkt. No. 238).

The District Court should have addressed and granted Plaintiff's Second Remand Motion and remanded the Action to California State Court.

The District Court also erred by improperly departing from the applicable standard of review in deciding the Motion to Dismiss under Rule 23.1 of the Federal Rules of Civil Procedure ("Rule 23.1"). The District Court failed to believe the Complaint's well-pled allegations and to draw all reasonable inferences in Plaintiff's favor. Instead, the District Court inappropriately considered documents outside of Plaintiff's Complaint to resolve disputed factual issues. Based upon its improper findings of fact, the District Court erroneously determined that the Complaint "require[d] dismissal under Rule 23.1" because Plaintiff's allegations did not satisfy Rule 23.1(b)(3)'s demand requirement or Rule 23.1(b)(1)'s contemporaneous ownership requirement. The District Court also erroneously determined that Plaintiff's claims were not ripe. Finally, the District Court misapplied the applicable standards to dismissal of Plaintiff's Complaint on ripeness grounds.

## V.    STANDARD OF REVIEW

This Court reviews *de novo* a district court's dismissal pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure, and has "an independent obligation to consider the presence or absence of subject matter jurisdiction *sua sponte*." *AmBase Corp. v. United States*, 731 F.3d 109, 119 (2d Cir. 2013)

(quoting *Joseph v. Leavitt*, 465 F.3d 87, 89 (2d Civ. 2006).[9]  Where a plaintiff seeks to remand a removed case to state court, defendants have the burden of establishing that federal subject matter jurisdiction applies to the removed action (*see Blockbuster, Inc. v. Galeno*, 472 F.3d 53, 56-58 (2d Cir. 2006)), and "out of respect for the limited jurisdiction of the federal courts and the rights of states, [the Court] must resolv[e] any doubts against removability."  *In re Methyl Tertiary Butyl Ether Prods. Liab. Litig.*, 488 F.3d 112, 124 (2d Cir. 2007) (quotation omitted).

Appellate review of the District Court's dismissal of the Complaint[10] pursuant to Rule 23.1 should be *de novo*.  The Second Circuit has recently noted that "[t]he correct standard of review remains an open question," but suggested that *de novo* review of dismissals based on Rule 23.1 is "more appropriate" than the abuse of discretion standard.  *Gamoran v. Neuberger Berman LLC*, No. 13-1589,

---

[9] Conclusions of law governing dismissals pursuant to Rule 12(b)(1) of the Federal Rules of Civil Procedure are also reviewed *de novo*.  *See Bldg. & Const. Trades Council of Buffalo, N.Y. & Vicinity v. Downtown Dev., Inc.*, 448 F.3d 138, 144 (2d Cir. 2006).  Here, as throughout, all emphasis is deemed added and all citations and footnotes are deemed omitted unless otherwise noted.

[10] "Complaint" refers to the Shareholder Derivative Complaint for Breach of Fiduciary Duty, Waste of Corporate Assets, and Unjust Enrichment, *Cole v. Zuckerberg, et al.*, Case No. CIV 514327 (Cal. Super. Ct. – San Mateo Cnty. filed May 31, 2012).  Vol. I, JA-121-54.

2013 WL 5779643, at *1 (2d Cir. Oct. 28, 2013) (citing *Scalisi v. Fund Asset Mgmt., L.P.*, 380 F.3d 133, 137 n.6 (2d Cir. 2004)).

In *Scalisi*, the Second Circuit explained that where "a challenge is made to the legal precepts applied by the district court in making a discretionary determination, plenary review of the district court's choice and interpretation of those legal precepts is appropriate." 380 F.3d at 137. Where, as here, a District Court dismisses a derivative Complaint pursuant to Rule 23.1, the ruling is generally dependent upon the application of the legal precepts of the corporation's state of incorporation. This is because Rule 23.1 is a federal pleading standard applicable to shareholder derivative actions filed in federal court. *See Halebian v. Berv*, 590 F.3d 195, 211 (2d Cir. 2009). The law of the company's state of incorporation governs the substantive issue of whether a plaintiff has satisfied the demand requirement described in Rule 23.1(b)(3). *Id.*; *see also Kamen v. Kemper Fin. Servs., Inc.*, 500 U.S. 90, 108-09 (1991). Because Plaintiff challenges the District Court's application of the "legal precepts" of Delaware demand futility law, review should be *de novo*. *See Scalisi*, 380 F.3d at 137; *see also Salve Regina Coll. v. Russell*, 499 U.S. 225, 239 (1991) ("The obligation of responsible appellate review and the principles of a cooperative judicial federalism … ***require*** that courts of appeals review the state-law determinations of district courts *de novo*.").

Finally, a district court's ripeness determination is reviewable *de novo*. *Connecticut v. Duncan*, 612 F.3d 107, 112 (2d Cir. 2010).

## VI.    ARGUMENT

### A.    The District Court Erred in Dismissing This Action, Which Pleads Only State Law Claims, Without First Determining Subject Matter Jurisdiction

After a case has been removed from state court, "[i]f at any time before final judgment it appears that the district court lacks subject matter jurisdiction, the case shall be remanded."  28 U.S.C. §1447(c).  It is a fundamental premise of law that "'[w]ithout jurisdiction the court cannot proceed at all in any cause.'"  *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 94 (1998) ("Jurisdiction is power to declare the law, and when it ceases to exist, the only function remaining to the court is that of announcing the fact and dismissing the cause.") (quotation omitted).  Therefore, it is axiomatic that a federal court "must first decide the threshold question whether it has subject matter jurisdiction over [the] case" before it can consider any other issues.  *Studebaker-Worthington Leasing Corp. v. Michael Rachlin & Co., LLC*, 357 F. Supp. 2d 529, 533 (E.D.N.Y. 2004) (addressing plaintiff's remand motion before defendant's motion to transfer venue; granting remand motion and denying motion to transfer as moot); *see also Mehlenbacher v. Akzo Nobel Salt, Inc.*, 216 F.3d 291, 299 (2d Cir. 2000) ("Because subject-matter jurisdiction is not established, we cannot and do not reach the merits of the

- 13 -

question of New York tort law presented to us on this appeal."); *Central States Se. & Sw. Areas Health & Welfare Fund v. Merck-Medco Managed Care, L.L.C.*, 433 F.3d 181, 203 (2d Cir. 2005) (jurisdictional questions should be addressed in the first instance by the district court). The District Court acknowledged that this rule is "equally true in the context of removal." SA-14 (quoting *Banco De Santander Cent. Hispano, S.A. v. Consalvi Int'l Inc.*, 425 F. Supp. 2d 421, 424 (S.D.N.Y. 2006)).

The District Court nonetheless relied on a limited exception to the rule that a federal court must first establish its subject matter jurisdiction: when the case involves "a straightforward personal jurisdiction issue presenting no complex question of state-law, and the alleged defect in subject-matter jurisdiction raises a difficult and novel question." *Ruhrgas AG v. Marathon Oil Co.*, 526 U.S. 574, 585-88 (1999); SA-14-15. The District Court also relied on *Sinochem*, in which the Supreme Court held that a federal court may dispose of a case on *forum non conveniens* grounds without addressing subject matter or personal jurisdiction "when considerations of convenience, fairness, and judicial economy so warrant." *Sinochem Int'l Co. v. Malaysia Int'l Shipping Corp.*, 549 U.S. 422, 432 (2007). Notwithstanding these narrow exceptions, the Supreme Court has made clear that if "a court can readily determine" that it lacks subject matter jurisdiction, "the proper course would be to dismiss on that ground." *Id.* at 436. And, "[i]n the mine

run of cases, jurisdiction 'will involve no arduous inquiry' and both judicial economy and the consideration ordinarily accorded the plaintiff's choice of forum 'should impel the federal court to dispose of [those] issue[s] first.'" *Id.* (quoting *Ruhrgas*, 526 U.S. at 587-88).

The issues decided prior to subject matter jurisdiction in *Ruhrgas* and *Sinochem* were very different from the issues in this Action. *Ruhrgas* and *Sinochem* involved the uncomplicated application of federal procedural rules that did not implicate any disputed state law issues. The courts addressed those issues first because doing so was less burdensome than addressing the more complicated jurisdictional issues. *Ruhrgas* involved a "straightforward personal jurisdiction issue" that "present[ed] no complex state-law question." *Ruhrgas*, 526 U.S. at 588. *Sinochem* involved "a textbook case for immediate *forum non conveniens* dismissal" because similar proceedings were already pending in China and because the jurisdictional issues presented a matter of first impression and would require discovery. *Sinochem*, 549 U.S. at 424. Indeed, *Sinochem*'s holding is limited to the issue of *forum non conveniens*, which the court noted is "essentially, a supervening venue provision, permitting displacement of the ordinary rules of venue." *Id*. at 429-30 (quotation omitted). Accordingly, *Sinochem* deemed *forum non conveniens* a threshold non-merits issue (in that context) because it did not require the court to assume "substantive 'law-declaring power.'" *Id*. at 433

(quoting *Ruhrgas*, 526 U.S. at 584-85).

Here, in contrast, the question whether the District Court has subject matter jurisdiction is not a "difficult" or "novel" one; it involves only a simple analysis of whether Plaintiff's state-law derivative claims involve a federal question. Conversely, the Motion to Dismiss raised highly disputed and "complex" substantive state law issues, including: (i) whether pre-suit demand upon Facebook's Board was excused under Delaware law because there is reason to doubt the Board could impartiality consider a demand; (ii) the date by which Plaintiff must have acquired Facebook stock in order to have derivative standing under the specific factual allegations and claims asserted in his Complaint; and (iii) whether the remedies sought by Plaintiff establish that his claims are ripe (and whether such a showing is even necessary for Plaintiff to maintain his derivative claims). Vol. I, JA-41 (Dkt. No. 23). These are complex, fact-intensive, and substantive legal questions involving the application of state laws, and Defendants "may not use removal proceedings as an occasion to adjudicate the substantive issues of a case." *Stan Winston Creatures, Inc. v. Toys "R" Us, Inc.*, 314 F. Supp. 2d 177, 182 (S.D.N.Y. 2003) (quotation omitted) (declining to find that a defendant was fraudulently joined to prevent removal where doing so would depend upon a finding that plaintiffs had not adequately stated a claim against the defendant; granting remand motion); *see also Nemazee v. Premier, Inc.*, 232 F.

Supp. 2d 172, 181 (S.D.N.Y. 2002) ("For purposes of the instant remand motion, the Court need not find that demand would have been futile."); *Steele v. Anderson*, No. 03-CV-1251, 2004 WL 45527, at *2 (N.D.N.Y. Jan. 8, 2004) ("Whether a demand was a necessary condition precedent to this litigation and, if so, whether that condition has been met, go more to the substantive merits of the underlying litigation than the Court's jurisdiction over this claim."). Addressing these complex, complaint- and plaintiff-specific state law questions was not less burdensome than deciding the straightforward jurisdictional issue. Given the ease with which the jurisdictional question could have been adjudicated, the District Court should not have engaged in the substantive legal analysis required to address the issues of demand futility, contemporaneous stock ownership, and ripeness before determining whether the court had subject matter jurisdiction over the Action. *See, e.g.*, *Betts v. Eli Lilly & Co.*, 435 F. Supp. 2d 1180, 1184 (S.D. Ala. 2006) ("[N]o party has a right to remain in federal court when subject matter jurisdiction is plainly lacking, and a defendant … is thus not prejudiced in any meaningful sense by an early rather than late remand to state court.").

Recent decisions in other jurisdictions have similarly held that courts should not make dispositive rulings on substantive issues like demand futility before determining subject matter jurisdiction. For example, after the Ninth Circuit held that a court could determine whether a plaintiff met the pleading requirements of

Rule 23.1 before reaching subject matter jurisdiction in *Potter v. Hughes*, 546 F.3d 1051 (9th Cir. 2008), the Ninth Circuit reversed a district court's dismissal of a state court derivative claim that had been removed from state court. *Dennis v. Hart*, 724 F.3d 1249 (9th Cir. 2013). The court rejected defendants' arguments that federal jurisdiction permitted dismissal before remand because resolution of the remand motion involved substantial issues of federal law, finding that "the district court lacked jurisdiction to do anything other than remand these cases to state court." *Id*. at 1255.

Similarly, in *Haith ex rel. Accretive Health, Inc. v. Bronfman*, 928 F. Supp. 2d 964 (N.D. Ill. 2013), the district court rejected defendants' contention that it should decide whether to dismiss a shareholder derivative action asserting only state-law claims on Rule 23.1 demand futility grounds before determining subject matter jurisdiction and remand. *Id*. at 972. The court cited with approval Ninth Circuit Judge Sandra S. Ikuta's dissenting opinion in *Potter* that "compliance with Rule 23.1 is not an appropriate threshold ground under *Sinochem*." *Id*. at 974; *see Potter*, 546 F.3d at 1059-64 (stating that the majority had "misconceiv[ed] the nature of Rule 23.1" and "decid[ed] a threshold issue that is neither clear nor logically antecedent to the jurisdictional question"). The court in *Haith* acknowledged that deciding non-jurisdictional issues "without first considering subject matter or personal jurisdiction … should be the exception rather than the

rule." 928 F. Supp. 2d at 974. The court further noted that, like in this Action, "the jurisdictional issue ... is not a heavy lift," while the demand futility issue "does not have obvious resolution." *Id.* Accordingly, the court held that it would not be appropriate to decide the non-jurisdictional issues before determining that it had subject matter jurisdiction. *Id.*

Here, the District Court opined that "'justiciability is a "threshold question,'" which a court may consider before subject matter jurisdiction", which includes "'ripeness [and] standing'" issues. *See* SA-16-17 (quoting *Can v. United States*, 14 F.3d 160, 162 n.1 (2d Cir. 1994); *Freund v. Republic of France*, 592 F. Supp. 2d 540, 551 (S.D.N.Y. 2008)[11]; and *Jones v. Deutsch*, 715 F. Supp. 1237, 1242 (S.D.N.Y. 1989)). SA-16-17. However, the District Court decided substantive state law issues, not simply purported "non-merits threshold grounds for dismissal." SA-39-70.

Demand futility "is a matter of substance," not merely a threshold procedural issue. *Kamen* 500 U.S. at 96-97; *see also Henik ex rel. LaBranche & Co. v. LaBranche*, 433 F. Supp. 2d 372, 379 (S.D.N.Y. 2006) (holding that the issue of whether the board of directors were disinterested and independent constitutes "a

---

[11] Notably, in *Freund*, the court considered the subject matter jurisdiction first before any of defendants' other arguments for dismissal, including on statute of limitations grounds. *Id.*

decision on the merits").  Further, "standing" to bring a shareholder derivative action pursuant to Rule 23.1 is not the same as Article III standing.  *See, e.g.*, *Mirto v. Am. Int'l Grp., Inc.*¸ No. C-04-4998-VRWQ, 2005 WL 827093, at *2 (N.D. Cal. Apr. 8, 2005) (distinguishing the "standing-like pleading requirements" of Rule 23.1 from the issue of Article III standing).

Determining whether Plaintiff has "standing" in this Action under Rule 23.1 – *i.e.*, whether Plaintiff has adequately alleged that a demand on Facebook's Board was futile – required the District Court to make declarations of substantive state law.  The cases cited by the District Court for the proposition that it may rule on "standing" before determining subject matter jurisdiction did not involve substantive state law issues, and thus, are inapposite.  *See* SA-17-18 (citing *Bi v. Union Carbide Chems. & Plastics Co.*, 984 F.2d 582 (2d Cir. 1993) (affirming lower court's dismissal on ground that plaintiffs lacked standing to maintain case in the U.S. in light of delegation to the Indian Government of the exclusive right to pursue claims, and declining to remand to state court because the state court would have to apply "federal common law" and "would be obliged to reach the same conclusion regarding appellants' lack of standing that [the federal appellate court] … reached"); *Pettus v. Morgenthau*, 554 F.3d 293, 298 (2d Cir. 2009) (noting only general proposition that "standing, like the §1915(g) [*in forma pauperis* statutory three strikes rule], is intended to be a threshold issue at least tentatively decided at

- 20 -

the outset of the litigation"; no issue regarding subject matter jurisdiction); *Tenet v. Doe*, 544 U.S. 1, 6 n.4 (2005) (citing only cases where courts decided abstention, Article III standing, and prudential standing issues before determining subject matter jurisdiction, and citing no cases involving demand futility or derivative standing). Even in *Can*, the Second Circuit stated that certain threshold non-merit issues could only be examined before determining subject matter jurisdiction "where … justiciability may be a less knotty question than jurisdiction." SA-17 (quoting *Can*, 14 F.3d at 162 n.1). Because the question of subject matter jurisdiction was not a "difficult" or "novel" one here, while the Motion to Dismiss raised highly disputed and "complex" merits-based issues, the District Court should not have addressed these issues before ruling on Plaintiff's Second Remand Motion.

The District Court reasoned that "even if the removed cases were remanded, the forum selection, standing and ripeness issues in the related case *Childs* would still require adjudication …. [which] would be duplicative and beget potentially conflicting rulings…. Avoiding this inefficiency and inconsistency further warrants the consideration of the justiciability issues before the removal issues." SA-20-21 (citing *Deep v. XAC, LLC*, No. 07-8-C, 2007 WL 1308356, at *2 (W.D. Ky. May 2, 2007); *Fixture Specialists, Inc. v. Global Const. Co., L.L.C.*, No. 3:07-CV-570, 2007 WL 3468997, at *1-2 (E.D. Va. Nov. 14, 2007); *Rollenhagen v. Int'l*

- 21 -

*Speedway Corp.*, No. 1:07-cv-818, 2007 WL 4324018, at *2-3 (W.D. Mich. Dec. 7, 2007)).  The cases the District Court relied upon involved only one of these issues – venue.  *See id.*[12]

Venue was also the only "justiciability issue" that uniformly applied to all of the derivative actions the District Court addressed here.  After the District Court properly determined that "the claims and parties involved in this action are not subject to the forum selection clause," (SA-39) there were no "considerations of judicial economy [or] consistency" that warranted addressing the plaintiff-specific standing issues (or ripeness issue).  SA-21.  As explained further below, by considering the standing issues, the District Court improperly conflated Plaintiff's allegations with those in other plaintiffs' complaints and erroneously dismissed Plaintiff's Complaint on standing and ripeness grounds.

Addressing the complex issues of substantive state law raised in the Motion to Dismiss was inappropriate before the District Court had first addressed the threshold jurisdictional issue and determined that it had subject matter jurisdiction.

---

[12] The courts in these cases held that venue issues were properly considered before personal jurisdiction was addressed.  *See Deep*, 2007 WL 1308356, at *2; *Fixture Specialists*, 2007 WL 3468997, at *1-2; *Rollenhagen*, 2007 WL 4324018, at *2-3.

### B. There Is No Subject Matter Jurisdiction Because the Complaint Relies Solely on State Law and Does Not Raise Any Federal Issues

#### 1. No Federal Question Is Presented on the Face of Plaintiff's Complaint

Where, as here, complete diversity of citizenship between the parties does not exist, a federal court has subject matter jurisdiction over an action only if it arises under federal law. *See* 28 U.S.C. §1331; *Glazer Capital Mgmt., LP v. Elec. Clearing House, Inc.*, 672 F. Supp. 2d 371, 376 (S.D.N.Y. 2009) ("Absent diversity of citizenship, federal courts have original jurisdiction only over cases that present federal questions….").

In determining whether an action "arises under" federal law, courts are governed by the "well-pleaded complaint" rule, which requires that a federal question be apparent on the face of the complaint. *Caterpillar Inc. v. Williams*, 482 U.S. 386, 392 (1987).[13] This requirement follows from the general rule that "a plaintiff is the 'master of the complaint' and is 'free to avoid federal jurisdiction by pleading only state claims even where a federal claim is also available.'" *Glazer*, 672 F. Supp. 2d at 376 (quoting *Marcus*, 138 F.3d at 52; *see also Caterpillar*, 482

---

[13] *See also Marcus v. AT&T Corp.*, 138 F.3d 46, 52 (2d Cir. 1998) ("The presence or absence of federal question jurisdiction is governed by the well-pleaded complaint rule," which provides "that federal question jurisdiction exists only when the plaintiff's own cause of action is based on federal law… and only when plaintiff's well-pleaded complaint raises issues of federal law.").

U.S. at 392. A federal question is pled "only if [a] plaintiff's statement of his own cause of action shows that it is based on federal law." *Romano v. Kazacos*, 609 F.3d 512, 518 (2d Cir. 2010) (quotation omitted). A defendant may not "evade this rule by raising a federal question in its responsive pleadings and then attempting to remove on that basis." *Calabro v. Aniqa Halal Live Poultry Corp.*, 650 F.3d 163, 166 (2d Cir. 2011). Further, a plaintiff "is free to avoid federal jurisdiction by 'pleading only state claims even where a federal claim is also available.'" *Romano*, 609 F.3d at 518 (quoting *Marcus*, 138 F.3d at 52).

Here, Plaintiff pleads only "classic" state law causes of action for breach of fiduciary duty, waste of corporate assets, and unjust enrichment. *See Sung ex rel. Lazard Ltd. v. Wasserstein*, 415 F. Supp. 2d 393, 405 (S.D.N.Y. 2006) (breach of fiduciary duty, waste of corporate assets, and unjust enrichment claims "are classic state causes of action"). The Individual Defendants' fiduciary duties are all created by state law, and Plaintiff's claims that they breached these duties are exclusively governed by state law. *See Flynn ex rel. Moody's Corp. v. McDaniel*, 689 F. Supp. 2d 686, 691 (S.D.N.Y. 2010) ("breach of fiduciary duty claim[] rest[s] on duties created by state, not federal, law"); *In re Hydrogen, L.L.C.*, 431 B.R. 337, 346 (Bankr. S.D.N.Y. 2010) ("A claim for breach of fiduciary duty brought against a corporate officer or director raises issues relating to the internal affairs of a

corporation and therefore should be governed by the law of the state of incorporation of the relevant corporation.").

Because no federal question is apparent from the face of Plaintiff's Complaint, the Action does not "arise under" federal law and no federal question jurisdiction exists.

### 2. This Action Does Not Meet the Narrow Exception of Substantial Federal Question Jurisdiction

Where (as here) Plaintiff's claims are not created by federal law, federal courts only have subject matter jurisdiction if the claims necessarily "turn on a substantial questions of federal law," and such cases are exceptionally rare. *Grable & Sons Metal Prods. Inc. v. Darue Eng'g & Mfg.*, 545 U.S. 308, 312 (2005) (explaining that "federal-question jurisdiction is invoked by and large by plaintiffs pleading a cause of action ***created*** by federal law" and "less frequently" by state law claims that "***turn on*** substantial questions of federal law"); *see also Empire Healthchoice Assurance, Inc. v. McVeigh*, 547 U.S. 677, 699 (2006) ("*McVeigh*") (the substantial federal question exception applies only in a "special and small" group of cases); *Gunn v. Minton*, 133 Sup. Ct. 1059, 1064-65 (2013) (federal question jurisdiction will be found only in a "slim category" of cases). Federal question jurisdiction over state law claims exists only where "a federal issue is: (1) necessarily raised, (2) actually disputed, (3) substantial, and (4) capable of

resolution in federal court without disrupting the federal-state balance approved by Congress." *Gunn*, 133 Sup. Ct. at 1065 (citing *Grable*, 545 U.S. at 313-14).

A federal issue is only necessarily raised when "federal law is a ***necessary*** element of one of the well-pleaded … claims." *Christianson v. Colt Indus. Operating Corp.*, 486 U.S. 800, 808 (1988) (ellipsis in original). Similarly, for an issue to be sufficiently "substantial" to give rise to federal question jurisdiction, there must be "'a serious federal interest in claiming the advantages thought to be inherent in a federal forum.'" *Broder v. Cablevision Sys. Corp.*, 418 F.3d 187, 195 (2d Cir. 2005) (quoting *Grable* 545 U.S. at 313). It is a "long-settled understanding that the mere presence of a federal issue in a state cause of action does not automatically confer federal-question jurisdiction." *Merrell Dow Pharm. Inc. v. Thompson*, 478 U.S. 804, 813 (1986).

Federal question jurisdiction does not exist here under *Gunn* and *Grable*. There is no "serious federal interest" in a federal court exercising jurisdiction over Plaintiff's claims because they implicate purely state law matters. Plaintiff's Complaint alleges that the Individual Defendants breached their fiduciary duties by (among other things) selling, or permitting other insiders to sell, their stock on the basis of material, nonpublic information that they knew artificially inflated Facebook's IPO stock price. Vol. I, JA-150-51 (¶¶93-96).

In *Kahn v. Kohlberg Kravis Roberts & Co., L.P.*, the Delaware Supreme Court made clear that breach of fiduciary duty claims relating to insider trading are state-law claims reflecting Delaware's "public policy of preventing unjust enrichment based on the misuse of confidential corporate information." 23 A.3d 831, 840 (Del. 2011) (citing *Brophy v. Cities Serv. Co.*, 70 A.2d 5, 6 (Del. Ch. 1949); *Guth v. Loft*, Inc., 5 A.2d 503 (Del.1939)); *see also In re HealthSouth Corp. S'holders Litig.*, 845 A.2d 1096, 1105-06 (Del. Ch. 2003) (state law unjust enrichment claim stands where corporate fiduciary profits from a sale of its stock at a price that was inflated because material information was not disclosed). *Kahn* rebuts any assertion that Plaintiff's breach of fiduciary duty claims depend upon any interpretation of federal law – especially the claims against the Selling Defendants, for which Plaintiff seeks disgorgement remedies (the "*Brophy*" claims). *Kahn*, 23 A.3d at 838, 840. The Court specifically held that *Brophy* is not "outdated precedent in light of federal securities laws," explaining that "*Brophy* focused on the public policy of preventing unjust enrichment based on the misuse of confidential corporate information." *Id.* at 840. Plaintiff's claims do not require any interpretation of the federal securities laws and are not dependent upon any finding that such laws were violated – the Individual Defendants' misconduct will

be measured against the state law fiduciary duties they owed Facebook, not the federal securities laws.[14]

Federal courts in this Circuit have repeatedly held that state law claims, including claims arising from alleged misrepresentations contained in documents filed with the SEC (such as prospectuses), do not present a substantial federal question and have remanded cases in such circumstances. *See, e.g.*, *Sung v. Wasserstein*, 415 F. Supp. 2d at 405 (although "[t]he filing of a misleading prospectus may constitute evidence of breach … the breach of fiduciary duty claim itself does not stand or fall based on the alleged misrepresentation in the prospectus[;] … [a]ny failure to comply with federal securities laws simply provide[s] the factual basis for [plaintiff's] state law claims"); *Finance & Trading, Ltd. v. Rhodia S.A. ("Rhodia")*, No. 04 Civ. 6083 (MBM), 2004 WL 2754862, at *1, *5-7 (S.D.N.Y. Nov. 30, 2004), (finding no federal question jurisdiction over plaintiffs' state law claims alleging misleading statements contained in prospectus and granting the plaintiffs' motion to remand, reasoning that to find otherwise "would result in plaintiffs' claims essentially being preempted by federal law," "[a]ssessing whether defendants committed fraud and negligent misrepresentation

---

[14] The same analysis applies to Plaintiff's unjust enrichment claim. As the Delaware Supreme Court explained in *Kahn¸ "Brophy* focused on the public policy of preventing unjust enrichment based on the misuse of confidential corporate information." 23 A.3d at 840.

that happened to occur during a sale of securities does not implicate any federal law," and the state law claims do "not depend on any rights of causes of action created by federal law").

Courts in other jurisdictions have held similarly. An Illinois federal district court recently rejected defendants' argument that the federal issues in the case were substantial to the federal system because resolving state law claims would require state courts to analyze and interpret federal regulatory statutes. *Haith*, 928 F. Supp. 2d at 970. The court noted that "the state court's rulings will not bind the federal courts in future cases and will have no preclusive effect beyond the parties to the state litigation, and the possibility that the parties might be subjected to a state court's incorrect interpretation of federal law does not suffice to create arising under jurisdiction." *Id*. (quotation omitted). The court continued: "The state court's resolution of those federal issues, in other words, will not have effects beyond the parties to these suits and certainly could not pose a threat to the workings of the federal system as a whole." *Id*. The court made clear that in passing laws to regulate the issuance and trading of securities, Congress did not "intend[] to bring derivative claims based on violations of those laws into the federal courts and thus upset the traditional relegation of derivative actions to state courts." *Id*. at 972. *See also Randolph v. Forsee*, No. 10-2445-JAR-JPO, 2010 WL 5148293, at *6 (D. Kan. Dec. 13, 2010) ("[T]he violation of federal securities law is by no means the

only, or even the primary legal or factual issue in this case, nor do the state law claims turn on the meaning of federal securities laws or regulations. Instead, they turn on the duties owed by defendants to [the Company], an issue defined by [state] law."); *Ekas v. Burris*, No. 07-61156-CIV, 2007 WL 4055630, at *4 (S.D. Fla. Nov. 14, 2007) (finding there was no basis for federal court jurisdiction where complaint alleged state law claims for breach of fiduciary duty and unjust enrichment brought as shareholder derivative claims "since resolution of the state claims will not require an inquiry into federal securities law"); *Stern v. Baldwin*, No. 09-4167 (WJM), 2010 WL 1142034, at *3 (D.N.J. Mar. 24, 2010) (no federal question for a "garden variety shareholder derivative suit, which will depend heavily on its facts").

The reasoning of these cases applies with equal force here. The mere fact that misleading statements relevant to this Action "were made in a federally required document does not change the inquiry whether, standing alone, they were false or misleading as a necessary element of a cause of action under state law." *Sung*, 415 F. Supp. 2d. at 406. Plaintiff's claims—particularly Plaintiff's *Brophy* claims—"may be assessed entirely by applying [state] common law standards to the facts in this case." *Rhodia*, 2004 WL 2754862, at *7. While the federal securities laws and securities class actions may bear on the additional damages Facebook has suffered as a result of the Individual Defendants' breaches of

- 30 -

fiduciary duty, a determination of whether Defendants violated federal laws is not necessary or dispositive.

Finally, finding subject matter jurisdiction here would wholly undermine the federal jurisdictional regime, as "every state law claim that adverts in any part to a proposition of federal law would satisfy the 'substantiality' requirement," and "would render inquiry as to whether the claims 'arise under' federal law meaningless." *Fracasse v. People's United Bank*, 747 F. 3d 141, 145 (2d Cir. 2014); *see also Bennett v. Sw. Airlines Co.*, 484 F.3d 907, 911 (7th Cir. 2007) (if tort claims arising out of a plane crash are found to involve a substantial federal issue it would "move a whole category of suits to federal court" and "upset a conscious legislative choice"). It is out of this concern that "courts have refused to find federal question jurisdiction under *Grable* in cases involving 'a fact-specific application of rules that come from both federal and state law,' and have instead confined *Grable* to those rare state-law claims posing 'a context-free inquiry into the meaning of federal law.'" *Wash. Consulting Grp., Inc. v. Raytheon Tech. Servs. Co., LLC*, 760 F. Supp. 2d 94, 101-02 (D.D.C. 2011) (quoting *Bennett*, 484 F.3d at 910).

Plaintiff's Action is a classic shareholder derivative case based on breaches of state law fiduciary duties, including principally breaches of the duty of loyalty stemming from the misappropriation of corporate information for personal gain.

The Action is not among the "slim category" of cases that "turn on substantial questions of federal law" such that federal subject matter jurisdiction exists.

### C. The District Court Erred in Dismissing Plaintiff's Complaint Under Rule 23.1

Rule 23.1 is a federal pleading standard that "does not 'abridge, enlarge or modify any substantive right.'" *Halebian*, 590 F.3d at 204 (quoting *Kamen*, 500 U.S. at 95). Rule 23.1(3)'s "demand requirement, by contrast, 'in delimiting the respective powers of the individual shareholder and of the directors to control corporate litigation[,] clearly is a matter of "substance," not "procedure."'" *Id.* (quoting *Kamen*, 500 U.S. at 96-97). Accordingly, whether Plaintiff has adequately alleged that demand was excused as futile is governed by the law of Delaware, Facebook's state of incorporation. Vol. I, JA-125 (¶13); *see Kamen*, 500 U.S. at 99.

On a motion to dismiss, the court's duty "is merely to assess the legal feasibility of the complaint, not to assay the weight of the evidence which might be offered in support thereof." *DiFolco v. MSNBC Cable L.L.C.*, 622 F.3d 104, 113 (2d Cir. 2010) (quotation omitted). The court must accept all well-pleaded factual allegations of the complaint as true and draw all reasonable inferences in the plaintiff's favor. *Id.* at 110-11; *see also Brehm v. Eisner*, 746 A.2d at 244, 255 (Del. 2000) (when deciding a motion to dismiss for failure to adequately plead demand futility, "[p]laintiffs are entitled to all reasonable factual inferences that

logically flow from the particularized facts alleged").  This is "a context-specific task."  *Halebian*, 590 F.3d at 203 (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009).

Under Delaware law, demand is futile where a plaintiff alleges facts raising a "reasonable doubt" that either: (i) a majority of the board was disinterested or independent in the transaction; or (ii) the transaction was a product of the board's valid exercise of business judgment.  *Aronson v. Lewis*, 473 A.2d 805, 814 (Del. 1984), *overruled on other grounds sub nom. by Brehm*, 746 A.2d at 244; *see also Seminaris v. Landa*, 662 A.2d 1350, 1354 (Del. Ch. 1995) ("If a derivative plaintiff can demonstrate a reasonable doubt as to the first or second prong of the *Aronson* test, then he has demonstrated that demand would have been futile.").[15]  The reasonable doubt standard "is sufficiently flexible and workable to provide [a] stockholder with 'the keys to the courthouse' in an appropriate case where [as here] the claim is not based on mere suspicions or stated solely in conclusory terms."  *Grimes v. Donald*, 673 A.2d 1207, 1217 (Del. 1996), *overruled on other grounds*

---

[15] Where there is no "transaction" being challenged, the only relevant inquiry for demand futility purposes is whether plaintiff has alleged facts that "create a reasonable doubt that … the board of directors could have properly exercised its independent and disinterested business judgment in responding to a demand." *Rales v. Blasband*, 634 A.2d 927, 934 (Del. 1993).  A reasonable doubt as to disinterestedness is created when the particularized allegations in the complaint present a "'substantial likelihood'" of liability on the part of a director.  *Id.* at 936 (citing *Aronson*, 473 A.2d at 815).

- 33 -

*sub nom. by Brehm*, 746 A.2d at 244. "Reasonable doubt must be decided by the trial court on a case-by-case basis employing an objective analysis." *Grobow v. Perot*, 539 A.2d 180, 186 (Del. 1988), *overruled on the other grounds sub nom. by Brehm*, 746 A.2d at 244.

Plaintiff is required "only [to] allege specific facts … not plead evidence" of demand futility. *Aronson*, 473 A.2d at 816. The court "must not rely on any one factor but must examine the totality of the circumstances and consider all of the relevant factors." *In re Cendant Corp. Derivative Action Litig.*, 189 F.R.D. 117, 128 (D.N.J. 1999) (applying Delaware law); *see also Harris v. Carter*, 582 A.2d 222, 229 (Del. Ch. 1990).

### 1. The District Court Applied an Incorrect Standard to Plaintiff's *Brophy* Claims

The District Court inappropriately interpreted the scienter element of a *Brophy* claim to require Plaintiff to allege a "fraud" to establish the Selling Defendants' "improper motivation and liability under [*Brophy*]." SA-55-56. Specifically, the District Court found that Plaintiff's allegations regarding the Selling Defendants'[16] sales of stock in the IPO were insufficient because they did not raise an "'inference of fraud' as '[e]arly [i]nvestors and [p]romoters routinely sell stock in IPOs.'" SA-55-56 (quoting *In re Prestige Brands Holding, Inc.*, No.

---

[16] "Selling Defendants" refers to defendants Zuckerberg, Thiel, and Breyer.

05 CV. 06924 (CLB), 2006 WL 2147719, at *7 (S.D.N.Y. July 10, 2006)). The District Court appears to have improperly applied the *Prestige* court's decision in a federal securities case to impose a heightened "fraud" pleading standard to Plaintiff's *Brophy* claims because they arose from stock sales in an IPO. *See id.* *Prestige* involved federal securities fraud claims, however, which are subject to different standards of pleading and proof than Plaintiff's state-law claims for breach of fiduciary duty under *Brophy*. The District Court's reliance on *Prestige* in applying a general rule to *Brophy* claims arising in the context of an IPO, and thus requiring Plaintiff to "explicitly allege fraud," was inappropriate. *See id.*

Although "Delaware case law makes the same policy judgment as federal law does, which is that insider trading claims depend importantly on proof that the selling defendants acted with scienter," *Guttman v. Huang*, 823 A.2d 492, 505 (Del. Ch. 2003), Delaware courts do not require a plaintiff to plead fraud to state a *Brophy* claim. To adequately plead *Brophy*'s scienter element, a plaintiff need only allege facts raising a reasonable inference that defendants "were aware" of material nonpublic information and used that information "improperly by making trades because [they were] motivated, in whole or in part, by the substance of that information." *Silverberg ex rel. Dendreon Corp. v. Gold*, No. 7646-VCP, 2013 WL 6859282, at *14 (Del. Ch. Dec. 31, 2013); *In re Oracle Corp. Derivative Litig.*, 867 A.2d 904, 934 (Del. Ch. 2004), *aff'd*, 872 A.2d 960 (Del. 2005)

(allegations that defendant sold stock while in "knowing possession" of material non-public information are sufficient at the pleading stage to establish improper motivation and liability under *Brophy*); *see also In re Am. Int'l Grp., Inc.*, 965 A.2d 763, 801 (Del. Ch. 2009) ("*AIG*"), *aff'd sub nom. Teachers' Ret. Sys. of La. v. PricewaterhouseCoopers LLP*, 11 A.3d 228 (Del. 2011).

*Kahn* confirms that fraud is not necessary to establish a breach of the duty of loyalty under *Brophy*. 23 A.3d at 837. In *Kahn*, the Delaware Supreme Court explained that "*Brophy* focused on the public policy of preventing unjust enrichment based on the misuse of confidential corporate information." *Id.* at 840. The court found that "no reasonable public policy ground [exists] to restrict the scope of disgorgement remedy in *Brophy* cases – irrespective of arguably parallel remedies in federal securities law," reasoning that "Delaware law dictates that the scope of recovery for a breach of the duty of loyalty is not to be determined narrowly." *Id*. (quotation omitted). The court held that "[t]o read *Brophy* as applying only where the corporation has suffered actual harm improperly limits its holding" and rejected *Pfeiffer*'s conclusion "that the purpose of *Brophy* is to 'remedy harm to the corporation.'" *Id*. (quoting *Pfeiffer v. Toll*, 989 A. 2d 683, 699 (Del. Ch. 2010) *abrogated by Kahn*, 23 A.3d at 831).

The District Court also did not consider *Kahn*'s holding that "actual harm to the corporation is not required for a plaintiff to state a claim under *Brophy*." 23

A.3d at 840.  Instead, the District Court appears to have relied solely on pre-*Kahn* cases in finding that Plaintiff had "not adequately alleged the [scienter] element of *Brophy*" because Plaintiff did not allege "a fraud."  SA-55-56 (improper motivation under *Brophy* "inferred where the timing of the sales suggests that defendants intentionally perpetrated, or took advantage of, a fraud") (citing *Pfeiffer*, 989 A.2d at 688-89, 694; *AIG*, 965 A.2d at 800; *In re Fossil, Inc. Derivative Litig.*, 713 F. Supp. 2d 644, 652 (N.D. Tex. 2010)).  These cases were decided when Delaware courts were "question[ing] the continuing vitality of *Brophy*" following "the establishment of current remedies for insider trading under the federal securities laws," and were "limiting *Brophy* to situations in which the corporation itself suffered harm" in order to avoid "potential interference with the federal regime." *In re Primedia, Inc. S'holders Litig.*, 67 A.3d 455, 472 (Del. Ch. 2013) (citing *Oracle*, 867 A.2d at 927-29; *AIG*, 965 A.2d at 800; *Guttman*, 823 A.2d at 505; *Pfeiffer*, 989 A.2d at 698-701).  The District Court "improperly limit[ed]" *Brophy* by relying on these cases to require Plaintiff to plead "a fraud," i.e., a harm to the corporation.  *See Kahn*, 23 A.3d at 840; SA-55-56.

The District Court's finding that Plaintiff did not state breach of fiduciary duty claims against the Selling Defendants under *Brophy* because Plaintiff had "not adequately alleged the second element of *Brophy*" was erroneous because it was based on a misinterpretation of Delaware law.  *See* SA-54-55.

2.    **The District Court Departed from the Applicable Standard of Review, Which Led It to Erroneously Determine that Plaintiff Lacked Standing**

In dismissing Plaintiff's Complaint under Rule 23.1, the District Court improperly failed to consider Plaintiff's allegations in totality, failed to draw all reasonable inferences in Plaintiff's favor, and failed to undertake the "context-specific" analysis of Plaintiff's Complaint that was required in evaluating the Motion to Dismiss. *See Halebian*, 590 F.3d at 203; *Ashcroft*, 556 U.S. at 678-79. The District Court also inappropriately considered the allegations of ***other*** complaints and documents outside the Complaint offered by Nominal Defendant Facebook for the purpose of disputing Plaintiff's allegations.

On a motion to dismiss, a court may only consider documents outside the complaint where they are incorporated by reference in, or otherwise "integral to the complaint[,]" ***and*** it is "clear that there exist no material disputed issues of fact regarding the relevance of the document." *DiFolco*, 622 F.3d at 111 (quotation omitted). Where, as here, the District Court's "opinion includes several pieces of information that appear to have come only from" a document outside the Complaint, and the District Court's "analysis would have been lacking without the information derived from" these materials, the issue should be considered on summary judgment. *Fagin v. Gilmartin*, 432 F.3d 276, 284-85 (3d Cir. 2005); *see also Halebian v. Berv.*, 644 F.3d 122, 130 (2d Cir. 2011) *aff'd*, 548 Fed. Appx. 641

(2d Cir. 2013) (when "matters outside the pleadings are presented to and not excluded by the court, the motion ***must*** be treated as one for summary judgment under Rule 56, in order to ensure that the party against whom the motion to dismiss is made may respond").

The District Court relied heavily upon facts contained in Facebook's Prospectus and various iterations of the Registration Statements – documents that were submitted by Defendant. *See, e.g.*, SA-5-7 (citing Registration Statement, Vol. III, JA-484-714; Prospectus, Vol. VI, JA-1106-108). In considering these documents as "facts" that were critical to its analysis of Plaintiff's Complaint, the District Court did not undertake any analysis of whether these documents were properly before the Court when it was considering Plaintiff's allegations. Instead, the District Court appears to have relied upon other complaints in determining that these documents were properly considered in analyzing Plaintiff's allegations. *See, e.g.*, SA-6 (referencing Registration Statement, Vol. III, JA-484-714, and citing Childs Cpt., Vol. I, JA-68-69 (¶28); Levy Cpt., Vol. I, JA-176 (¶47)); SA-7 (referencing Prospectus, Vol. VI, JA-1106-108; citing Levy Cpt., Vol. I, JA-176-77 (¶¶48-49)); *see also* SA-46, n.18 ("As Plaintiff Childs explains….").

The District Court failed to conduct even a basic analysis of whether these documents were properly before the Court with respect to Plaintiff's Complaint. Although the Offering Documents were referenced in Plaintiff's Complaint, they

were not "integral" to Plaintiff's allegations. *See DiFolco*, 622 F.3d at 111. They were referenced only for the purpose of showing the Director Defendants'[17] knowledge of nonpublic information that was not disclosed in these documents, and to provide context for Plaintiff's *Brophy* claims against the Selling Defendants. *See, e.g.*, Vol. I, JA-123 (¶7), 133-37 (¶¶42-46), 141-43 (¶¶55-62). The District Court acknowledged as much, referring to Plaintiff's Complaint in noting that Plaintiff alleged that "the Facebook Defendants failed to disclose that the Company was, at the time of the IPO, experiencing a reduction in revenue growth… [yet] took no action to stop" the improper stock sales. SA-10 (citing Cole Cpt., Vol. I, JA-135 (¶45)). The District Court nonetheless inappropriately referred to the content of these documents to resolve disputed factual issues, which is improper on a Motion to Dismiss even when a document is properly considered by the court (which these were not). *See DiFolco*, 622 F.3d at 111.

The District Court's departure from the applicable standard of review led it to make improper factual findings and to erroneously conclude that the Complaint "require[d] dismissal under Rule 23.1" because Plaintiff's allegations did not satisfy Rule 23.1(b)(3)'s demand requirement or Rule 23.1(b)(1)'s contemporaneous ownership requirement. SA-65.

---

[17] "Director Defendants" refers to defendants Zuckerberg, Thiel, Breyer, Andreessen, Graham, Hastings, and Bowles.

**a.    The District Court Improperly Resolved a Disputed Factual Issue Relating to Plaintiff's Allegations That Demand Was Futile Because the Director Defendants Lacked Disinterestedness**

The District Court found that Plaintiff's allegations did not "support an inference that the Board possessed information that was materially different from what existed in the marketplace" because Defendants "repeatedly made express and extensive warnings in the Company's Registration Statement, drafts of the Registration Statement and in its final Offering Documents about the trend of increased use of mobile applications." *See* SA-54-55, (citing Registration Statement (Apr. 23, 2012), Vol. V, JA-850; Prospectus, Vol. V, JA-1107-108)). The District Court's determination that the Director Defendants did not possess any material nonpublic information was based on the factual content of the Offering Documents, which contradicted Plaintiff's allegations. *See id.*; *cf.* Vol. I, JA-123 (¶7), 133 (¶40), 134-38 (¶¶44-48), 141-43 (¶¶55-62).

Because the District Court inappropriately resolved this disputed factual issue in Defendants' favor, it failed to analyze Plaintiff's allegations that the Director Defendants breached their fiduciary duties by allowing the Selling Defendants to benefit from this information without regard for whether this was in the Company's best interest.   Vol. I, JA-123 (¶¶6, 7), 133 (¶¶40, 42), 141 (¶¶55-61).   This prevented the District Court from undertaking any evaluation of

Plaintiff's claims that demand was futile under the second prong of *Aronson* because the Board's decision to permit the Selling Defendants' breaches of loyalty was not a valid exercise of business judgment rule, or because the Director Defendants faced a substantial likelihood of liability and were interested under *Rales* or *Aronson*'s first prong. This, in turn, led the District Court to erroneously conclude that Plaintiff's breach of fiduciary duty claims could only have arisen before the IPO and that Plaintiff did not have standing to assert his derivative claims because he did not contemporaneously own stock at the time of the purported wrongdoing. *See* SA-42 ("under the contemporaneous ownership rule, 'the timing of the allegedly wrongful transaction must be determined by identifying the wrongful acts which [plaintiffs] want remedied and which are susceptible of being remedied'") (alteration in original) (quoting *7547 Partners v. Beck*, 682 A.2d 160, 162 (Del. 1996) ("*Beck*")).

> **b.    The District Court Improperly Resolved Disputed Factual Issues Relating to Plaintiff's Allegations of Contemporaneous Stock Ownership**

The District Court acknowledged that Plaintiff did "'not challenge the price of the IPO or the misconduct that occurred before the IPO[,]' but instead contend[s] that all 'alleged wrong here happened on the date of the IPO ….'" *See* SA-41

(citing Opp. to the Motion to Dismiss, Vol. I, JA-42 (Dkt. No. 42) (at 22-24).[18]

The District Court nonetheless appears to have adopted Defendants' interpretation of the wrongful conduct Plaintiff sought to remedy, determining that "the essence of the [Complaint] is that the Board allowed Facebook to file a Registration Statement that did not disclose its internal revenue projections." SA-64 (citing Cole Cpt., Vol. I, JA-123 (¶5), 137-39 (¶¶48-51)).[19]

The District Court improperly considered the allegations of other complaints that did not contain any allegations of insider sales as support for this mischaracterization of Plaintiff's claims. SA-64 (citing Childs Cpt., Vol. I, JA-63 (¶2), 69-75 (¶¶33-36). The District Court also inappropriately referred to documents outside the Complaint offered by Defendants, finding that "[t]he Offering Documents… declared that the Board had approved of the Selling Defendants selling their shares to the underwriting syndicate before they became

---

[18] Nominal Defendant first asserted in its Motion to Dismiss that "[t]he 'wrong' in which the Directors are alleged to have 'knowingly participated' is the filing of a registration statement that was supposedly defective under federal securities laws." Motion to Dismiss at 18, Vol. I, JA-7 (Dkt. No. 24) (citing Vol. I, JA-127-28 (¶¶20-23), 151 (¶96)).

[19] Nominal Defendant Facebook argued to the District Court that "[t]he crux of Plaintiffs' Complaints is that the Directors allowed Facebook to file a Registration Statement that did not disclose its internal revenue projections." Reply to Motion to Dismiss at 17, Vol. I, JA-52 (Dkt. No. 143) (citing Cpt., Vol. I, JA-123 (¶5), 137-38 (¶¶48-51)). The District Court cited to only five paragraphs in Plaintiff's Complaint as support for its finding – the same paragraphs referenced by the Nominal Defendant. SA-64 (citing Vol. I, JA-123 (¶5), 137-38 (¶¶48-51)).

available in the open market." SA-43-44 (citing Registration Statement, Vol. III, JA-654-58). Based upon this finding, the District Court held that Plaintiff could not have standing to assert any breach of fiduciary duty claims because Plaintiff had not alleged that he acquired his shares "before May 18, 2012, the day of the IPO." SA-40 (citing Vol. I, JA-124 (¶12)).[20]

The District Court also improperly referred to documents outside the Complaint to inappropriately resolve a factual dispute regarding the timing of the Selling Defendants' stock sales. The District Court found that "all sales of stock by the Selling Defendants were not sold on the open market, but instead, as the Offering Documents disclosed, sold to the underwriters." SA-45-46. Thus, the District Court found that Plaintiff "had no derivative standing to allege that a

---

[20] The District Court relied on *Beck*, 682 A.2d at 162-63, in holding that Plaintiff could not establish standing through contemporaneous ownership. *See* SA-43-46; SA-45-46 ("[H]ere, as in *Beck*, the alleged misconduct was completed with the approval of the allegedly misleading Registration Statement, which went into effect the day before the IPO, and when the Offering Documents were disclosed to investors on the day of the IPO."). Although Plaintiff explained that the rationale of *Maclary v. Pleasant Hills, Inc.*, 109 A.2d 830 (Del. Ch. 1954), was applicable to Plaintiff's claims, *see* Opp. to the Motion to Dismiss, Vol. I, JA-42 (at 22, 23), the District Court erroneously found, based upon dicta in *Beck*, that "the *Beck* Court had "confined *Maclary* to the 'facts of that case.'" SA-45 (citing *Beck*, 682 A.2d at 162). The District Court overlooked that the Delaware Chancery Court had applied the "same logic" as *Maclary* in *Leung v. Schuler*, No. 17089, 2000 WL 264328, at *8 (Del. Ch. Feb. 29, 2000), perhaps simply because *Leung* was "an unpublished case." *See* SA-44. The Delaware Supreme Court has since cited *Leung* approvingly (albeit for a different proposition). *See Freedman v. Adams*, 58 A.3d 414, 416 n.3 (Del. 2013).

disclosure in the company's form S-1 was rendered misleading by a transaction on the eve of the IPO because [he] did not acquire [his] shares until the IPO, after the S-1 was already declared effective."  SA-41 (citing *Griggs v. Jornayvaz*, No. 09-cv-00629-PAB-KMT, 2010 WL 4932674, at *3-4 (D. Colo. Nov. 29, 2010).[21]  The District Court's reference to documents outside the Complaint to resolve this disputed issue of fact was inappropriate because Plaintiff did not reference these documents in alleging his contemporaneous stock ownership (Vol. I, JA-124 (¶12), and the Complaint did not contain any allegations suggesting that the timing of any stock sales or purchases should be considered at the pleading stage.  This issue should have been resolved on summary judgment, after all parties had the benefit of discovery sufficient to resolve this factual dispute.  *See Halebian*, 644 F.3d at 130 (when "matters outside the pleadings are presented to and not excluded by the court, the motion must be treated as one for summary judgment under Rule 56, in

---

[21] Plaintiff noted that statements in Facebook's Registration Statement contradicted Defendants' version of events, and indicated that "the sale of these shares did not occur 'before' the underwriters sold Facebook stock in the open market, because the listing – *i.e.*, sale – of this stock in the open market was itself a prerequisite to completion of the sale."  Vol. 1, JA-48 (at 22, n20).  Facebook's Registration Statement stated that the Underwriters agreed to purchase stock from Zuckerberg, Breyer, and Thiel (among others) pursuant to an agreement which "'provides that the obligations of the several underwriters to pay for and accept delivery of the shares… are subject to the approval of certain legal matters by their counsel and to certain other conditions, ***including the listing of our Class A common stock on the NASDAQ Global Select Market***."  *Id*. (alterations in original); Registration Statement, Vol. III, JA-654.

order to ensure that the party against whom the motion to dismiss is made may respond") (quotation omitted). Based upon these improper factual findings, the District Court erroneously determined that Plaintiff "*cannot* establish standing" because Plaintiff was not a shareholder at the time of the wrongdoing Plaintiff purportedly sought to remedy. SA-48.[22]

### 3. The District Court Misapplied Delaware Law Regarding Director Independence

While the District Court acknowledged that "'[i]ndependence" is a fact-specific'" issue that must be determined based on the "'particularized factual allegations of a stockholder complaint'" (SA-50-51) (quoting *Beam ex rel. Martha Stewart Living Omnimedia, Inc. v. Stewart*, 845 A.2d 1040, 1049-50 (Del. 2004); *Rales*, 634 A.2d at 934)), the District Court failed to analyze numerous critical facts alleged in Plaintiff's Complaint, an unfortunate byproduct of one dispositive ruling being issued regarding multiple derivative complaints containing different allegations. Vol. I, JA-146-79 (¶¶74-84).

---

[22] The District Court appears to have improperly applied a heightened pleading standard to Plaintiff's allegations of contemporaneous stock ownership, concluding that Plaintiff's allegations did not "*specifically* demonstrate" the Individual Defendants' "wrongdoing on the day of the IPO" and were "*general allegations* with no evidence of wrongdoing on May 18, 2012 specifically". *See* SA-47. The particularized pleading requirements of Rule 23.1(b)(3) do not apply to the allegations of contemporaneous stock ownership required by Rule 23.1(b)(1).

A director lacks independence where he cannot evaluate derivative claims "based on the corporate merits of the subject before the board rather than extraneous considerations or influences." *Aronson*, 473 A.2d at 816. Demand is futile where a plaintiff alleges facts suggesting that a majority of the directors are "beholden" to a controlling person or so under their influence that they would have trouble exercising autonomous discretion. *Rales*, 634 A.2d at 936-37.

The Delaware Supreme Court has adopted a "subjective" test to determine whether each "particular director … lacks independence because he is controlled by another." *Orman v. Cullman*, 794 A.2d 5, 24 (Del. Ch. 2002) (citing *Cinerama, Inc. v. Technicolor, Inc.*, 663 A.2d 1156, 1167 (Del. 1995)). In applying this test, courts have found it necessary to make a fact-specific determination of whether and to what extent the board of directors and/or the company are controlled by a dominant shareholder or director. *See, e.g.*, *Zimmerman ex rel. Priceline.com Inc. v. Braddock*, No. Civ. A. 18473-NC, 2002 WL 31926608, at *10 (Del. Ch. Dec. 20, 2002) ("Thus, my resolution of demand futility begins with a determination of which, if any, entities have been shown by the Plaintiff's particularized facts to be controlled or dominated by the interested Selling Defendants."); *Beam*, 845 A.2d at 1049 (independence is a "fact-specific" "[c]ontextual [i]nquiry").

The District Court erred by failing to evaluate Plaintiff's allegations regarding Zuckerberg's control (SA-58) in tandem with Plaintiff's allegations

concerning the relationships between Zuckerberg and the directors, which support the inference that the directors were beholden to him. *See Beam*, 845 A.2d at 1054 (recognizing that a stockholder's control of a corporation coupled with particularized allegations regarding the relations between directors and the controlling stockholder will excuse pre-suit demand). The District Court ignored or overlooked many significant facts alleged in the Complaint that demonstrate that demand was futile because Zuckerberg dominates and controls the Board.

> **a.** **The District Court Improperly Failed to Evaluate Plaintiff's Allegations Regarding Zuckerberg's Domination and Control**

The District Court appears to have ignored many of Plaintiff's allegations regarding Zuckerberg's domination and control, addressing only Plaintiff's allegations regarding Zuckerberg's stock ownership. SA-57. The District Court relied on *Aronson* for the proposition that "'even proof of majority of ownership of a company does not strip the directors of the presumptions of independence.'" SA-57 (quoting *Aronson*, 473 A.2d at 815). But *Aronson* makes clear that allegations of control, coupled with "facts as would demonstrate that through personal or other relationships the directors are beholden to the controlling person," will suffice to demonstrate a lack of independence. *See* 473 A.2d at 815; *see also In re eBay, Inc. S'holders Litig.*, No. C.A. 19988-NC, 2004 WL 253521, at *3 (Del. Ch. Feb. 11, 2004) (recognizing that defendants "control the company and

- 48 -

the election of directors" in concluding that demand was futile). The District Court improperly failed to address, and draw all reasonable inferences from Plaintiff's other allegations that establish Zuckerberg's domination and control.

Zuckerberg never intended to, nor even gave lip service to, ceding control of the Company. Facebook is a "controlled" company that the Board "determined [will] not … have an independent nominating function[.]" Vol. I, JA-147 (¶77). The Prospectus even acknowledged that "Zuckerberg' will have the ability to control the outcome of matters submitted to [] stockholders for approval, including the election of [] directors ….'" Vol. I, JA-147 (¶76). Defendants Andreessen, Graham, and Hastings were "elected as designees" of Zuckerberg, (Vol. I, JA-148 (¶80), and Zuckerberg's position on the nominating committee gives him further control – he can "either entrench the current members that act in accordance with his wishes, or appoint new members to do his bidding." *Id*.

Zuckerberg also has a history of dominating the Board and doing as he pleases without any substantive Board oversight or control—by way of example, he negotiated Facebook's $1 billion purchase of Instagram over the course of a weekend, with no more than a "largely symbolic" vote from the Board. Vol. I, JA-147-48 (¶79). As Columbia Law School Professor John Coffee stated, "'[p]retending that Facebook will have an independent board … is like putting rouge on a corpse.'" Vol. I, JA-146 (¶74).

> **b.** **The District Court Improperly Failed to Evaluate Plaintiff's Allegations Regarding the Directors' Relationships With Zuckerberg**

The District Court further erred by failing to conduct a director-by-director analysis of Plaintiff's allegations that Zuckerberg decided whether each director will retain his Board position and/or other ties with Facebook, and to evaluate whether those positions and relationships were material. SA-61-62; *see also* Vol. I, JA-148 (¶80); *eBay*, 2004 WL 253521, at *3 (analyzing the effect of defendant's control of the election of directors in concluding that they could not impartially consider a demand against the controlling party); *Orman*, 794 A.2d at 26-32 (conducting a director-by-director analysis of the materiality of the director's connections to the controlling party, and concluding that "it is reasonable to infer that $75,000 would be material to [a director] and that he is beholden to [the controlling party] for continued receipt of such fees"). The District Court also failed to apply the subjective "actual person" standard to Plaintiff's allegations.

> **(1)** **Defendant Andreessen Lacks Independence**

In analyzing Andreessen's sense of "owingness" to Zuckerberg after the Instagram deal (*see* Vol. I, JA-149 (¶84), the District Court simply compared Plaintiffs allegations with other generic business deals. SA-59-60. The District

Court did not undertake any analysis regarding whether there was reason to doubt that, subjectively, Andreessen's sense of "owingness" to Zuckerberg precluded him from objectively deciding whether or not to bring suit against Zuckerberg. *See id.*, 84; *Beam*, 845 A.2d at 1049. Andreessen has made millions of dollars through his business relationships with Zuckerberg. *Id.* at 84. Andreessen's venture capital firm, Andreessen Horowitz, invested in Facebook before it went public and realized tens or hundreds of millions of dollars in gains in connection with the IPO and its seed investment in Instagram, the company Facebook acquired for $1 billion. *Id.*

The District Court incorrectly concluded that Andreessen was not necessarily beholden to Zuckerberg because courts in certain other unrelated, factually distinct cases had not found that business dealings between two directors rendered one dependent upon the other. SA-60. The cases the District Court relied upon are inapposite because they did not involve controlling shareholders. The plaintiffs in *In re Goldman Sachs Grp., Inc. S'holder Litig.*, No. 5215-VCG, 2011 WL 4826104, at *9-12 (Del Ch. Oct. 12, 2011), alleged a lack of independence based on interlocking charitable and business ties between the company and certain of its board members, but they did not allege that a controlling shareholder had the ability to unilaterally sever those ties. *See generally id.* Similarly, in *Zimmerman*, 2002 WL 31926608, at *10, the court expressly based its holding that director fees

did not render the board member interested on the fact that there were no allegations that the company paying the fees was controlled by interested parties.[23] Absent from both *Goldman Sachs* and *Zimmerman* is the critical sense of "owingness" Andreessen felt due to the millions of dollars he has earned from various business relationships with Zuckerberg. It is reasonable to infer that the more than $100 million that Andreessen has reaped from transactions with Zuckerberg was material. Vol. I, JA-149 (¶84). *See, e.g.*, *In re Limited, Inc. S'holders Litig.*, No. Civ. A. 17148-NC, 2002 WL 537692, at *5 (Del. Ch. Mar. 27, 2002) (finding $1.8 million received by a director from employment by the controlling party is material to the controlled director).

### (2)  Defendant Bowles Lacks Independence

The District Court improperly rejected Plaintiff's allegations that defendant Bowles lacks independence from Zuckerberg on the ground that other courts have presumed, generally, that directors can remain objective even if tangential harm to a company with which they are affiliated is threatened. SA-61 (citing *Jacobs v.*

---

[23] "If one concludes for purposes of this motion, as I have, that the Complaint contains insufficient particularly facts from which an inference may be drawn that [the interested directors] controlled [the company], the allegations as to [the director in question's] principal employment with Allen & Co. and the consulting fees that Allen & Co received from [the company] fail to rebut the presumption that [the director in question] would have acted independently as well." *Zimmerman*, 2002 WL 31926608, at *10.

- 52 -

*Yang*, No. 206-N, 2004 WL 1728521, at *6 (Del. Ch. Aug. 2, 2004) *aff'd*, 867 A.2d 902 (Del. 2005). The District Court cited the *Jacobs* court's statement that the existence of contractual relationships between the company on whose board the director serves and other companies with whom that director is affiliated does not necessarily render the director non-independent. SA-61. However, the *Jacobs* court explicitly based its reasoning on the fact that there were no allegations in that case that the interested directors of Yahoo! could exercise control over Yahoo! or Yahoo!'s relationship with the director's companies. *Jacobs*, 2004 WL 172852, at *6.[24]

*Jacobs*' rationale does not apply here because Plaintiff alleged particularized facts demonstrating Zuckerberg's domination and control and his ability to terminate Facebook's relationship with Morgan Stanley. Defendant Bowles sits on the Board of Morgan Stanley, one of the Underwriters that selectively disseminated non-public information it received from Facebook. Vol. I, JA-149 (¶83). Bowles' pursuit of a claim against Zuckerberg relating to the IPO would not

---

[24] In addition, the court in *Jacobs* found that Yahoo!'s contractual agreements with the director's companies were merely licensing agreements valued at less than $1 million and, therefore, were not necessarily material to those companies. *Jacobs*, 2004 WL 172852, at *5-6. In contrast, Plaintiff's Complaint details the extensive work Morgan Stanley completed as Facebook's lead underwriter, and the value of this relationship with a powerful company with a market capitalization approaching $200 billion. Vol. I, JA-122-23 (¶¶4-5), 138 (¶50), 139-41 (¶53), 149 (¶83).

only jeopardize his relationship with Zuckerberg, it would also jeopardize his position at Morgan Stanley, by putting Morgan Stanley's valuable position as investment banker to Facebook, a $200 billion dollar company, at risk, and by subjecting Morgan Stanley to litigation risk relating to the IPO.  *Id*.  Taken together, Plaintiff's allegations raise reason to doubt that Bowles is independent from Zuckerberg.  *Beam*, 845 A.2d at 1049; *see Cal. Pub. Emps.' Ret. Sys. v. Coulter*, No. Civ. A. 19191, 2002 WL 31888343, at *9 (Del. Ch. Dec. 18, 2002) (concluding that even if, viewed separately, personal friendships, outside business ties, and contributions to the challenged action do not raise a reasonable doubt, when taken together, they do raise a reasonable doubt as to the director's independence and disinterestedness).

The District Court erred by failing to consider Plaintiff's independence allegations in their totality.  The Complaint adequately alleges that demand was futile because a majority of the Board lacked independence from director Zuckerberg.

### D.  The District Court Erred in Dismissing Plaintiff's Action on Ripeness Grounds

"'"Ripeness" is a term that has been used to describe two overlapping threshold criteria for the exercise of a federal court's jurisdiction.'"  *In re Methyl Tertiary Butyl Ether Prods. Liab. Litig.*, 725 F.3d 65, 109 (2d Cir. 2013) (quoting *Simmonds v. I.N.S.*, 326 F.3d 351, 356-57 (2d Cir. 2003).  The first such

- 54 -

requirement—which is referred to as "constitutional ripeness"—is drawn from Article III limitations on judicial power. *Id*. The second such requirement—which is referred to as "prudential ripeness"—is drawn from prudential reasons for refusing to exercise jurisdiction. *Id*. at 110.

The doctrine of constitutional ripeness "prevents a federal court from entangling itself in abstract disagreements over matters that are premature for review because the injury is merely speculative and may never occur." *Id*. (quotation omitted). This aspect of the ripeness doctrine overlaps with the standing doctrine, "most notably in the shared requirement that the plaintiff's injury be imminent rather than conjectural or hypothetical." *Id*. (quotation omitted). "In most cases, that a plaintiff has Article III standing is enough to render its claim constitutionally ripe." *Id*.

The doctrine of prudential ripeness allows a court to determine "'that the case will be better decided later.'" *Id*. (quoting *Simmonds*, 326 F.3d at 357). Prudential ripeness is "'a tool that courts may use to enhance the accuracy of their decisions and to avoid becoming embroiled in adjudications that may later turn out to be unnecessary.'" *Id*. In determining whether a claim is prudentially ripe, the court asks "'whether [the claim] is fit for judicial resolution'" and "'whether and to what extent the parties will endure hardship if decision is withheld.'" *Id*. (quoting *Simmonds*, 326 F.3d at 359).

Here, the District Court began its discussion by outlining the standards for "constitutional" ripeness. *See* SA-65-66 ("ripeness is a 'constitutional prerequisite' to the exercise of jurisdiction by federal court") (quoting *Nutritional Health Alliance v. Shalala*, 144 F. 3d 220, 225 (2d Cir. 1998)); "a dispute may only be adjudicated when there is 'a real, substantial controversy between parties having adverse legal interests, a dispute definite and concrete, not hypothetical or abstract'" (quoting *Motor Vehicle Mfrs. Assoc. v. N.Y. State Dept. of Envtl. Conservation*, 79 F. 3d 1298, 1305 (2d Cir. 1996))). Instead of a discussion about the constitutional ripeness of Plaintiff's claims, however, the District Court proceeded to apply the test for "prudential" ripeness. SA-66-67 (noting that the Court "must make a fact-specific evaluation of 'both the fitness of the issues for judicial decision and the hardship to the parties of withholding court consideration'") (quoting *United States v. Fell*, 360 F. 3d 135, 139 (2d Cir. 2004)). The District Court considered and relied upon these strictly "prudential" concerns, which are irrelevant to the issue of Article III ripeness. The District Court improperly applied the test for prudential ripeness, which addresses the timing in which—not whether—a court will adjudicate a matter, in determining to dismiss Plaintiff's Action. *See N.Y. Civil Liberties Union v. Grandeau*, 528 F.3d 122, 131 (2d Cir. 2008); *Methyl*, 725 F.3d at 110 (The doctrine of prudential ripeness allows

- 56 -

a court to determine "'that the case will be better decided later.'") (quoting *Simmonds*, 326 F.3d at 357).

Constitutional ripeness requires only a showing that Facebook, the real party in interest in this derivative action, has suffered an "injury in fact." *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992). The injury in fact requirement is satisfied by "proof of some damage" flowing from a defendant's wrongful conduct. *Zenith Radio Corp. v. Hazeltine Research, Inc.*, 395 U.S. 100, 114 n.9 (1969). Plaintiff has easily satisfied that requirement here.

The crux of Plaintiff's Action, and Plaintiff's primary allegation of damages to Facebook, concerns the nearly $4 billion of insider sales proceeds reaped by Defendants Zuckerberg, Breyer, and Thiel. Vol. I, JA-123 (¶7), 133 (¶40), 141-43 (¶¶55-62), 151 (¶95), 152 (¶¶104-06). The primary relief Plaintiff seeks is the disgorgement of those billions of dollars in insider trading proceeds. *Id.*; Vol. I, JA-119 (§§C-D). Facebook's corporate assets have already been misappropriated for Defendants' personal gain, and Facebook's entitlement to disgorgement of those proceeds is in no way "speculative" or uncertain. Indeed, the Delaware Supreme Court has recognized that disgorgement of profits derived from insider selling is a viable remedy independent and distinct from any other remedies a corporation may seek, and that actual harm to the corporation is not required for a Plaintiff to state a claim under *Brophy* because it is inequitable to permit the fiduciary to profit from

using confidential corporate information. *Kahn*, 23 A.3d at 836-40. The focus of a *Brophy* claim is "on preventing a fiduciary wrongdoer from being unjustly enriched," and the remedy for disgorgement of ill-gotten gains exists under Delaware law "irrespective of arguably parallel remedies grounded in federal securities law." *Id*. at 840.

Plaintiff also alleged other damages that have already been suffered by Facebook as a result of Defendants' wrongdoing, including: (i) harm to Facebook's business reputation, corporate image, and goodwill, which has impaired the Company's ability to raise equity capital and debt on favorable terms; (ii) costs already incurred in investigating and defending Facebook and certain officers and directors in connection with litigation stemming from the Defendants' wrongdoing; and (iii) harm to the Company's market capitalization. Vol. I, JA-143-44 (¶¶63-65). Under Delaware law a claim for "[d]amage to one's business and reputation is a cognizable injury for which damages may be awarded if the underlying charges are proved." *In re Cendant Corp. Deriv. Action Litig*., 189 F.R.D. at 135; s*ee also Sonkin v. Barker*, 670 F. Supp. 249 (S.D. Ind. 1987) (refusing to dismiss derivative complaint on ripeness grounds where plaintiffs alleged "damages for [the company's] expenditures for legal and other professional fees, its loss of present and future business opportunities, its increased interest expense, its difficulty in obtaining credit and raising funds via issuance of public

securities, and the harm to its business reputation and standing in the community");

*In re RasterOps Corp. Sec. Litig.*, No. C-92-20115-RMW-EAI, 1993 WL 476651, at *3 (N.D. Cal. Sept. 10, 1993) (recognizing, separate and apart from alleged damages arising from concurrent lawsuits, "allegations of present injury caused by defendants' breach of their fiduciary duties," including reputational harm to the company).

Plaintiff has alleged cognizable "injuries in fact" already suffered by Facebook—damages that are neither premature nor speculative—as well as *Brophy* insider trading claims that may stand regardless whether the Company suffered any actual harm. The District Court erred in dismissing the Action on ripeness grounds.

## VII.  CONCLUSION

The Judgment of the District Court dismissing the Complaint (the reasons for which are stated in the District Court's Opinion dated February 13, 2013) should be reversed and the Action should be remanded to California State Court.

Dated: August 11, 2014                      Respectfully submitted,

ROBBINS ARROYO LLP
FELIPE J. ARROYO
SHANE P. SANDERS

*/s/ Shane P. Sanders*
SHANE P. SANDERS

600 B Street, Suite 1900
San Diego, CA 92101
Telephone: (619) 525-3990

Facsimile: (619) 525-3991
farroyo@robbinsarroyo.com
ssanders@robbinsarroyo.com

THOMAS G. AMON
LAW OFFICES OF THOMAS G.
  AMON
250 West 57th Street, Suite 1316
New York, NY 10107
Telephone: (212) 810-2430
Facsimile: (212) 810-2427
tamon@amonlaw.com

*Counsel for Plaintiff–Appellant–
Cross-Appellee William Cole*

974538

## <u>CERTIFICATE OF COMPLIANCE</u>

1.    This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B)(iii) because it has 13,819 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii).

2.    This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in a proportionally spaced typeface using Microsoft Word in 14-point Times New Roman.

Dated: August 11, 2014

*/s/ Shane P. Sanders*
SHANE P. SANDERS

# SPECIAL APPENDIX

**i**

## INDEX OF CONTENTS

**Document**                                                   **Page**

Opinion Order: *IPO Sec. & Derivative Litig.*, Case No. 1:12-md-02389 (S.D.N.Y. Feb. 13, 2013)..............................................................SA-1

*In re Facebook, Inc., IPO Sec. & Derivative Litig.*, Case No. 1:12-md-02389 (S.D.N.Y. Apr. 22, 2014).....................................................SA-71

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:
DATE FILED: 2-13-13

------------------------------------x

IN RE FACEBOOK, INC., IPO SECURITIES AND
DERIVATIVE LITIGATION,

OPINION & ORDER
MDL No. 12-2389

Case Relates to:
   12 Civ. 4156
   12 Civ. 7549
   12 Civ. 7553
   12 Civ. 7815

------------------------------------X

A P P E A R A N C E S:

        Attorneys for the Plaintiff Edward Childs
        GLANCY BINKOW & GOLDBERG LLP
        77 Water Street, 7th Floor
        New York, NY 10005
        By:  Gregory Linkh, Esq.
             Michael M. Goldberg, Esq.

        MURRAY FRANK LLP
        275 Madison Avenue, Suite 801
        New York, NY 10016
        By:  Brian Philip Murray, Esq.

        BARRACK, RODOS & BACINE
        3300 Two Commerce Square
        2001 Market Street
        Philadelphia, PA 19103
        By:  Mark Robert Rosen, Esq.
             Stephen R. Basser, Esq.

        Attorneys for the Plaintiff Lidia Levy
        SCOTT & SCOTT
        405 Lexington Avenue, 40th Floor
        New York, NY 10174
        By:  Joseph P. Guglielmo, Esq.
             Deborah Clark-Weintraub, Esq.

1

LAW OFFICES OF SCOTT D. EGLESTON
12000 Biscayne Boulevard, Suite 220
North Miami Beach, FL 33181
By:  Scott D. Egleston, Esq.


Attorneys for Plaintiffs William Cole and
Hal Hubuschman
ROBBINS ARROYO, LLP
600 B Street, Suite 1900
San Diego, CA 92101
By:  Shane Sanders, Esq.
     Brian J. Robbins, Esq.
     Felipe J. Arroyo, Esq.
     Gina Stassi, Esq.


Attorneys for the Facebook Defendants
KIRKLAND & ELLIS LLP
601 Lexington Avenue
New York, NY 10022
By:  Andrew B. Clubok, Esq.
     Brant Warren Bishop, Esq.
     Elizabeth L. Deeley, Esq.
     James Francis Basile, Esq.
     Susan Elisabeth Engel, Esq.

WILLKIE FARR & GALLAGHER LLP
1875 K Street, N.W.
Washington, DC 20006
By:  Richard D. Bernstein, Esq.
     Tariq Mundiya, Esq.
     Todd G. Cosenza, Esq.
     Elizabeth J. Bower, Esq.

2

**Sweet, D.J.**

Plaintiffs William Cole ("Cole"), Hal Hubuschman ("Hubuschman") and Linda Levy ("Levy") (collectively, the "Plaintiffs") have moved to remand their shareholder derivative actions (the "Removed Actions")[1] to the Superior Court of the State of California, County of San Mateo (the "California State Court"), pursuant to 28 U.S.C. § 1447(c). Plaintiffs originally filed their respective complaints in the California State Court on behalf of shareholders, charging certain officers and directors of Facebook, Inc. ("Facebook" or the "Company") (collectively, the "Facebook Defendants")[2] with breach of their fiduciary duties, waste of corporate assets and unjust enrichment. Facebook Defendants removed the Removed Actions to the Southern District of New York and Plaintiffs now move to remand the case back to California State Court.

Facebook Defendants contend that certain threshold

---

[1] The Derivative Actions include: <u>Cole v. Zuckerberg, et al.</u>, No. 12-cv-7549 (removed 6/28/12); <u>Hubuschman v. Zuckerberg, et al.</u>, No. 12-cv-7553 (removed 6/28/12); and <u>Levy v. Zuckerberg, et al.</u>, No. 12-cv-7815 (removed 7/12/12), which were removed from the Northern District of California; and <u>Childs v. Zuckerberg, et al.</u>, No. 12-cv-4156 (filed 5/24/12), which was filed in this District.

[2] The Facebook Defendants include Facebook, Inc.; Mark Zuckerberg ("Zuckerberg"); Sheryl K. Sandberg ("Sandberg"); David A. Ebersman ("Ebersman"); David M. Spillane ("Spillane"); Marc L. Andreessen ("Andreessen"); Erskine B. Bowles ("Bowles"); James B. Breyer ("Breyer"); Donald E. Graham ("Graham"); Reed Hastings("Hastings"); and Peter A. Thiel ("Thiel").

grounds for dismissal should be considered before Plaintiffs'
motions to remand.  Facebook Defendants have accordingly moved
to dismiss Plaintiffs' Removed Actions as well as Plaintiff
Edward Childs' ("Childs," together with the Plaintiffs, the
"Derivative Plaintiffs") derivative action[3] (together with the
Removed Actions, the "Derivative Actions") on the independent
grounds of venue, standing and ripeness, pursuant to Rules
12(b)(1), 12(b)(3) and 12(b)(6) of the Federal Rules of Civil
Procedure, and the standing and demand requirements of Rule 23.1
of the Federal Rules of Civil Procedure.

        Upon the facts and conclusions set forth below,
Facebook Defendants' threshold grounds for dismissal will be
resolved first, and their motion to dismiss is granted on the
basis of standing and ripeness, but denied as to venue.  Having
granted Facebook Defendants' motion to dismiss, the Plaintiffs'
motions to remand are denied as moot.

I.  **Prior Proceedings and Facts**

        The facts and prior proceedings underlying this action
are set out in this Court's May 9, 2012 Opinion, In re Facebook

---

[3] Plaintiff Childs filed his action in the Southern District of New York on
May 24, 2012, basing jurisdiction on diversity pursuant to 28 U.S.C. § 1332
(a)(2).

4

IPO Secs. & Derivative Litig., 12 MDL No. 2389, --- F.R.D. ---,
2012 WL 6061862 (S.D.N.Y. Dec. 6, 2012), familiarity with which
is assumed.  Accordingly, only facts relevant to this action
will be provided below.

     The Derivative Actions arise out of events in
connection with the May 18, 2012 initial public offering ("IPO")
of Facebook.

     On February 1, 2012, in preparation for its IPO,
Facebook filed a Form S-1 Registration Statement with the U.S.
Securities Exchange Commission (the "SEC").  Facebook
subsequently amended the registration statement several times,
including on February 1, and April 23, 2012, before filing their
final Form S-1/A on May 16, 2012 (the "Registration Statement").[4]
The Registration Statement expressed caution about revenue
growth due to a rapid shift by users to mobile devices, stating
that,

     Based upon our experience in the second quarter of
     2012, to date, the trend we saw in the first quarter
     of [daily active users] increasing more rapidly than
     the increase in number of ads delivered has continued.
     We believe this trend is driven in part by increased
     usage of Facebook on mobile devices where we have only

_____

[4] All of Facebook's Form S-1 Disclosures, including amendments, and the SEC's
declaration of effectiveness are searchable on the SEC's EDGAR search
platform at http://www.sec.gov/edgar/searchedgar/webusers.htm.

recently begun showing an immaterial number of
sponsored stories in News Feed, and in part due to
certain pages having fewer ads per pages as a result
of product decisions.

(Clubok Decl. 11/14/12, Ex. E at 57; see also Childs Compl.

¶ 28, Levy Compl. ¶ 47).


    On May 15, 2012, General Motors announced that it was

pulling its advertising business from Facebook, stating that

Facebook ads were less effective than other forms of

advertising.  (Childs Compl. ¶ 29).  According to the Derivative

Plaintiffs' complaints, despite such negative news, Facebook's

final Registration Statement stated that the Company, "in

consultation with the underwriters," had increased the IPO price

range from between $28 and $35 to between $34 and $38 per share.

(Cole Compl. ¶ 47).


    In early May 2012, Facebook and its underwriters,

including three lead underwriters, Morgan Stanley & Co. LLC

("Morgan Stanley"), J.P. Morgan Securities, LLC ("JP Morgan"),

and Goldman, Sachs & Co. ("Goldman Sachs") (collectively, the

"Lead Underwriters"), participated in an IPO roadshow to provide

potential investors with information about Facebook.  On May 18,

2012, the Company filed a Form 424(b)(4) Prospectus (the

"Prospectus") with respect to the IPO (together with the

Registration Statement, the "Offering Documents").  The

Prospectus warned investors that,

> Growth in use of Facebook through our mobile products,
> where our ability to monetize is unproven, as a
> substitute for use on personal computers may
> negatively affect our revenue and financial results. .
> . .
>
> We generate a substantial majority of our revenue from
> advertising.  The loss of advertisers, or reduction in
> spending by advertisers with Facebook, could seriously
> harm our business.

(Clubok Decl. 12/5/12, Ex. 3; see also Levy Compl. ¶¶ 48, 49).


On May 18, 2012, the Company offered 421 million

shares of Facebook common stock to the public at $38.00 per

share on the NASDAQ stock exchange, thereby valuing the total

size of the IPO at more than $16 billion.


On May 19, 2012, the day after the IPO, Reuters

reported that Facebook "altered its guidance for research

earnings last week, during the road show, a rare and disruptive

move."[5]


On May 21, 2012, The New York Times reported that

---

[5] Nadia Damouni, Morgan Stanley Was A Control-Freak On Facebook IPO -- And It
May Have Royally Screwed Itself, BUSINESS INSIDER, May 19, 2012,
http://www.businessinsider.com/morgan-stanley-facebook-ipo-2012-5.

"[r]ivals involved in the Facebook underwriting process say that Morgan Stanley exerted an enormous amount of control over important aspects of the process" and "ignored some input about pricing."[6]  However, the article also stated that "others involved in the underwriting say that Morgan Stanley and other advisers held thousands of conversations with potential investors on what was a fair level, and that the $38 price was justified."[7]

Then, on May 22, 2012, prior to the start of trading, Reuters revealed that the Lead Underwriters had cut their earnings forecasts for the Company prior to the IPO, but that it was "unclear whether Morgan Stanley only told its top clients about the revised view or spread the word more broadly."[8]  That day, Facebook stock closed at $31.00 per share, which was 18.42% below the IPO price.

On May 22, 2012, Facebook's Restated Certification of Incorporation (the "Certificate") was filed with the Delaware

---

[6] Michael J. De La Merced, Evelyn M. Rusli and Susanne Craig, As Facebook's Stock Struggles, Fingers Start Pointing, THE NEW YORK TIMES, http://dealbook.nytimes.com/2012/05/21/as-facebooks-stock-struggles-fingers-start-pointing/.

[7] Id.

[8] Alistair Barr, Insight: Morgan Stanley Cut Facebook Estimates Just Before IPO, REUTERS, http://www.reuters.com/article/2012/05/22/us-facebook-forecasts-idUSBRE84L06920120522.

Secretary of State.  The original certificate of incorporation

(the "Original Certificate") had been filed in Delaware under

the corporate name TheFacebook, Inc. on July 29, 2004.  The

Certificate contained some amendments to the Original

Certificate, including Article IX, which contained a "Choice of

Forum" provision, stating:


> Unless the corporation consents in writing to the
> selection of an alternative forum, the Court of
> Chancery of the State of Delaware shall, to the
> fullest extent permitted by law, be the sole and
> exclusive forum for (1) any derivative action or
> proceeding brought on behalf of the corporation, (2)
> any action asserting a claim of breach of a fiduciary
> duty owed by, or other wrongdoing by, any director,
> officer, employee or agent of the corporation to the
> corporation or the corporation's stockholders, (3) any
> action asserting a claim arising pursuant to any
> provision of the General Corporation Law or the
> corporation's Restated Certificate of Incorporation or
> Bylaws, (4) any action to interpret, apply, enforce or
> determine the validity of the corporation's Restated
> Certificate of Incorporation or Bylaws or (5) any
> action asserting a claim governed by the internal
> affairs doctrine, in each such case subject to said Court
> of Chancery having personal jurisdiction over
> the indispensible parties named as defendants therein.
> Any person or entity purchasing or otherwise acquiring
> any interest in shares of capital stock of the
> corporation shall be deemed to have notice of and
> consented to the provisions of this ARTICLE IX.


(Clubok Decl. 11/14/12, Ex. B at Art. IX).


      Three out of four of the Derivative Actions were

originally filed in the California State Court.[9]  According to

the Derivative Plaintiffs' complaints, Facebook's executives

selectively disclosed to the Lead Underwriters that certain

negative trends were causing the Company's revenues to fall

short of earlier estimates for the second quarter of 2012 during

the roadshow.  The Lead Underwriters allegedly, in turn, reduced

their own earnings forecasts for the Company, and conveyed this

information to a select group of potential investors, but not to

the public at large.

     The Derivative Plaintiffs maintain that the Facebook

Defendants failed to disclose that the Company was, at the time

of the IPO, experiencing a reduction in revenue growth due to an

increase of users of its Facebook application and website

through mobile devices rather than a traditional personal

computer.  (Cole Compl. ¶ 45, Levy Compl. ¶ 49).  They allege

that the Facebook Defendants, despite knowledge of material,

non-public facts concerning Facebook's reduction in advertising

and declining internal revenue projections, took no action to

stop the IPO from taking place.  Other allegations involve the

---

[9] Plaintiff Hubuschman originally filed his Shareholder Derivative Complaint
for Breach of Fiduciary Duty, Waste of Corporate Assets, and Unjust
Enrichment in the California State Court on May 30, 2012.  Plaintiff Cole
originally filed his Shareholder Derivative Complaint for Breach of Fiduciary
Duty, Waste of Corporate Assets, and Unjust Enrichment in the California
State Court on May 31, 2012.  Plaintiff Levy originally filed her Shareholder
Derivative Complaint in the California State Court on June 13, 2012.

Offering Documents which allegedly contained improper statements
and projections in violation of applicable federal securities
and state laws.  In addition, according to the Plaintiffs'
complaints, individually-named Facebook Defendants Zuckerberg,
Breyer and Thiel (the "Selling Defendants") sold more than $3.9
billion worth of their personally held Facebook stock during the
IPO, with knowledge of the non-public facts concerning the
Company's declining advertising revenues and reduced earnings
forecasts.

        On June 28, 2012, Facebook Defendants removed the
Removed Actions to the Northern District of California (the
"California Federal Court"), asserting that the federal court
had original jurisdiction pursuant to 28 U.S.C. § 1331 and as a
"covered class action" under the Securities Litigation Uniform
Standards Act ("SLUSA").

        The following day, Facebook Defendants and the Lead
Underwriters filed a Second Amended Motion to Transfer and a
Schedule of Actions, which added the Derivative Actions to the
cases they sought to be transferred to the Southern District of
New York by the United States Judicial Panel on Multidistrict
Litigation (the "MDL Panel").  The Facebook Defendants also
filed motions to stay the three Removed Actions in California

11

pending the ruling by the MDL Panel on the transfer motion.

Plaintiffs timely filed motions to remand the Removed Actions to California State Court on August 1, 2012.  On August 3, 2012, Facebook Defendants filed a motion to dismiss the Removed Actions.  On August 10, 2012, Plaintiffs filed an administrative motion to extend the briefing schedule and hearing on Facebook Defendants' motion to dismiss until after the stay and the remand motions were decided.  The California Federal Court issued an order granting Plaintiffs' motion on August 15, 2012.

The parties briefed the stay and remand motions simultaneously.  On September 11, 2012, the California Federal Court issued an order granting the stay but declined to hear the remand motions due to the MDL's pending decision on transferring the actions.  The MDL Panel granted the motion to transfer to this Court on October 4, 2012, holding that "the securities and derivative actions allege that the Facebook and underwriter defendants violated federal securities laws by providing material nonpublic information to certain preferred investors, causing Facebook's stock price to decline . . . [and] [c]ertainly these actions share questions of fact."  In re Facebook, 2012 WL 4748325, at *2.

12

On November 7, 2012, this Court ordered a hearing to resolve the outstanding issues pertaining to the Derivative Actions.  (Dkt. No. 15).  On November 14, 2012, Plaintiffs filed the instant remand motions and Facebook Defendants filed the instant motion to dismiss.  Plaintiffs seek to have the Removed Actions remanded to California State Court.  Facebook Defendants seek dismissal of all four Derivative Actions on the independent threshold grounds of venue, standing and ripeness.  All motions were marked fully submitted on December 12, 2012.

I. **Subject Matter Jurisdiction and The Threshold Grounds for Dismissal**

A "federal court generally may not rule on the merits of a case without first determining that it has jurisdiction over the category of claim in suit (subject-matter jurisdiction) and the parties (personal jurisdiction)." Sinochem Int'l Co. Ltd. v. Malaysia Int'l Shipping Corp., 549 U.S. 422, 430-31, 127 S. Ct. 1184, 167 L. Ed. 2d 15 (2007).  "[T]he first and fundamental question is that of jurisdiction . . . This question the court is bound to ask and answer for itself, even when not otherwise suggested, and without respect to the relation of the parties to it." Steel Co. v. Citizens for a Better Environment, 523 U.S. 83, 94, 118 S. Ct. 1003, 140 L. Ed. 2d 210 (1998).

13

     The Second Circuit has reiterated that
"[j]urisdictional questions . . . should be addressed in the
first instance by the District Court." Central States Se. & Sw.
Areas Health & Welfare Fund v. Merck-Medco Manages Care, L.L.C.,
433 F.3d 181, 203 (2d Cir. 2005). "This is equally true in the
context of removal." Banco De Santander Central Hispano, S.A.
v. Consalvi Int'l Inc., 425 F. Supp. 2d 421, 424 (S.D.N.Y.
2006); Bakoss v. Certain Underwriters at Lloyds of London
Issuing Certificate No. 0510135, No. 10-CV-1455(DLI)(LB), 2011
WL 4529668, at *4 (E.D.N.Y. Sept. 27, 2011) ("This obligation
extends to removal cases.").

     While Article III courts generally adhere to the
principle "that a federal court may not hypothesize subject-
matter jurisdiction for the purposes of deciding the merits,"
the Supreme Court in Ruhrgas AG v. Marathon Oil Co. declined to
prescribe a strict mandatory "sequencing of jurisdictional
issues." 526 U.S. 574, 577, 119 S. Ct. 1563, 143 L. Ed. 2d 760
(1999). The Supreme Court noted that "[i]t is hardly novel for
a federal court to choose among threshold grounds for denying
audience to a case on the merits." Id. at 585. Thus, there is
"no underlying jurisdictional hierarchy," and a federal court
may adjudicate personal jurisdiction before considering a

14

challenge to subject matter jurisdiction.  Id. at 578.

        Plaintiffs assert that their remand motions must be
resolved first because this Court lacks subject matter
jurisdiction under 28 U.S.C. § 1331 to decide the Facebook
Defendants' motion to dismiss.  Plaintiffs contend that "[g]iven
the ease with which the jurisdictional question can be
adjudicated by this Court," "the Court, need not, and should
not, engage in . . .  [the] rigorous, complaint and plaintiff-
specific analyses of the merits of each derivative action"
necessary to resolve the other allegedly threshold issues.
(Hubuschman/ Cole Memo. – Motion to Remand at 10-11).  To
support their argument, Plaintiffs Hubuschman and Cole cite to
Studebaker-Worthington Leasing Corp. v. Michael Rachlin & Co.,
LLC, in which the court addressed a plaintiff's remand motion
before it considered the defendant's motion to transfer venue,
because it "must first decide the threshold question whether it
ha[d] subject matter jurisdiction over th[e] case."  357 F.
Supp. 2d 529, 533 (E.D.N.Y. 2004).  Plaintiffs urge that their
remand motions should similarly be addressed first.

        Facebook Defendants, on the other hand, contend that
this Court should "address the threshold grounds for dismissal
that Facebook raised its Dismissal Motion before it addresses

15

Plaintiffs' Remand Motions, because the dismissal issues are
logically antecedent to subject matter jurisdiction and because
it is most efficient and convenient to do so." (Def. Opp. –
Motion to Remand at 5).  The threshold grounds for dismissal
advanced by the Facebook Defendants include: (1) improper venue
in violation of an exclusive Delaware forum selection provision;
(2) lack of standing both for failure to make a demand on
Facebook's board of directors (the "Board") and because
Plaintiffs cannot allege or demonstrate that they owned Facebook
shares at the time of the alleged wrongdoing; and (3) lack of
ripeness because Plaintiffs' claims are expressly predicated on
speculative, future harm, i.e., that Facebook will lose the
civil Securities Act cases filed against it.  According to the
Facebook Defendants, "[a]ll of these issues can and should be
heard before Plaintiffs' Remand Motions."  (Id.).

        As an initial matter, Studebaker and the other cases
on which Plaintiffs rely for the proposition that remand must be
decided first, pre-date Sinochem.  (See Hubuschman/ Cole Memo. –
Motion to Remand at 6-11).  In Sinochem, the Supreme Court noted
that "[b]oth Steel Co. and Ruhrgas recognized that a federal
court has leeway to choose among threshold grounds for denying
audience to a case on the merits."  Sinochem, 549 U.S. at 431.
Such threshold non-merits grounds for dismissing a claim,

16

include determinations as to whether abstention is proper,
Spargo v. New York State Com'n on Judicial Conduct, 351 F.3d 65,
74 (2d Cir. 2003), whether a foreign tribunal is a more suitable
arbiter under the forum non conveniens doctrine, Sinochem, 549
U.S. at 434-35, or the resolution of "justiciability issues
before deciding whether jurisdiction is proper." [10]  Freund v.
Rep. of France, 592 F. Supp. 2d 540, 551 (S.D.N.Y. 2008).

     In Can v. United States, for example, the Second
Circuit noted that "justiciability is also a 'threshold
question,'" which a court may consider before subject matter
jurisdiction.  14 F.3d 160, 162 n.1 (2d Cir. 1994).  The Court
stated that "where, as appears to be true here, justiciability
may be a less knotty question than jurisdiction, we think it not
inappropriate to begin by examining that question." Id. (citing
to Bi v. Union Carbide Chemicals and Plastics Co., 984 F.2d 582
(2d Cir. 1993)) (rejecting an appeal on consideration of
standing, in advance of consideration of subject matter
jurisdiction); see also Pettus v. Morgenthau, 554 F.3d 293, 298
(2d Cir. 2009) (finding that "standing . . . is intended to be a
threshold issue at least tentatively decided at the outset of

---

[10] "Justiciability . . . is an umbrella-like term which finds beneath its
cover the various doctrines that shape and define our authority to act in
particular cases:  ripeness, standing, mootness, advisory opinion, and
political question." Jones v. Deutsch, 715 F. Supp. 1237, 1242 (S.D.N.Y.
1989).

the litigation.").

In addition to justiciability, courts have found
improper venue to be a non-merits-based determination.  See
Crotona 1967 Corp. v. Vidu Bro. Corp., No. 09-Civ-10627(NRB),
2010 WL 5299866, at *1 n.1 (S.D.N.Y. Dec. 21, 2010) (finding
that "[i]mproper venue is not the type of merits-based dismissal
which the Supreme Court has cautioned cannot take place before a
court has assured itself of subject matter jurisdiction."); see
also Shay v. Sight & Sound Sys., Inc., 668 F. Supp. 2d 80, 82
(D.D.C. 2009) (stating that "a court may decide questions of
venue before addressing issues of personal or subject matter
jurisdiction."); Fed. R. Civ. P. 41(b) (listing improper venue
among non-merits-based dismissals).

Accordingly, precedent indicates that, in appropriate
circumstances, a federal court has the discretion and leeway to
dismiss a case based on certain threshold issues prior to
addressing subject matter jurisdiction.  See Sinochem, 549 U.S.
at 431; Ruhrgas, 526 U.S. at 584-85; Can, 14 F.3d at 162 n.1.
In particular, the issues of venue, derivative standing and
ripeness are "the sort of 'threshold question[s]'" that "may be
resolved before addressing jurisdiction."  Tenet v. Doe, 544
U.S. 1, 6 n.4, 125 S. Ct. 1230, 161 L. Ed. 2d 82 (2005) (citing

18

cases). The fact that these threshold issues "may [ ] involve a brush with factual and legal issues of the underlying dispute" does not transform them into merits issues. Sinochem, 549 U.S. at 433.

In addition, procedural convenience, efficiency and judicial economy warrant consideration of the threshold dismissal issues first. As the Honorable Maxine M. Chesney of the Northern District of California ruled, the three Removed Actions and Childs "give rise to a number of common issues" including "whether the cases are improperly venued in any court other than a state court in Delaware, whether the cases are ripe to the extent they are based on a theory that Facebook, Inc. has suffered any injury by reason of defendants' alleged violation of federal securities laws, and whether plaintiffs lack standing to seek relief on behalf of Facebook, Inc." Hubuschman v. Zuckerberg, No. C-12-3366(MMC), 2012 WL 3985509, at *2 (N.D. Cal. Sept. 11, 2012).

Courts involved in multidistrict litigation have been cognizant of the numerous potential problems that may arise when such common issues are addressed. See e.g., See In re Integrated Resources, Inc., MDL No. 897, 1995 WL 234975, at *4 (S.D.N.Y. Apr. 21, 1995) ("It is a fundamental assumption of the

19

multidistrict system that having only one court sort out the
facts of complex and multi-faced transactions and occurrences
which have given rise to many competing legal claims well serves
the goal of judicial economy."); In re Allion Healthcare Inc.
Shareholders Litig., No. 5022-CC, 2011 WL 1135016, at *4 (Del.
Ch. Mar. 29, 2011) (identifying certain problems that may arise
in a multi-forum litigation including that "[d]efense counsel is
forced to litigate the same case — often identical claims — in
multiple courts.  Judicial resources are wasted as judges in two
or more jurisdictions review the same documents and at times are
asked to decide the exact same motions.  Worse still, if a case
does not settle or consolidate in one forum, there is the
possibility that two judges would apply the law differently or
otherwise reach different outcomes, which would then leave the
law in a confused state and pose full faith and credit problems
for all involved.").

        These concerns are implicated in the instant case
because even if the removed cases were remanded, the forum
selection, standing and ripeness issues in the related case
Childs would still require adjudication.  Adjudicating one case
while remanding others with "common issues" would be duplicative
and beget potentially conflicting rulings by this Court and the
California State Court.  Avoiding this inefficiency and

inconsistency further warrants the consideration of the
justiciability issues before the removal issues.  See Deep v.
XAC, LLC, No., 2007 WL 1308356, at *2 (W.D. Ky. May 2, 2007)
(stating that "since this court's consideration of venue is
inevitable, and its determination of personal jurisdiction is
not, judicial economy favors deciding the motion to transfer
before the motion to dismiss this action for lack of personal
jurisdiction."); Fixture Specialists, Inc. v. Global Const. Co.,
LLC., No. 3:07-CV-570, 2007 WL 3468997, at *1-2 (E.D. Va. Nov.
14, 2007) (citing Sinochem as authority for transferring case to
another federal district without considering whether it had
jurisdiction over the parties); Rollenhagen v. Int'l Speedway
Corp., No. 1:07-CV-818, 2007 WL 4324018, at *2-3 (W.D. Mich.
Dec. 7, 2007) (citing Sinochem as authority to rule on venue
issues before considering any asserted lack of jurisdiction).

        Taken together, considering that district courts have
the discretion to address non-merits threshold grounds for
dismissal before jurisdiction and that considerations of
judicial economy and consistency weigh in favor of the same, the
issues concerning venue and justiciability will be considered
first.

**II.  The Facebook Defendants' Motion to Dismiss is Granted**

21

Facebook Defendants contend that all four of the
Derivative Action should be dismissed pursuant to Rules
12(b)(1), 12(b)(3), 12(b)(6) and 23.1 of the Federal Rules of
Civil Procedure.  First, Facebook Defendants argue that the
Derivative Actions do not belong in this Court or the California
State Court, but rather that the forum selection clause mandates
that the Delaware Chancery Court must exclusively resolve all
corporate disputes.  Second, Facebook Defendants advance that
the Derivative Plaintiffs lack standing because their claims of
alleged misconduct predate their purchase of shares and because
they have no excuse for failing to make a demand on Facebook's
Board prior to bringing suit on the Company's behalf.  Third,
Facebook Defendants contend that SLUSA precludes litigation of
the Derivative Actions because they raise direct claims premised
on the same alleged federal securities violations as the
securities class actions pending before this Court and thus
qualify as "covered class action[s]" that may not "be maintained
in any State or Federal court by any private party."  15 U.S.C.
§ 77p(b).  Lastly, Facebook Defendants maintain that none of the
Derivative Plaintiff's claims are ripe because they seek only to
recover damages that could result if Facebook is found liable in
another proceeding.

22

In response, Derivative Plaintiffs insist that the forum selection clause is unenforceable as it was unilaterally adopted several days after the Company's IPO and therefore should apply only to shareholders who purchased or acquired their stock after May 22, 2012.  Second, Derivative Plaintiffs contend that they have demonstrated contemporaneous ownership of their stock to establish standing and that demand would have been futile because a majority of the Board lacks independence. Third, Derivative Plaintiffs maintain that SLUSA does not apply as their actions do not constitute covered class actions under the statute.  Finally, Derivative Plaintiffs contend that their claims are ripe because they allege current injuries in the form of reputational and legal costs, and not merely potential future liabilities.

These contentions raise a number of issues.  As discussed above, however, only threshold issues such as venue and justiciability may be considered prior to jurisdiction. Accordingly, Facebook Defendants' venue, standing and ripeness arguments are considered below.  This Court need not, and does not, reach on the other issues raised by the parties.

**A) <u>The Applicable Standards</u>**

23

The Rule 12(b)(3) and 12(b)(6) Standards

        Presumably in an abundance of caution, Facebook
Defendants have advanced arguments that the forum selection
clause is a threshold matter to be dismissed under Rule
12(b)(1), 12(b)(3) and 12(b)(6).  As the Second Circuit noted,
there is "no consensus developed as to the proper procedural
mechanism to request dismissal of a suit based upon a valid
forum selection clause."  New Moon Shipping Co., Ltd. v. MAN B &
W Diesel AG, 121 F.3d 24, 28 (2d Cir. 1997).  This Circuit has
"refused to pigeon-hole" claims based on forum selection into a
particular clause of Rule 12(b).  Asoma Corp. v. SK Shipping
Co., 467 F.3d 817, 822 (2d Cir. 2006).  However, "[a] forum-
selection clause does not divest a federal court of subject
matter jurisdiction, so it would not be appropriate to dismiss
this case pursuant to Rule 12(b)(1)."  Chiste v. Hotels.com
L.P., 756 F. Supp. 2d 382, 298 (S.D.N.Y. 2010).  "Courts in this
Circuit appear to prefer Rule 12(b)(3) as the procedural device
used to enforce a forum selection clause."  Nippon Express
U.S.A. (Ill.), Inc. v. M/V Chang Jiang Bridge, No. 06-CV-
694(PKC), 2012 WL 6019280, at *3 (S.D.N.Y. Dec. 13, 2007).  For
the sake of clarity and consistency, the Court will therefore
consider Facebook Defendants' motion pursuant to Rule 12(b)(3).

Rule 12(b)(3) provides that a defendant may move to dismiss a complaint on the grounds of improper venue.  See Fed. R. Civ. P. 12(b)(3).  A motion to dismiss for improper venue based on a forum selection clause is properly based on Rule 12(b)(3).  See Nippon Express, 2012 WL 6019280, at *3; see also Ferraro Foods, Inc. v. M/V IZZET INCEKARA, No. 01-CV-2682(RWS), 2001 WL 940562, at *3 n.1 (S.D.N.Y. Aug. 20, 2001).  A court may consider evidentiary matters outside the pleadings to resolve the jurisdictional issue.  See TradeComent.com LLC v. Google, Inc., 693 F. Supp. 2d 370, 375 n.3 (S.D.N.Y. 2010).  The burden on the party opposing enforcement of a forum selection clause "is analogous to that imposed on a plaintiff to prove that the federal court has subject matter jurisdiction over his suit or personal jurisdiction over the defendant."  New Moon Shipping, 121 F. 3d at 29.  Thus, courts apply the standard of review applicable to motions to dismiss for lack of jurisdiction, taking the facts in the light most favorable to the party resisting enforcement of the forum selection clause.  See id.

In considering a motion to dismiss pursuant to Rule 12(b)(6), the Court construes the complaint liberally, accepting all factual allegations as true and drawing all reasonable inferences in the plaintiff's favor.  Mills v. Polar Molecular Corp., 12 F.3d 1170, 1174 (2d Cir. 1993).  The issue "is not

whether a plaintiff will ultimately prevail but whether the
claimant is entitled to offer evidence to support the claims."
Villager Pond, Inc. v. Town of Darien, 56 F.3d 375, 378 (2d Cir.
1995) (quoting Scheuer v. Rhodes, 416 U.S. 232, 235-36, 94 S.
Ct. 1683, 40 L. Ed. 2d 90 (1974)).

    To survive dismissal, "a complaint must contain
sufficient factual matter, accepted as true, to 'state a claim
to relief that is plausible on its face.'"  Ashcroft v. Iqbal,
556 U.S. 662, 129 S. Ct. 1937, 1949, 173 L. Ed. 2d 868 (2009)
(quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570, 127 S.
Ct. 1955, 167 L. Ed. 2d 929 (2007)).  Plaintiffs must allege
sufficient facts to "nudge[ ] their claims across the line from
conceivable to plausible."  Twombly, 550 U.S. at 570.  "The
plausibility standard is not akin to a 'probability
requirement,' but it asks for more than a sheer possibility that
a defendant has acted unlawfully."  Cohen v. Stevanovich, 772 F.
Supp. 2d 416, 423 (S.D.N.Y. 2010).  Though the court must accept
the factual allegations of a complaint as true, it is "not bound
to accept as true a legal conclusion couched as a factual
allegation."  Iqbal, 556 U.S. at 678. (quoting Twombly, 550 U.S.
at 555).

The Rule 23.1 Standard

26

The derivative form of action permits individual shareholders of a corporation to bring an action on behalf of the corporation to protect the corporation's interests from "the misfeasance and malfeasance of faithless directors and managers." Kamen v. Kemper Fin. Servs., Inc., 500 U.S. 90, 95, 111 S. Ct. 1711, 114 L. Ed. 2d 152 (1991) (quoting Cohen v. Beneficial Loan Corp., 337 U.S. 541, 548, 69 S. Ct. 1221, 93 L. Ed. 1528 (1949)). "To prevent abuse of this remedy, however, equity courts established as a 'precondition for the suit' that the shareholder demonstrate that 'the corporation itself had refused to proceed after suitable demand, unless excused by extraordinary conditions'" and satisfy the requirement of standing. Id. (quoting Ross v. Bernhard, 396 U.S. 531, 534, 90 S. Ct. 733, 24 L. Ed. 2d 729 (1970)).

To establish standing nder Rule 23.1,[11] a shareholder's

---

[11] Rule 23.1 of the Federal Rules of Civil Procedure provides as follows:

> In a derivative action brought by one or more shareholders or members to enforce a right of a corporation or of an unincorporated association, the corporation or association having failed to enforce a right which may properly be asserted by it, the complaint shall be verified and shall allege (1) that the plaintiff was a shareholder or member at the time of the transaction of which the plaintiff complains or that the plaintiff's share or membership thereafter devolved on the plaintiff by operation of law, and (2) that the action is not a collusive one to confer jurisdiction on a court of the United States which it would not otherwise have. The complaint shall also allege with particularity the efforts, if any, made by the plaintiff to obtain the action the plaintiff desires from the

derivative complaint must allege that the "plaintiff was a
shareholder or member at the time of the transaction complained
of, or that the plaintiff's share or membership later devolved
on it by operation of law." Fed. R. Civ. P. 23.1.[12] In essence,
this "contemporaneous ownership rule" is a procedural
requirement that "denies a derivative plaintiff standing to
challenge transactions that occurred prior to the time the
plaintiff became a shareholder." Ensign Corp. v. Interlogic
Trace, Inc., No. 90-CV-3497, 1990 WL 213085, at *2 (S.D.N.Y.
Dec. 19, 1990). "The policies underlying the requirement are
twofold: (1) to prevent potential derivative plaintiffs from
'buying a lawsuit' by purchasing stock; and (2) to insure that
derivative actions are brought by shareholders who have actually
suffered injury and have an interest in the outcome of the
case." Id.

directors or comparable authority and, if necessary, from the
shareholders or members, and the reasons for the plaintiff's
failure to obtain the action or for not making the effort. The
derivative action may not be maintained if it appears that the
plaintiff does not fairly and adequately represent the interests
of the shareholders or members similarly situated in enforcing
the right of the corporation or association. The action shall not
be dismissed or compromised without the approval of the court,
and notice of the proposed dismissal or compromise shall be given
to shareholders or members in such manner as the court directs.

[12] Similarly, section 327 is the only provision in the Delaware General
Corporation Law (the "DGC"), 8 Del. Code § 327, which addresses derivative
actions. 2 Edward P. Welch, et al., Folk on the Delaware General Corporation
Law § 327.1, at GCL-XIII-42 (5th ed. 2010). It mirrors Rule 23.1 and
provides: "In any derivative suit instituted by a stockholder of a
corporation, it shall be averred in the complaint that the plaintiff was a
stockholder of the corporation at the time of the transaction of which such
stockholder complains or that such stockholder's stock thereafter devolved
upon such stockholder by operation of law." 8 Del. Code § 327.

        In addition to the standing requirement, Rule 23.1
provides that the complaint in a derivative suit must "allege
with particularity the efforts, if any, made by the plaintiff to
obtain the action the plaintiff desires from the directors or
comparable authority and, if necessary, from the shareholders or
members, and the reasons for the plaintiff's failure to obtain
the action or for not making the effort."  Fed. R. Civ. P. 23.1.

**B) <u>The Forum Selection Clause is Unenforceable as to the
    Derivative Plaintiffs</u>**

        The Second Circuit applies a four-part test in
determining whether to enforce a contractual forum selection
provision.  "The first inquiry is whether the clause was
reasonably communicated to the party resisting enforcement."
<u>Phillips v. Audio Active Ltd.</u>, 494 F.3d 378, 383 (2d Cir. 2007).
The second inquiry requires the Court "to classify the clause as
mandatory or permissive, i.e., to decide whether the parties are
<u>required</u> to bring any dispute to the designated forum or simply
<u>permitted</u> to do so." <u>Id.</u> (emphasis in original).  Part three
asks whether the claims and parties involved in the suit are
subject to the forum selection clause." <u>Id.</u>  If the forum
selection clause satisfies these first three criteria, "it is
presumptively enforceable." <u>Id.</u>

If a forum selection clause is prima facie valid, the party opposing its operation "bear[s] the heavy burden of making a 'strong showing' in order to overcome the presumption of validity. . . ." Eslwordwide.com, Inc. v. Interland, Inc., No. 06-CV-2503, 2006 WL 1716881, at *2 (S.D.N.Y. June 21, 2006); see also Reed & Barton Corp. v. M.V. Tokio Exp., No. 98-CIV-1079(LAP), 1999 WL 92608, *2 (S.D.N.Y. Feb. 22, 1999). "The fourth, and final, step is to ascertain whether the resisting party has rebutted the presumption of enforceability by making a sufficiently strong showing that 'enforcement would be unreasonable or unjust, or that the clause was invalid for such reasons as fraud or overreaching.'" Id. at 383-84 (quoting M/S Bremen v. Zapata Off-Shore Co., 407 U.S. 1, 15, 92 S. Ct. 1907, 32 L. Ed. 2d 513 (1972)). To the extent that a forum selection clause is vague or ambiguous, it will be construed against the party who drafted it. See JP Morgan Chase Bank, N.A. v. Reijtenbagh, 611 F. Supp. 2d 389, 391 (S.D.N.Y. 2009); Johns Insulation, Inc. v. Siska Const. Co., Inc., 671 F. Supp. 289, 295 (S.D.N.Y. 1987).

Article IX of Facebook's Certificate contains a forum selection provision requiring that the Delaware Chancery Court serve as the sole and exclusive forum for "any derivative action

30

or proceeding brought on behalf of the corporation." [13]   (Clubok

Decl. 11/14/12, Ex. B at Art. IX).  Facebook Defendants assert

that the forum selection provision is indisputably a contract

between Facebook and its shareholders because it was adopted as

a provision of Facebook's Certificate.  See M+J Savitt, Inc. v.

Savitt, No. 08-CV-8535(DLC), 2009 WL 691278, at *9 (S.D.N.Y.

Mar. 17, 2009) ("[A] company's certificate of incorporation and

by-laws in substance are a contract between the corporation and

its shareholders and among the shareholders inter se."

(citation and internal quotations omitted).  They contend that

the forum selection provision in Facebook's Certificate

satisfies all three criteria necessary to create a presumptively

enforceable forum selection provision, and that Derivative

Plaintiffs have made no showing to rebut that presumption.

      At the outset, some of the Derivative Plaintiffs claim

for the first time in their opposition papers that "Facebook did

not adopt the relevant forum selection provision until May 22,

---

[13] The Court takes judicial notice of the provisions of the Company's
certificate of incorporation for the purposes of this shareholder derivative
suit.  See, e.g., La. Mun. Police Employees Ret. Sys. v. Blankfein, No. 08-
CV-7605(LBS), 2009 WL 1422868, at *7 (S.D.N.Y. May 19, 2009) (taking judicial
notice of exculpatory provisions applying to directors in nominal defendant's
certificate of incorporation); Ferre v. McGrath, No. 06-CV-1684, 2007 WL
1180650, at *8 (S.D.N.Y. Feb. 16, 2007) (where plaintiff "left th[e]
significant fact" of the forum provision in certificate of incorporation out
of his derivative complaint, "the court may take judicial notice of the
existence of this provision").  A Court may also take judicial notice of
required disclosure statements on file with the SEC. See In re Merrill Lynch
& Co., 273 F. Supp. 2d 351, 356-57 (S.D.N.Y. 2003), aff'd, 396 F.3d 161 (2d
Cir. 2005).

2012 – four days following the IPO and Plaintiff's purchases of
her Facebook shares."  (Levy Opp. – Motion to Dismiss at 4);
(see also Hubuschman/ Cole Opp. – Motion to Dismiss at 10)
("Director Defendants adopted the exclusive forum clause after
the alleged wrongdoing occurred.").  However, it appears that
these plaintiffs are conflating the date Facebook adopted the
forum selection clause with the date that the Company filed its
Certificate with Delaware's Secretary of State.

        Under Delaware General Corporations Law § 242(b), an
amendment to a company's certificate of incorporation must first
be adopted through shareholder approval and only then may be
filed with the Secretary of State.  8 Del. Code Ann. § 242(b).
As disclosed in Facebook's SEC filings, the Company's pre-IPO
shareholders adopted the draft of the restated certificate by
written consent on April 21, 2012, nearly a month before
Derivative Plaintiffs purchased their shares.  (Clubok Decl.
12/5/12, Ex. 1).  That restated certificate draft included the
actual terms of the forum selection provision.  (See Clubok
Decl. 11/14/12, Ex. D, Ex. 3.3 to Apr. 23, 2012 Registration
Statement).  The first page of the draft also informed that "the
provisions of the Certificate of Incorporation of this
corporation as heretofore amended and/or restated, has been duly
adopted by the corporation's Board of Directors and by the

stockholders in accordance with Sections 242 and 245 of the

General Corporations Law of the State of Delaware, with the

approval of the corporation's stockholders having been given by

written consent without a meeting in accordance with Section 228

of the General Corporation Law of the State of Delaware." (Id.

at Ex. B).  As such, the forum selection clause was adopted by

the Company's Board and shareholders prior to the IPO and

Derivative Plaintiffs cannot assert otherwise.

        Turning to the four-part analysis to determine whether

to dismiss a claim based upon a forum selection clause, the

first and second steps of the analysis have been met.  Contrary

to the Derivative Plaintiffs' contention that they lacked notice

of the terms of the forum provision, Facebook Defendants have

more than met the first inquiry.  On February 1, 2012, Facebook

disclosed to all potential shareholders in the Prospectus, that

upon conclusion of its IPO, Facebook would amend its Certificate

to include a provision making the Delaware Chancery Court, the

exclusive forum for all derivative or intra-corporate disputes.[14]

Facebook disclosed the precise terms of the forum provision on

---

[14] Specifically:  "Our restated certificate of incorporation will provide that
the Court of Chancery of the State of Delaware will be the exclusive forum
for any derivative action . . . any action asserting a breach of fiduciary
duty . . . or any action asserting a claim against us that is governed by the
internal affairs doctrine."  (Facebook's S-1, 2/1/12, at 136 (attached as
Clubok Decl., Ex. C).

33

April 23, 2012, when it filed an amendment to its Registration

Statement and attached as Exhibit 3.3., the actual draft of the

Certificate that would be filed with the Delaware Secretary of

State upon conclusion of the IPO.[15]  (See Facebook's S-1,

4/23/12, at Ex. 3.3 (attached as Clubok Decl. 11/14/12, Ex. D).

The Prospectus also communicated that, "[o]ur restated

certificate of incorporation will provide that the Court of

Chancery of the State of Delaware will be the exclusive forum."

(Clubok Decl. 11/14/12, Ex. E).  Accordingly, the forum

selection clause was repeatedly and reasonably communicated to

Derivative Plaintiffs.

         As to the second prong, "[a] forum selection clause is

viewed as mandatory when it confers exclusive jurisdiction on

the designated forum or incorporates obligatory venue language."

Phillips, 494 F. 3d at 386.   Here, the forum selection clause

is mandatory, not permissive.  The provision states, in relevant

part, that "the Court of Chancery of the State of Delaware

shall, to the fullest extent permitted by law, be the sole and

exclusive forum" for the designated types of actions.  (Clubok

Decl. 11/14/12, Ex. B at Art. IX).  The use of the word "shall"

---

[15] At the beginning of the Registration Statement, Facebook expressly stated
that "[u]nless expressly indicated or the context requires otherwise, all
information of this prospectus assumes . . . the filing of our restated
certificate of incorporation . . . in connection with our initial public
offering."  (Clubok Decl. 11/14/12, Ex. E).

has been construed by courts to make such clauses "classically
mandatory." Crewe v. Rich Dad Educ., LLC, --- F. Supp. 2d ---,
2012 WL 3240185, at *21 (S.D.N.Y. Aug. 3, 2012).

Facebook Defendants, however, fail to meet the third
inquiry because the claims and parties involved in this suit
cannot be subject to the forum selection clause.  Facebook
Defendants contend that the provision expressly states that it
covers "(1) any derivative action or proceeding brought on
behalf of the corporation; (2) any action asserting a claim of
breach of a fiduciary duty owed by, or other wrongdoing by, any
director, officer, employee or agent of the corporation to the
corporation or the corporation's stockholders . . . or (5) any
action asserting a claim governed by the internal affairs
doctrine." (Clubok Decl. 11/14/12, Ex. B at Art. IX).  They
maintain that the Derivative Plaintiffs meet all three criteria
as they "(1) are styled as derivative actions (All Complaints ¶
1); (2) assert claims against Facebook's directors for breach of
fiduciary duty (Levy Compl. ¶¶ 80-87, 106-10; Cole Compl. ¶¶ 91-
97; Child Compl. ¶¶ 58-64); and (3) plead claims based on duties
allegedly owed to the company by its officers and directors that
are governed by the internal affairs doctrine." (Defendants'
Memo. – Motion to Dismiss at 11).

In opposition, Derivative Plaintiffs maintain that the
clause is unenforceable because it was adopted without their
consent and therefore constitutes an impermissible unilateral
modification, disallowed under Galaviz v. Berg, 763 F. Supp. 2d
1170 (N.D. Cal. 2011).  (Childs Opp. - Motion to Dismiss at 6-8;
Hubuschman/ Cole Opp. - Motion to Dismiss at 8-10).  The
Derivative Plaintiffs also advance that, under Delaware law and
under its express terms, the forum selection clause did not
become effective until May 22, 2012, when Defendant Zuckerberg
signed the Restated Certificate and filed it with the Delaware
Secretary of State.  (Childs Opp. - Motion to Dismiss at 4-6,
citing to Clubok Decl., Ex. B at 1; Hubuschman/ Cole Opp. -
Motion to Dismiss at 9 n.9).

In Galaviz, a case of first impression, the forum
selection clause was "unilaterally adopted" as a bylaw "by the
directors who are defendants in this action, after the majority
of the purported wrongdoing is alleged to have occurred, and
without the consent of existing shareholders who acquired their
shares when no such bylaw was in effect."  Galaviz, 763 F. 1174.
The Galaviz Court denied defendants' motion to dismiss on the
grounds of improper venue, holding that "[u]nder these
circumstances, there is no basis for the Court to disregard the
plaintiffs' choice of forum . . . " Id. at 1174-75.  The Court

36

reasoned that it would be inequitable to apply the forum clause

to plaintiffs, who had purchased their shares before the bylaw

was adopted and therefore had no notice of it.  The Court also

suggested that the result may have been different if the clause

were adopted in the company's certificate of incorporation,

after a shareholder vote.  See id. at 1174-75 & n.6 ("Certainly

were a majority of shareholders to approve such a charter

amendment, the arguments for treating the venue provision like

those in commercial contracts would be much stronger") and ("The

comment in Revlon that appears to have precipitated Oracle's

bylaw amendment specifically referred to 'charter provision . .

.'") (citing In re Revlon, Inc. S'holders Litig., 990 A.2d 940,

960 (Del. Ch. 2010)).


          Putting aside whether the reasoning in Galaviz should

now extend to certificates of incorporation,[16] the forum

selection clause here was adopted by the Board and approved by

Facebook's pre-IPO stockholders by written consent without a

meeting in accordance with Section 228 of Delaware General

Corporation Law.  (See Clubok Decl. 11/14/12, Ex. B).  As such,

_____
[16] The Court recognizes the considerable debate on the efficacy,
enforceability and desirability of the use of exclusive forum provisions and
declines to advance any position here.  See e.g., David Hernand and Thomas
Baxter, Under Fire:  Continued Attacks on Exclusive Forum Provisions May Slow
Adoption, 16 No. 5 M & A Law 12 (2012); Bonnie White, Note, Reevaluating
Galaviz v. Berg:  An Analysis of Forum-Selection Provisions in Unilaterally
Adopted Corporate Bylaws as Requirement Contracts, 160 U. Pa. L. Rev. PENNumbra
390 (2012).

there was no need to obtain consent from these Derivative
Plaintiffs to amend the Certificate, and therefore its adoption
does not constitute an impermissible unilateral modification.

Under Delaware law, however, a certificate of
incorporation, or any amendment to it, becomes effective only
"when filed with the Delaware Secretary of State." Blades v.
Wisehart, No. 5317-VCS, 2010 WL 4638603, at *3 (Del. Ch. Nov.
17, 2010); see also 8 Del. C. § 103(d) ("Any instrument filed in
accordance with subsection (c) of this section shall be
effective upon its filing date."). The Certificate here was
filed and thus became effective on May 22, 2012, four days after
the Company's IPO. (See Clubok Decl. 11/14/12, Ex. B). The
Original Certificate, filed on July 29, 2004, was therefore in
effect until the new filing and on the date of the IPO. In
addition, the fact that a corporation's may amend any proposed
amendment to a certificate of incorporation "at any time prior
to the effectiveness of the filing of the amendment with the
Secretary of State . . . ." further supports that the Original
Certificate was in effect until the Certificate's filing. 8
Del. C. § 242(c).

Facebook's S-1 Forms also stated that the proposed
revision to the Original Certificate, including the forum

38

selection clause, would take place once the Certificate became
effective.  (See Clubok Decl. 11/14/12, Ex. C) (stating that
"[o]ur restated certificate of incorporation will provide that
the Court of Chancery of the State of Delaware will be the
exclusive forum for any derivative action or proceeding brought
on our behalf . . . .") (emphasis added).  While such language
may have provided notice to prospective shareholders, it does
not become part of Facebook's charter until the date of the
Certificate's filing.  See 8 Del. C. § 103(d).

        Accordingly, the claims and parties involved in this
action are not subject to the forum selection clause in the
Certificate.  The Facebook Defendants' motion to dismiss based
on the forum selection clause and venue is therefore denied.


   **C) The Derivative Plaintiffs Cannot Establish Standing Nor
      Adequately Plead Demand Futility**

        Courts have reasoned that if "a books and records
demand is to investigate wrongdoing and the plaintiff's sole
purpose is to pursue a derivative suit, the plaintiff must have
standing to pursue the underlying suit to have a proper
purpose."  West Coast Mgmt. & Capital, LLC v. Carrier Access,
914 A.2d 636, 641 (Del. Ch. 2006).  Thus, "[i]f plaintiff would
not have standing to bring suit, plaintiff does not have a

proper purpose to investigate wrongdoing because its stated
purpose is not reasonably related to its role as a stockholder."
<u>Graulich v. Dell Inc.</u>, No. 5846-CC, 2011 WL 1843813, at *5 (Del.
Ch. May 16, 2011); <u>see In re Bank of N.Y. Derivative Litig.</u>, 320
F.3d 291, 298 (2d Cir. 2003) ("[A] plaintiff must have owned
stock in the corporation throughout the course of the activities
that constitute the primary basis of the complaint.").

        Derivative Plaintiffs do not plead that they acquired
their shares before May 18, 2012, the day of the IPO.[17]  To the
contrary, Derivative Plaintiffs admit that they purchased shares
in the public market the day of Facebook's IPO. (<u>See</u> Levy Compl.
¶ 18; Childs Compl. ¶ 5; Hubuschman/ Cole Opp. – Motion to
Dismiss at 21).  Instead, Derivative Plaintiffs contend that
they have demonstrated contemporaneous ownership because the IPO
itself occurred on May 18, 2012 and that the alleged wrongs
happened on the date of the IPO. (<u>See</u> Childs Opp. – Motion to
Dismiss at 16) (stating that the selling of the "IPO shares to

_____

[17] Plaintiffs Hubuschman and Cole alleges that each "was, at times relevant
hereto, an owner and holder of Facebook stock." (Hubuschman/ Cole Compl. ¶
12).  This does not satisfy the <u>Twombly</u> standard.  550 U.S. at 570.  Nor does
the vague allegation plead specific facts showing continuous and
contemporaneous share ownership.  <u>See Metcalf v. Zoullas</u>, No. 11-CV-
3996(AKH), 2012 WL 169874, at *3 (S.D.N.Y. Jan. 19, 2012) ("Because Rule 23.1
requires particularized allegations, the pleading standard is higher than the
standard is higher than the standard applicable to a pleading subject to a
motion to dismiss pursuant to Rule 12(b)(6)."); <u>see also In re Accuray, Inc.
S'holder Derivative Litig.</u>, 757 F. Supp. 2d 919, 926 (N.D. Cal. 2010)
("Plaintiffs generally allege that they were shareholders of 'Accuray at the
time of the continuing wrongs complained of herein.' This vague allegation
does not satisfy the strict standard of Rule 23.1.").

the public is the core wrongful conduct."); (Hubuschman/Cole
Opp. – Motion to Dismiss at 22-24) (stating that they "do not
challenge the price of the IPO or misconduct that occurred
before the IPO[,]" but instead contend that all "alleged wrong
here happened on the date of the IPO; namely the Director
Defendants' conscious inactions on the date the stock was
issued, not the Board's previous authorization of the IPO.").
Plaintiff Childs adds that the Facebook "Defendants' effort to
restate the Complaint as emphasizing acts preparatory to the IPO
as the core of wrongful conduct should be rejected." (Childs
Opp. – Motion to Dismiss at 15).

        Federal and Delaware courts have repeatedly held that
even plaintiffs who acquire shares during an IPO are not
permitted to bring derivative actions based on allegedly
wrongful conduct that took place before they acquired their
shares. In Grigs v. Jornayvaz, for example, the Court held that
plaintiffs had no derivative standing to allege that a
disclosure in the company's form S-1 was rendered misleading by
a transaction on the eve of the IPO because they did not acquire
their shares until the IPO, after the S-1 was already declared
effective. No. 09-CV-629-PAB-KMT, 2010 WL 4932674, at *3-4 (D.
Colo. Nov. 29, 2010) ("[Nominal Defendant's] stock was not
public until April 22, 2008. . . As a result, according to the

41

contemporaneous ownership rule, plaintiffs cannot base any of
their claims on transactions that took place prior to April 22,
2008").

          Additionally, the Delaware Supreme Court in 7547
Partners v. Beck established that, under the contemporaneous
ownership rule, "the timing of the allegedly wrongful
transaction must be determined by identifying the wrongful acts
which [plaintiffs] want remedied and which are susceptible of
being remedied by a legal tribunal." 682 A.2d 160, 162 (Del.
1996) (citation and internal quotations omitted). The Court
held that the derivative plaintiff lacked standing to challenge
the pricing terms, including an underwriter's discount, set
forth in its prospectus because she must have been a shareholder
at the time the terms "were established." Id. at 163. The
Court emphasized that the allegations in the complaint made
clear that the transaction for which the plaintiff sought a
remedy took place at the time of the terms, rather than at the
execution of the sale. Id. at 161-63.

          Similarly, here, the challenged disclosures were made
prior to the IPO and appeared in the Prospectus, which was
declared effective by the SEC, before the Derivative Plaintiffs
acquired their shares. (Facebook's S-1, 5/16/12, at 141-48

(Clubok Decl., Ex. E)).  As stated in the Derivative Plaintiffs'
complaints, Facebook Defendants' alleged failures include, among
other things, permitting Facebook to complete its IPO by
allowing for a misleading documents, including the Registration
Statement, to be filed and disseminated while knowing that a
select group of potential investors were privy to proprietary
information regarding the Company's projected earnings (Levy
Compl. ¶¶ 81-84; Childs Compl. ¶¶ 59-64; Hubuschman/ Cole Compl.
¶¶ 93-96); selling their Facebook stock with knowledge of the
non-proprietary, non-public projections (Levy Compl. ¶ 106-110;
Hubuschman/ Cole Compl. ¶¶ 94, 105); and other claims, such as
waste of corporate assets and insider trading, in connection
with the above (Childs Compl. ¶ 75; Levy Compl. ¶ 95;
Hubuschman/ Cole Compl. ¶ 99).

       It is undisputed that Facebook filed and signed its
Registration Statement, made all amendments to the Registration
Statement, and participated in an IPO roadshow with the Lead
Underwriters prior to May 18, 2012.  (Facebook's S-1, 5/16/12,
at 163-67 (Clubok Decl. 11/14/12, Ex. E)).  The Offering
Documents also declared that the Board had approved of the
Selling Defendants selling their shares to the underwriting
syndicate before they became available in the open market.
(Facebook's S-1, 5/16/12, at 163-67 (Clubok Decl. 11/14/12, Ex.

43

E).  The Offering Documents' terms were disclosed to investors
on the day of the IPO.  All of the above events occurred before
the Company and the Lead Underwriters issued shares to the
investing public, including the Derivative Plaintiffs, in the
IPO.  The alleged wrongful conduct is therefore not "the
technicality of [the IPO's] consummation" as Derivative
Plaintiffs now assert in their opposition papers, Beck, 682 A.2d
at 163, and they cannot assert that they were shareholders at
the time the terms of the challenged disclosures were made.

        Derivative Plaintiffs attempt to distinguish Beck by
citing to Maclary v. Pleasant Hills, Inc., 109 A.2d 830, 834
(Del. Ch. 1954) and Leung v. Shuler, No. 17089, 2000 WL 264328
(Del. Ch. 2000), an unpublished case, as instructive.  In those
cases, the Delaware Chancery Court held that the plaintiffs had
standing to pursue their claims as the issuance of the stock
itself was the alleged wrong.  Leung, 2000 WL 264328, at *8;
Maclary, 109 A.2d at 834.  They contend that their claims are
similar because, as in those cases, "the alleged wrong [was] the
issuance of the stock . . . rather than its authorization by the
board two months before."  (Hubuschman/ Cole Opp. – Motion to
Dismiss at 24) (citing to Leung, 2000 WL 264328, at *8).

        Specifically, in Maclary, the derivative action sought

44

the cancellation of 100 shares of stock allegedly issued without

consideration, and where the challenged shares had not been

issued until 3 years after the resolution and more than 1 year

after plaintiffs became equitable stockholders.  109 A.2d at

833.  Notably, the defendant directors were alleged to have

continued to act culpably after the plaintiffs had acquired

their shares by engaging in the complained-of issuance of

securities.  Id. at 833.  Moreover, the Beck Court confined

Maclary to the "facts of that case," in which plaintiffs were

seeking cancellation of the stock and alleging that the issuance

of the shares was unlawful.  Beck, 682 A.2d at 162.  Leung is

also distinguishable as the derivative claims were based on

exchange of shares during a merger, issued at a price allegedly

below fair market value, and in which an insider sale was not

disclosed to shareholders until after their shares had been

automatically converted.  Leung, 2000 WL 264328, at *3, 8.  In

such instances, the wrongdoing was the issuance of the stock

itself.


         By contrast, here, as in Beck, the alleged misconduct

was completed with the approval of the allegedly misleading

Registration Statement, which went into effect the day before

the IPO, and when the Offering Documents were disclosed to

investors on the day of the IPO.  For example, all sales of

45

stock by the Selling Defendants were not sold on the open market, but instead, as the Offering Documents disclosed, sold to the underwriters.[18]  Given that Plaintiffs Levy and Childs plead that they acquired their shares on the open market (Levy Compl. ¶ 18; Childs Compl. ¶ 5), and Plaintiff Cole admits that he did as well (Cole Opp. – Motion to Dismiss at 21), they cannot now establish standing through contemporaneous ownership when all of the alleged wrongs occurred prior to the acquisition of their shares.

Plaintiffs Hubuschman and Cole highlight the Board members' alleged conscious inactions on May 18, 2012 to support their standing argument.[19]  (Hubuschman/ Cole Opp. – Motion to Dismiss at 24) (citing to Hubuschman/ Cole Compl. ¶¶ 3, 46-47, 93, 96, 99, 100).  "Where a claim of directorial liability for corporate loss is predicated upon conscious inaction, '. . . only a sustained or systematic failure of the board to exercise such oversight – such as an utter failure to attempt to assure a reasonable information and reporting system exists – will

---

[18] As Plaintiff Childs explains, that is how IPOs work: "Facebook's investment bankers, serving as underwriters, were directly responsible for the distribution of the Facebook shares to the public and the development of the market for those shares."  (Childs Opp. – Motion to Dismiss at 18).

[19] The Court notes that allegations of conscious inaction are usually reserved for discussions of demand futility under the standard set in In re Caremark Int'l Inc. Derivative Litig., 698 A.2d 959 (Del. Ch. 1996), and addresses them to the extent that such discussion may be applicable to the issue of standing.

establish the lack of good faith that is a necessary condition
to liability.'" In re Veeco Instruments, Inc. Secs. Litig., 434
F. Supp. 2d 267, 276 (S.D.N.Y. June 14, 2006) (citing to
Caremark, 698 A.2d at 971). None of the allegations cited in
Plaintiffs Hubuschman and Cole's complaint specifically
demonstrate how the Facebook Defendants failed to take action in
the face of the knowledge of any alleged wrongdoing on the day
of the IPO. In fact, most of the cited-to allegations involve
alleged wrongdoing in connection with the Registration
Statement, (See e.g., Hubuschman/ Cole Compl. ¶¶ 3, 46-47, 99),
or are general allegations with no evidence of wrongdoing on May
18, 2012 specifically. (See e.g., Hubuschman/ Cole Compl. ¶¶
96, 100).

Derivative Plaintiffs also explicitly and implicitly
rely on the "continuing wrong" exception to the contemporaneous
ownership requirement to contend that the Facebook Defendants
engaged in a "continuing wrong" because they failed to cancel
the IPO. (Levy Opp. – Motion to Dismiss at 21-22; Childs Opp. –
Motion to Dismiss at 20; Cole Opp. – Motion to Dismiss at 23-
24). "This doctrine permits a derivative plaintiff to challenge
a corporate action that occurred before the plaintiff became a
shareholder if that action was part of a continuing fraud or
impropriety that was begun but not completed at the time the

plaintiff became a shareholder." <u>Ensign</u>, 1990 WL 213085, at *2.

Their complaints, however, are devoid of any specific allegations as to any "continuing fraud or impropriety." Moreover, "[t]he continuing wrong doctrine has not been universally adopted by the federal courts, and it has been invoked sparingly by those courts that have adopted it." <u>Id.</u> at *3. The Second Circuit has conceded that "it is unclear whether the doctrine is the law of this Circuit." <u>In re Bank of N.Y. Derivative Litig.</u>, 320 F.3d at 296; <u>Silverstein ex rel. Tetragon Financial Group Ltd. v. Knief</u>, 843 F. Supp. 2d 441, 445 (S.D.N.Y. 2012) (stating that the Second Circuit has "reject[ed] the continuing wrong doctrine adopted by some courts."). Thus, even if the complaints adequately alleged that they were continuously wronged, this Circuit does not appear to recognize the doctrine and has explicitly rejected the "expansive definition of the term 'transaction' that is inherent to the continuing wrong doctrine." <u>In re Bank of N.Y. Derivative Litig.</u>, 320 F.3d at 298.

Accordingly, because the Derivative Plaintiffs were not stockholders at the time the alleged wrongful transactions took place, they cannot establish standing for their derivative claims.

48

Moreover, even assuming that Derivative Plaintiffs could establish standing, in addition to the contemporaneous ownership rule, plaintiffs must also meet the demand requirement.  Fed. R. Civ. P. 23.  It is well established that demand requirements for a derivative suit are determined by the law of the state of incorporation.  See Kamen, 500 U.S. at 98–101.  Because Facebook is a Delaware corporation, the sufficiency of the Derivative Plaintiffs' demand futility allegations is analyzed under Delaware law.

Pursuant to Delaware law, a plaintiff in a shareholder derivative action must allege either: (1) that he has made a demand upon the corporation's board of directors to take the requested action; or (2) the reasons why such a demand upon the board would be futile.  See Rales v. Blasband, 634 A.2d 927, 930 (Del. 1993); Aronson v. Lewis, 473 A.2d 805, 808 (Del. 1984) overruled on other grounds by Brehm v. Eisner, 746 A.2d 244 (Del. 2000).  In order to sufficiently allege that a demand upon the board would have been futile, a plaintiff must present particularized facts showing that the board is "incapable of exercising its power and authority to pursue derivative claims directly."  White v. Panic, 783 A.2d 543, 551 (Del. 2001).  The plaintiff may not rely on mere conclusory allegations.  In re

inforUSA Inc. S'holders Litig., 953 A.2d 963, 985 (Del. Ch. 2007).  The pleading burden imposed by Rule 23.1 is a high hurdle for plaintiffs to clear.  McPadden v. Sidhu, 964 A.2d 1262, 1269 (Del. Ch. 2008) (noting that this burden "is more onerous than that demanded by Rule 12(b)(6).").

If a decision of the board of directors is being challenged in a derivative suit, a court may apply the Aronson test, under which a plaintiff must plead sufficient facts to raise a reasonable doubt that: "(1) the [majority of the] directors are disinterested and independent and (2) [that] the challenged transaction was otherwise the product of a valid exercise of business judgment." Aronson, 473 A.2d at 814.  Thus in order to survive dismissal, a complaint must allege facts that the corporate "officers and directors are under an influence which sterilizes their discretion, [so that] they cannot be considered proper persons to conduct litigation on behalf of the corporation." Id. at 813.

In some cases, however, the Delaware Supreme Court has recognized that the Aronson test does not apply, where a loss eventuates not from a board's decision but rather from considered inaction.  In these Caremark cases, "[a] court must determine whether or not the particularized factual allegations

of a stockholder complaint create a reasonable doubt that, as of the time of the complaint is filed, the board of directors could have properly exercised its independent and disinterested business judgment in responding to a demand." Rales, 634 A.2d at 934.

"Independence is a fact-specific determination made in the context of a particular case." Beam ex. Rel. Martha Stewart Living Omnimedia, Inc. v. Stewart, 845 A.2d 1040, 1049-50 (Del. 2004). Specific factual allegations that a director faces a "substantial likelihood of liability," for example, may establish a reasonable doubt as to a director's disinterestedness. Aronson, 473 A.2d at 815; Rales, 634 A.2d at 936. Allegations of facts supporting a reasonable inference that a director is so beholden to an interested party that his "discretion would be sterilized" also establish a reasonable doubt as to the director's independence. Rales, 634 A.2d at 936, citing Aronson, 473 A.2d at 815. A plaintiff is not required to prove success on the merits to show that a demand upon the board would have been futile. See Rales, 634 A.2d at 934.

Derivative Plaintiffs contend that Facebook's Board was not independent or disinterested for demand purposes because

(i) Defendants Zuckerberg, Breyer and Thiel face a substantial likelihood of liability for breach of fiduciary duty based on their allegedly improper stock sales and (Levy Compl. ¶ 78; Cole Compl. ¶ 70; Childs Compl. ¶¶ 47-56); (ii) the entire Board is dominated and controlled by Defendant Zuckerberg (Levy Compl. ¶ 78(c); Cole Compl. ¶ 76; Childs Compl. ¶ 55); and (iii) the entire Board has business connections that render them not independent and subject to a substantial likelihood of liability for various alleged misconduct (Levy Compl. ¶ 78; Cole Compl. ¶ 71).

First, Derivative Plaintiffs assert their claims for breach of fiduciary duty of loyalty under Brophy v. Cities Serv. Co., 70 A. 2d 5 (Del. Ch. 1949). They allege claims against the Selling Defendants because they purportedly "sold stock in the IPO on the basis of [material, non-public] information," namely Facebook's mid-quarter internal revenue projections. (Cole Opp. - Motion to Dismiss at 13-14; Levy Opp. - Motion to Dismiss at 13). Specifically, Plaintiffs Hubuschman and Cole contend that the Selling Defendants, as well as the entire Board, "knew that in the months leading up to the IPO, Facebook had experienced increased mobile usage of its website, which had caused negative trends in the Company's advertising business." (Hubuschman/ Cole Opp. - Motion to Dismiss at 13).

　　　　　To state a claim under <u>Brophy</u>, a plaintiff must allege
that: "1) the corporate fiduciary possessed material, nonpublic
company information; and 2) the corporate fiduciary used that
information improperly by making trades because she was
motivated, in whole or in part, by the substance of that
information." <u>In re Oracle Corp. Derivative Litig.</u>, 867 A.2d
904, 934 (Del. Ch. 2004). "This doctrine is not designed to
punish inadvertence, but to police intentional misconduct."
<u>Guttman v. Huang</u>, 823 A.2d 492, 505 (Del. Ch. 2003). "The
internal information known to the defendant can be hard, in the
sense of actual historical operating results, or soft, in the
sense of trends or projections." <u>Pfeiffer v. Toll</u>, 989 A.2d
683, 691 (Del. Ch. 2010) abrogated on other grounds by <u>Kahn v.
Kolberg Kravis Roberts & Co., L.P.</u>, 23 A.3d 831 (Del. Supr. June
20, 2011). Because <u>Brophy</u> claims "depend importantly on proof
that the selling defendants acted with scienter[,]" <u>Guttman</u>, 823
A.2d at 505, "Delaware courts . . . have been reluctant to
require disclosure of information that does not bear reliably on
firm value, particularly soft information such as projections of
performance or estimates of value." <u>In re Oracle</u>, 867 A.2d at
938 n. 149; <u>see also Repairman's Serv. Corp. v. Nat'l
Intergroup, Inc.</u>, No. 7811, 1985 WL 11540, at *8 (Del. Ch. Mar.
15, 1985) (stating that "[g]enerally, 'soft' information, such

as projections and estimates as to value, need not be disclosed due to their lack of reliability.").

Derivative Plaintiffs aver that their complaints plead with particularity that the Facebook Defendants knew, when they knew it, that they hid what they knew from the marketplace and then used what they knew as a motivation for profit on their trades. (Hubuschman/ Cole Opp. – Motion to Dismiss at 13). Facebook Defendants, however, repeatedly made express and extensive warnings in the Company's Registration Statement, drafts of the Registration Statement and in its final Offering Documents about the trend of increased use of mobile applications. (See e.g., Clubok Decl. 12/15/12, Ex. 2 (April 23, 2012 Registration Statement) at 14; Clubok Decl. 5/9/12, Ex. 3) (stating that "[t]he loss of advertisers, or reduction in spending by advertisers with Facebook, could seriously harm our business."). Thus, even if internal projections could be considered material to the IPO, Derivative Plaintiffs have not demonstrated that the Facebook projections would have "significantly altered the total mix of information in the marketplace[,]" considering that these disclosures were publicly disseminated. In re Oracle, 867 A.2d at 934 (internal quotations omitted).

Thus, contrary to their contention, Derivative
Plaintiffs have not alleged particularized facts that support an
inference that the Board possessed information that was
materially different from what existed in the marketplace.  Even
assuming the information was material and non-public, Derivative
Plaintiffs have not adequately alleged the second element of
Brophy to suggesting "that each sale by each individual
defendant was entered into and completed on the basis of, and
because of adverse material non-public information."  Guttman,
823 A.2d at 505 (internal quotations omitted).  According to the
Plaintiffs Hubuschman and Cole, allegations that a defendant
sold stock while in "knowing possession" of material non-public
information are sufficient at the pleading stage to establish
improper motivation and liability under Brody.  (Hubuschman/
Cole Opp. – Motion to Dismiss at 13) (citing cases).  However,
each of their cited cases found that improper motivation can be
inferred where the timing of the sales suggests that defendants
intentionally perpetrated, or took advantage of, a fraud.

For example, in Pfeiffer, the defendants publicly
projected revenue growth of 20 percent for the upcoming years
without any "reasonable basis in fact" and then, during that
same period, sold 14 million shares of their stock.  989 A.2d at
688-89.  The Court found that the defendants' trades were

"sufficiently unusual in timing and amount to support a
pleading-stage inference that the sellers took advantage of
confidential corporate information." Id. at 694.  Similarly, in
In re American Int'l Group, Inc., defendants sold their stock
while the company was "permeated by the frauds described
earlier, all of which, if known, would have made AIG a much less
attractive investment."  965 A.2d 763, 800 (Del. Ch. 2009); see
also In re Fossil, Inc., 713 F. Supp. 2d 644, 652 (N.D. Tex.
2010) (finding a strong inference of scienter where, "[s]pecific
to each Defendant, the [complaint] allege[d] the approval or
acceptance of backdated options, participation in or
responsibility for compensation and options as a committee
member, oversight of the Company's internal controls, and
approval of false financial statements.")

     In contrast, Derivative Plaintiffs here do not
explicitly allege any fraud or scienter adequately.  Unlike in
the cited cases above, the Selling Directors sold their stock in
the IPO.  Without more than generic accusations, "such sales
raise no inference of fraud" as "[e]arly investors and promoters
routinely sell stock in IPOs."  In re Prestige Brands Holding,
Inc., No. 05-CV-6924(CLB), 2006 WL 2147719, at *7 (S.D.N.Y. July
10, 2006).

Derivative Plaintiffs also allege that the Board is dominated and controlled by Zuckerberg, but have not alleged facts with specificity suggesting that he personally engaged in any wrongdoing that would render him "interested" for the purposes of this lawsuit.  See Rales, 634 A.2d at 936 ("To establish lack of independence, [a plaintiff] must show that the directors are 'beholden' to the [interested person]."  In addition, even if Derivative Plaintiffs adequately allege that Zuckerberg is interested, they must overcome the presumption that the Board acts independently of him." See Beam, 845 A.2d at 1048-49 (stating that "[t]he key principle upon which this area of our jurisprudence is based is that the directors are entitled to a presumption that they were faithful to their fiduciary duties.  In the context of presuit demand, the burden is upon the plaintiff in a derivative action to overcome that presumption.") (emphasis in the original).

In their complaints, Derivative Plaintiffs first rely on the fact that Zuckerberg controls over half of Facebook's voting shares and thus purportedly determines the composition of the Board.  (Hubuschman/ Cole Opp. - Motion to Dismiss at 16).  However, the Delaware Supreme Court has repeatedly held that "even proof of majority of ownership of a company does not strip the directors of the presumption of independence."  Aronson, 473

A.2d at 815; see also Beam, 845 A.2d at 1054 ("A stockholder's
control of a corporation does not excuse presuit demand on the
board . . . .").

Plaintiffs Hubuschman and Cole concede that
"controlling voting power alone may not be sufficient to
establish that a director lacks independence."  (Hubuschman/
Cole Opp. - Motion to Dismiss at 17 n.5).  Thus, the Derivative
Plaintiffs bolster their allegations by noting that members of
the Board have had past business dealings with Zuckerberg and
the Company.  (Levy Opp. - Motion to Dismiss at 14-16;
Hubuschman/ Cole Opp. - Motion to Dismiss at 17-18; Childs Opp.
- Motion to Dismiss at 13-15).  They contend that their
complaints sufficiently allege that the Board has "entangled
alliances with Zuckerberg, including material financial
interests, and that they depend upon Zuckerberg for their
continuing positions on the Board . . . ." (Hubuschman/ Cole
Opp. - Motion to Dismiss at 17) (citing to Hubuschman/ Cole
Compl. ¶¶ 80-84).

However, "[m]ere allegations that [directors] move in
the same business and social circles, or a characterization that
they are close friends, is not enough to negate independence for
demand excusal purposes.")  Beam, 845 A.2d at 1051-42.  Instead,

58

"a plaintiff must plead facts that would support the inference that because of the nature of a relationship or additional circumstance other than the interested director's stock ownership or voting power, the non-interested director would be more willing to risk his or her reputation than risk the relationship with the interested director."  Id. at 1052.

Derivative Plaintiffs fail to meet this burden.  They allege that Zuckerberg's unilateral decision to cause Facebook to acquire Instagram, Inc. ("Instagram") demonstrates his domination and control over the Board and that Andreessen felt "a sense of owingness" to Zuckerberg because Andreessen's venture capital firm made money on Facebook's acquisition of Instagram.  (Hubuschman/ Cole Opp. - Motion to Dismiss at 17; Childs Opp. - Motion to Dismiss at 14).  Derivative Plaintiffs aver that "[t]his material financial benefit is precisely the type that courts routinely find may instill in a director 'a sense of owingness' to another director, disabling him from considering a demand."  (Hubuschman/ Cole Opp. - Motion to Dismiss at 17) (citing to In re The Ltd., Inc. S'holder Litig., 2002 WL 537692, at *7 (Del. Ch. Mar. 27, 2002) (finding a director beholden to controlling director who gave a $25 million dollar gift to a university where the director was president.").

However, Derivative Plaintiffs do not allege that
Facebook paid more for Instagram than it was worth, or that the
acquisition was anything other than a business deal that
benefitted both parties.  Unlike a $25 million donation, which
is "a gift of  . . . magnitude [that] can reasonably be
considered as instilling . . . a sense of 'owingness[,]'"  In re
Ltd., 2002 WL 537692, at *7, the Instagram deal was a mutually-
beneficial business dealings.  Courts have found that such
dealings between two directors do not render one dependent upon
the other. See, e.g., In re Goldman Sachs Grp., Inc. S'holder
Litig., No. 5215-VCG, 2011 WL 4826104, at *9-12 (Del. Ch. Oct.
12, 2011) (rejecting argument that Goldman director lacked
independence because he was the Chairman and CEO of a company
that received billons of dollars in financing from Goldman);
Zimmerman v. Braddock, No. 18473-NC, 2002 WL 31926608, at *10
(Del. Ch. Dec. 20, 2002) (rejecting challenge to Priceline
director's independence despite employment with an investment
banking company that generated almost $1 million in fees from
Priceline).  Derivative Plaintiffs' conclusory claims that other
directors "also received material financial benefits from
Zuckerberg and, therefore, lack independence from him," fail for
the same reasons. (Cole Opp. – Motion to Dismiss at 18; accord
Levy Opp. – Motion to Dismiss at 14-15; Childs Opp. – Motion to
Dismiss at 13-15).

Derivative Plaintiffs also assert that Bowles is
conflicted because he sits on the board of Morgan Stanley and
"cannot be expected to objectively consider a demand, which
would undoubtedly focus on wrongdoing by Morgan Stanley, and
could jeopardize the business relationship between Facebook and
Morgan Stanley." (Childs Opp. - Motion to Dismiss at 14).
Plaintiff Childs also contends that Graham and Hastings are not
independent directors because they serve as CEOs of The
Washington Post and Netflix respectively, which are "major
advertiser[s]" with Facebook. (Childs Opp. - Motion to Dismiss
at 14-15).

Courts, however, have held that directors are
presumptively able to consider independently whether to take
legal action that could cause tangential harm to a company with
which they are affiliated. See Jacobs v. Yang, No. 206-N, 2004
WL 1728521, at *6 (Del. Ch. Aug. 2, 2004) (while the fact that a
decision relates to "companies that directors are affiliated
with potentially makes the board's decision more difficult, . .
. it does not sterilize the board's ability to decide.")
(internal quotation omitted), aff'd, 867 A.2d 902 (Del. 2005).
Instead, Plaintiff Childs cites a case under New York law which
found that a director lacked independence because "his small,

three attorney law firm earned . . . nearly $1 million [from the
company] during the two years prior to the filing of the
complaint." Tsutsui v. Barasch, 67 A.D.3d 896, 898 (N.Y. App.
Div. 2009).  This case is distinguishable because the complaints
here do not allege that Bowles, Graham or Hastings derived
direct personal benefit from Facebook's relationship with their
companies, much less one that is "of such subjective material
importance" that its "threatened loss might create a reason to
question whether the director is able to consider the corporate
merits of the [demand] objectively." Telxon Corp. v. Meyerson,
802 A.2d 257, 264 (Del. 2002).  Nor does Plaintiff Levy's
allegation that Morgan Stanley is "part of the lending team
supporting Facebook's revolving credit facility" bolster
Plaintiffs' case against Bowles.  (Levy Opp. – Motion to 16;
Levy Compl. ¶ 78(i)).  There are no facts alleged to suggest
that Bowles, Graham or Hastings would risk their reputations and
careers to protect their respective companies' relationship with
Facebook nor any facts that suggest that any of Facebook's
Defendants would have or threatened to severe their relations
with any of these companies.  Without such individualized
allegations, there is no basis to assume that these Facebook
Defendants did not act independently.

In addition, to the extent that the Derivative

62

Plaintiffs assert Caremark claims that "an unconsidered failure
of the board to act in circumstances in which due attention
would, arguably, have prevented the loss[,]"  698 A.2d at 967;
(see Hubuschman/ Cole Opp. – Motion to Dismiss at 24), the
Derivative Plaintiffs "must demonstrate that the directors
either knew or should have known that violations of the law were
occurring, and that they took no steps in a good faith effort to
prevent or remedy that situation."  In re Vecco, 434 F. Supp. 2d
at 276 (citing Caremark, 698 A.2d at 971) (noting that such
claims are "possibly the most difficult theory in corporate law
upon which a plaintiff might hope to win judgment.").

        Courts have found "facts that show [that] the company
entirely lacked an audit committee or other important
supervisory structures, or that a formally constituted committee
failed to meet[,] or "[a] claim that an audit committee or board
had notice of serious misconduct and simply failed to
investigate, for example, would survive a motion to dismiss."
David B. Shaev Profit Sharing Acct. v. Armstrong, No. 1449-N,
2006 WL 391931, at *5 (Del. Ch. Feb. 13, 2006).

        Here, no such facts have been alleged except
allegations that "Defendants Andreessen, Bowles, and Thiel, as
members of the Audit Committee, face a substantial likelihood of

personal liability for the issuance of Facebook's Registration

Statement."  Without more, these allegations are precisely the

type of conclusory statements that do not constitute a Caremark

claim.  Derivative Plaintiffs' complaints do not allege that

there was a lack of proper compliance systems in place, that

these systems failed to function, or that the Board was ever

presented with information which they chose to disregard.

Instead, the essence of the Derivative Plaintiffs' complaints is

that the Board allowed Facebook to file a Registration Statement

that did not disclose its internal revenue projections.  (Levy

Compl. ¶¶ 10,49; Cole Compl. ¶¶ 5, 48-51; Childs Compl. ¶¶ 2,

33-36).  Courts throughout the country have uniformly agreed

that "internal calculations and projections are not material

facts that are requires to be disclosed" in a registration

statement.  Sheppard v. TCW/DW Term Trust 2000, 938 F. Supp.

171, 177-78 (S.D.N.Y. 1996); see also In re N. Telecom Ltd. Sec.

Litig., 116 F. Supp. 2d 446, 458 (S.D.N.Y. 2000) ("The federal

securities laws do not obligate companies to disclose their

internal forecasts.") (internal quotations omitted); Rubke v.

Capitol Bancorp Ltd., 551 F.3d 1156, 1163 (9th Cir. 2009)

("[T]here is no duty to disclose income projections in a

prospectus."); Glassman v. Computervision Corp., 90 F.3d 617,

631 (1st Cir. 1996) ("The federal securities laws impose no

obligation upon an issuer to disclose forward-looking

information such as internal projections, estimates of future
performance, forecasts, busgets, and similar data.") (internal
quotations omitted).  These courts have followed the lead of the
SEC, which has consistently refused to adopt a rule that would
"require projections or other forward-looking information to be
included in [IPO] registration statements." Sec. Offering
Reform, 70 Fed. Reg. 44722, 44739 (Aug. 3, 2005).  Derivative
Plaintiffs do not cite to any authority holding that internal
revenue projections before an IPO must be disclosed or that such
nondisclosure is a violation of law, which the directors knew or
should have known and then disclosed.

Taken together, Derivative Plaintiffs made no demand
to the Board, failed to rebut the presumption that the majority
of the Board was interested and have not pled sufficient facts
demonstrating the Board's conscious inaction.  Accordingly,
Derivative Plaintiffs' failure to adequately plead demand
futility, as well as their inability to establish standing,
requires dismissal under Rule 23.1.

### D) Derivative Plaintiffs' Claims are Not Ripe

Ripeness is a "constitutional prerequisite" to the
exercise of jurisdiction by federal court.  Nutritional Health

Alliance v. Shalala, 144 F.3d 220, 225 (2d Cir. 1998).  The
ripeness doctrine provides that a dispute may only be
adjudicated when there is "a real, substantial controversy
between parties having adverse legal interests, a dispute
definite and concrete, not hypothetical or abstract."  Motor
Vehicle Mfrs. v. DEC, 79 F.3d 1298, 1305 (2d Cir. 1996)
(citations omitted); see also Pacific Gas & Elec. Co. v. State
Energy Resources Conservation and Dev. Comm'n, 461 U.S. 190,
203, 103 S. Ct. 1713, 75 L. Ed. 2d 752 (1983) (the ripeness
doctrine prevents the premature adjudication of issues that may
never arise.).  Consequently, "when resolution of an issue turns
on whether there are nebulous future events so contingent in
nature that there is no certainty there will ever occur, the
case is not ripe for adjudication."  Thomas v. City of New York,
143 F.3d 31, 34 (2d Cir. 1998) (internal quotation omitted).

        "In order to determine whether an issue is ripe for
adjudication, a court must make a fact-specific evaluation of
'both the fitness of the issues for judicial decision and the
hardship to the parties of withholding court consideration.'"
United States v. Fell, 360 F.3d 135, 139 (2d Cir. 2004).  A
claim is fit for review when it requires no further factual
development to crystallize the legal issues and aid the court in
resolving them.  Ohio Forestry Ass'n v. Sierra Club, 523 U.S.

726, 737, 118 S. Ct. 1665, 140 L. Ed. 2d 921 (1998); <u>Isaacs v.
Bowen</u>, 865 F.2d 468, 478 (2d Cir. 1989) ("The fitness inquiry is
concerned with whether the issues sought to be adjudicated are
contingent on future events or may never occur."). In assessing
the possible hardship to the parties, the court considers
"whether the challenged action creates a direct and immediate
dilemma for the parties . . ." outside the "mere possibility of
future injury" without the prospect of causing "present
detriment." <u>N.Y. Civil Liberties Union v. Grandeau</u>, 528 F.3d
122, 131 (2d Cir. 2008).

Derivative Plaintiffs maintain that their claims are
ripe because they have alleged damages to Facebook that have
already occurred. (Hubuschman/ Cole Compl. ¶¶ 51-54, 63-64;
Levy ¶¶ 68-71; Childs ¶¶ 41-42). Specifically, expenditures
include:

(a) Costs incurred in investigating and defending Facebook
and certain officers and directors in the class actions
for violations of federal securities laws; and

(b) Costs incurred from paying any potential settlement or
adverse judgment in the already eight filed class actions
for violations of federal securities laws.

(Hubuschman/ Cole Compl. ¶ 64). In addition, Derivative
Plaintiffs allege reputational harm as well as damages flowing
from the sale of Facebook stock by individual Facebook

Defendants. (Hubuschman/ Cole Compl. ¶ 65; Levy Compl. ¶¶ 68-71; Childs Compl. ¶ 42).

Courts have found damages unrecoverable where they are contingent "on the outcome of a class action suit in which no judgment had been entered or settlement reached." In re Cray Inc., 431 F. Supp. 2d 1114, 1133 (W.D. Wash. 2006). In In re Symbol Technologies Secs. Litig., the plaintiff, like the Derivative Plaintiffs, contended that defendants should "be liable for all costs incurred in defending the class action" against claims of violations of securities laws. 762 F. Supp. 510, 516 (E.D.N.Y. 1991). The Court held that "no injury has been sustained for which plaintiff may sue to recover" when "the damages claims . . . hinge entirely on the outcome of another pending action. . . ." Id. at 516-17.   Other courts have similarly found that "derivative claims are foreclosed when they merely allege damages based on the potential costs of investigating, defending, or satisfying a judgment or settlement for what might be unlawful conduct" and therefore "[p]laintiffs' damage allegations based on potential costs of the [securities] class action suits are insufficient to state a claim for relief." In re Cray Inc., 431 F. Supp. 2d at 1133-34; see Falkenberg v. Baldwin, No. 76-CV-2409, 1977 WL 1025, at *4 (S.D.N.Y. June 13, 1977) (derivative claim stemming from costs

68

associated with other litigation against company unripe because merits had yet to be determined).

In addition, "the showing of reputational harm must be concrete and corroborated, not merely speculative." Trudeau v. Federal Trade Comm'n, 384 F. Supp. 2d 281, 297 (D.D.C. 2005). Here, Plaintiff Childs cites to a Slate.com opinion piece as indicative of causing "significant reputational harm." (Childs Compl. ¶ 42). The article refers to "annoyed retail investors," and that Facebook "once viewed as a benign force . . . now risks being synonymous with Wall Street money-grubbing."[20] (emphasis added). The article speculates as to potential risks and the harm cited hardly rises to being "concrete and corroborated." Other alleged harms are similarly forward-looking and speculative. (See e.g., Cole Compl. ¶ 65 ("Facebook will suffer from what is known as the "liar's discount" . . . Facebook's ability to raise equity capital or debt on favorable terms in the future is now impaired."); Levy Compl. ¶ 71 ("Facebook will expend significant sums of money . . . .")) (emphasis added).

Thus, where "the claim of damages is contingent on the outcome of a separate, pending lawsuit, the claim is not ripe

---

[20] Rob Cox, One Reason for the Facebook IPO Mess: Zuckerberg Didn't Care, Slate.com, http://www.slate.com/blogs/breakingviews/2012/05/23/one_reason_for_the_facebook_ipo_mess_zuckerberg_didn_t_care_.html.

and the complaint must be dismissed."   In re United Telecomms.
Inc., Secs. Litig., No. 90-2251-EEO, 1993 WL 100202, at *3 (D.
Kan. Mar. 4, 1993) (dismissing derivative claims seeking
"damages that are speculative and contingent upon the outcome of
the class action."). Accordingly, because Derivative Plaintiffs
have not demonstrated that the alleged costs were caused by an
actual corporate wrong, which is not predicated on the
resolution of other litigation, their claims are not ripe and
therefore dismissed on this basis.


III. **Conclusion**


        Based upon the conclusions set forth above, the
Facebook Defendants' motion to dismiss is granted in part on the
grounds of standing and ripeness, and the Derivative Plaintiffs'
complaints are dismissed. Having dismissed the complaints,
Plaintiffs' motions to remand are denied as moot. Derivative
Plaintiffs are granted leave to replead within twenty days.


**New York, NY**
**February /2, 2013**

                              ROBERT W. SWEET
                                 U.S.D.J.


70

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| IN RE FACEBOOK, INC., IPO SECURITIES AND DERIVATIVE LITIGATION, | MDL No. 12-2389 <br> ECF Case |
| WILLIAM COLE, Derivatively on Behalf of Himself and All Others Similarly Situated, | Hon. Robert W. Sweet |
| Plaintiff, | Case No. 12 Civ. 7549 (RWS) |
| v. | ECF Case |
| MARK ZUCKERBERG, et al., | |
| Defendants, | |
| -and- | |
| FACEBOOK, INC., a Delaware corporation, | |
| Nominal Defendant. | |



**(~~PROPOSED~~) JUDGMENT**

**ORDERED, ADJUDGED AND DECREED**, that for the reasons stated in the Court's February

12, 2013 Opinion and Order, and in the April 17, 2014 Stipulation and Order, final judgment is

entered dismissing the action in its entirety.

DATED:     New York, New York
           April 2l, 2014

So Ordered:

_____
THE HONORABLE ROBERT W. SWEET

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:
DATE FILED: 4/22/14

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on August 11, 2014, I electronically filed Brief and Special Appendix for Plaintiff–Appellant–Cross-Appellee William Cole with the Clerk of the District Court for the United States Court of Appeals for the Second Circuit by using the appellate CM/ECF system. I certify that the aforementioned was thereby served on all counsel of record in this action through this Court's CM/ECF filing system.

Dated: August 11, 2014

<i>/s/ Shane P. Sanders</i><br>
SHANE P. SANDERS